# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
### ROANOKE DIVISION

| | | |
|---|---|---|
| **IVAN TELEGUZ,** | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| | ) | Case No. 7:10CV00254 |
| | ) | |
| v. | ) | **OPINION** |
| | ) | |
| **LORETTA KELLY, WARDEN,** | ) | By: James P. Jones |
| **SUSSEX I STATE PRISON,** | ) | United States District Judge |
| | ) | |
| Respondent. | ) | |

*Matthew C. Stiegler, Philadelphia, Pennsylvania, and Elizabeth Peiffer, Virginia Capital Representation Resource Center, Charlottesville, Virginia, for Petitioner; Katherine Baldwin Burnett, Senior Assistant Attorney General, Office of the Attorney General, Richmond, Virginia, for Respondent.*

A Virginia jury convicted Ivan Teleguz of the murder for hire of Stephanie Sipe, his former girlfriend and the mother of his child, and sentenced him to death. After unsuccessfully challenging his conviction and death penalty on direct appeal and in state collateral proceedings, Teleguz now petitions this court for a writ of habeas corpus.

Through his appointed attorneys, Teleguz raises a number of claims asserting that his conviction and sentence were unconstitutionally obtained. Among these claims, Teleguz contends that his trial counsel was ineffective at both the guilt and penalty phases, that prosecutors knowingly presented false evidence

and failed to disclose exculpatory evidence, and that the prosecution unfairly denied him access to consular assistance from the Ukraine, his native country. He also asserts that he is actually innocent of the murder.

After a careful review of the record, I find that Teleguz's claims are without legal merit and accordingly deny his petition.

The reasons for my decision follow.

## I.    FACTS.

In affirming Teleguz's conviction and sentence on direct appeal, the Supreme Court of Virginia summarized the facts in the light most favorable to the prosecution as follows:

> During the summer of 2001, Teleguz hired Edwin Lee Gilkes, Jr., and Michael Anthony Hetrick to kill Sipe, who was Teleguz's ex-girlfriend and the mother of his young child. On July 21, 2001, Teleguz, driving his car, took Gilkes and Hetrick from their apartment in Lancaster, Pennsylvania, to Harrisonburg, Virginia, where Sipe lived. Teleguz told Hetrick he wanted Sipe's "throat cut" and "to make sure she was dead." Once in Virginia, Teleguz waited in the car while Gilkes and Hetrick went into a Wal-Mart. Hetrick purchased a fillet knife, which Teleguz approved as a suitable murder weapon. Teleguz took the men to Sipe's apartment complex and pointed out her apartment. They then drove the car to a parking lot near Sipe's residence, where Gilkes and Hetrick got out of the car. Teleguz told the men to "wait until he had time to get back to Pennsylvania."

> After waiting several hours, Gilkes and Hetrick walked back to Sipe's apartment complex. Hetrick approached Sipe's apartment

alone and gained entry by asking to use the telephone. Once in the apartment, Hetrick killed Sipe by cutting her throat. In the course of the attack, Hetrick injured his hand. Hetrick went to the bathroom to clean his hand and was surprised to find Sipe's infant son "in the bathtub with the water running." Hetrick turned off the water and left the apartment. Gilkes and Hetrick returned to Pennsylvania by bus.

On the evening of July 23, 2001, Sipe's mother, Pamela Y. Woods, went to her daughter's apartment because she had not heard from Sipe during the previous two days and was unable to reach her by telephone. When Woods entered the apartment, she found Sipe's body in the front room and began screaming for help. Woods then found Sipe's twenty-three month-old son in the bathroom of the apartment, with the bathtub full of water. The child was unharmed. In response to Woods' screams, Mark Edwin Moore, a neighbor, went to Sipe's apartment and, after placing a blanket over Sipe's body, took Woods and her grandson out of the apartment.

The medical examiner testified that Sipe suffered a number of cuts described as defensive wounds, as well as three other wounds. The first, according to the medical examiner, was a superficial wound. The second wound was a "stabbing wound," which affected the area "all the way from the left side of the neck . . . to the right side of the neck" and consisted of a cut to Sipe's windpipe and esophagus. The medical examiner also testified that the third wound, the fatal wound, was a "cutting wound" which consisted of a cut approximately two and one-half inches deep into Sipe's trachea, larynx, and a major artery on the right side of Sipe's neck, which was completely severed.

At the crime scene, the Harrisonburg police discovered blood that did not belong to Sipe. Investigator Kevin A. Whitfield learned from Sipe's family members that Teleguz was the father of Sipe's son and that he was currently living in Pennsylvania. Investigator Whitfield also learned that relations between Sipe and Teleguz had been strained, and that Teleguz was upset about a court order

requiring him to pay child support. On July 24, 2001, Investigator Whitfield interviewed Teleguz at Teleguz's residence in Pennsylvania. Teleguz denied any involvement in the murder, and stated he had been in Pennsylvania since July 20, 2001.

On December 14, 2001, Investigator Whitfield, assisted by Pennsylvania State Police, executed a search warrant on Teleguz. Police collected samples of Teleguz's blood, hair, and saliva. Testing revealed that Teleguz was not the source of the blood found at Sipe's apartment.

Also in 2001, Investigator Whitfield interviewed Mark Moore who told Whitfield that he had seen an unknown person around Sipe's apartment prior to her murder. When shown a photograph array that included a photograph of Teleguz, Moore told Investigator Whitfield he was about 70 percent certain Teleguz was the person he had seen at Sipe's apartment. Investigator Whitfield also interviewed Ryan Ferguson, who was with Moore the night he saw the individual leave Sipe's apartment. Ferguson was also shown a photograph array. Although Ferguson initially failed to identify Teleguz, he subsequently identified the photograph of Teleguz as the one which "most" resembled the person he had seen leaving Sipe's apartment. No arrests were made on the basis of these interviews.

The investigation stalled until February 2003, when Michael Nelson, a deputy marshal with the United States Marshal [sic] Service, contacted Investigator Whitfield with information about the Sipe murder. Aleksey Safanov, who was facing federal criminal charges, told Deputy Marshal Nelson that Teleguz had hired a black male from Lancaster, Pennsylvania, to kill Sipe because Teleguz was angry about having to pay child support. According to Safanov, Teleguz said that Sipe had been murdered, and that Teleguz was upset because "[w]hoever killed her left blood evidence." Safanov also told investigators that after Sipe's murder, Teleguz wanted to rob Sipe's

parents, and that he and Teleguz had driven to Harrisonburg but ultimately did not commit the robbery.

　　　Safanov's information led the police to Edwin Gilkes, who told the police that he refused Teleguz's offer to murder Sipe for pay but that Michael Hetrick accepted the offer.  The police then contacted Hetrick who ultimately confessed to murdering Sipe.  Hetrick said Teleguz had hired him to kill Sipe for $2,000, with half to be paid before the murder.  When Teleguz received confirmation of Sipe's death, he paid Gilkes and Hetrick the remaining $1,000 plus an additional $500 for expenses.  Subsequent testing revealed that Hetrick was the source of the unidentified blood found at Sipe's apartment.

*Teleguz v. Commonwealth*, 643 S.E.2d 708, 714-15 (Va. 2007) ("*Teleguz I*").


## II.  PROCEDURAL HISTORY.

### A.  STATE PROCEEDINGS.

Following Hetrick's confession, Teleguz was arrested in Pennsylvania on July 1, 2004, and subsequently extradited to Virginia.  A Rockingham County, Virginia, grand jury indicted Hetrick for the willful, deliberate, and premeditated killing of a person by another for hire as an accessory before the fact, a Class 1 felony punishable by death.  Va. Code Ann. § 18.2-31(2) (Supp. 2010).  Teleguz was appointed counsel and tried by a jury over four days in the Circuit Court of Rockingham County.  The jury found Teleguz guilty of capital murder for hire on February 9, 2006.  Following a separate penalty proceeding on February 13 and 14, 2006, the jury fixed Teleguz's punishment at death.

At the penalty hearing, the state presented evidence of Teleguz's prior criminal convictions and of the likely resulting pain from Sipe's injuries in the attack, as well as testimony by her relatives. Teleguz presented mitigation evidence, including testimony from his family members, and testimony regarding his background as an immigrant to the United States and his childhood in the Ukraine. The trial court entered a final judgment on July 20, 2006, sentencing Teleguz to death in accordance with the jury's verdict.

Teleguz appealed his conviction and sentence to the Supreme Court of Virginia, presenting twenty-six assignments of error.[1] *Teleguz I*, 643 S.E.2d at 708. The court unanimously affirmed the conviction and sentence on April 20, 2007. *Id.* at 732. On May 21, 2007, Teleguz filed a petition for rehearing, which was denied on June 22, 2007. Thereafter, Teleguz sought a writ of certiorari from the United States Supreme Court, which was denied on February 19, 2008, *Teleguz v. Virginia*, 552 U.S. 1191 (2008), and moved for a rehearing, which was denied on April 14, 2008, 552 U.S. 1332 (2008).

Post-conviction counsel was appointed, and Teleguz filed his petition for a writ of habeas corpus with the Supreme Court of Virginia on April 21, 2008.[2]

---

[1] A sentence of death is subject to mandatory review by the Supreme Court of Virginia. *See* Va. Code Ann. § 17.1-313 (2010).

[2] In death cases, the Supreme Court of Virginia has exclusive habeas corpus jurisdiction, although the court may refer specific issues to the trial court to conduct an

Teleguz also filed a motion for leave to exceed the court's fifty-page petition limit established by its rules, which the court denied. Teleguz's state habeas petition asserted twenty claims and requested expert assistance, discovery, and an evidentiary hearing.

The state[3] filed a motion to dismiss Teleguz's petition on May 21, 2008, and in a detailed opinion issued on January 15, 2010, the Supreme Court of Virginia granted the motion. *Teleguz v. Warden of Sussex I State Prison*, 688 S.E.2d 865, 868 (Va. 2010) ("*Teleguz II*"). On February 16, 2010, Teleguz filed a petition for a rehearing, which was denied on April 22, 2010. The Rockingham County Circuit Court then scheduled Teleguz's execution for June 21, 2010.

### B. FEDERAL PROCEEDINGS.

On June 14, 2010, Teleguz filed a motion in this court to stay his scheduled execution, a notice of intent to file a petition for a writ of habeas corpus pursuant to 28 U.S.C.A. § 2254 (West 2006), and a motion seeking appointment of counsel. This court appointed counsel and stayed Teleguz's execution pending determination of his federal habeas petition. Teleguz sought an extension of time

---

evidentiary hearing and make findings of fact and recommended conclusions of law. *See* Va. Code Ann. § 8.01-654(C)(1)-(3) (2007).

[3] For convenience, throughout this Opinion I will refer to the Commonwealth of Virginia and the respondent warden collectively as "the state."

to file his federal habeas petition, which was granted in part.[4]  In an Amended

Petition for a Writ of Habeas Corpus filed December 6, 2010, Teleguz asserted

twelve grounds for habeas relief, which I will hereafter consider in this Opinion.

The state has filed an Answer and a Motion to Dismiss.  The Motion to

Dismiss has been extensively briefed and orally argued by the parties and is ripe

for decision.

---

[4]  Less than two weeks before the original filing date set for Teleguz's federal habeas petition, he requested a new extension of ninety days.  The state opposed this extension.  Based on the volume of material and the addition of at least one new attorney to Teleguz's case, I found that the circumstances justified a short extension and accordingly set a new filing date for October 14, 2010.  *Teleguz v. Kelly*, No. 7:10CV00254, 2010 WL 3629497, at *1 (W.D. Va. Sept. 13, 2010).  A 205-page Petition for a Writ of Habeas Corpus was filed on that day.  Teleguz then moved to be allowed to withdraw the petition, on the ground that he should not be required to file any habeas petition before February 21, 2011, the last day of the applicable statute of limitations.  *See* 28 U.S.C.A. § 2244(d) (West 2006).  I denied his motion.  *Teleguz v. Kelly*, No. 7:10CV00254, 2010 WL 4117493, at *1 (W.D. Va. Oct. 19, 2010).

On November 12, 2010, without prior leave of court, Teleguz filed a 266-page Amended Petition for a Writ of Habeas Corpus.  The next day, November 13, 2010, the state filed an Answer and Motion to Dismiss the initial, unamended petition.  On December 6, 2010, Teleguz filed another amended petition, identical to the one filed on November 12.  I determined that the December 6 amended petition was timely pursuant to Federal Rule of Civil Procedure 15(a)(1)(B) (allowing amendment without leave of court within twenty-one days of service of responsive pleading), and struck the identical untimely and unauthorized November 12 petition.  (Order, Dec. 9, 2010.) The state thereafter filed an Answer and Motion to Dismiss to the December 6 petition, which I now have under consideration.

# III. ANALYSIS.

In his present federal habeas petition, Teleguz presents twelve claims for relief, several of which incorporate multiple, detailed subclaims. In support of these claims, Teleguz relies on the trial record, the record as developed during his state habeas action, and an appendix of new evidence obtained since petitioning for state habeas relief.[5] Before addressing these claims, I will outline the legal principles governing his petition.

My review of Teleguz's application is largely governed by 28 U.S.C.A. § 2254, as amended by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), Pub. L. No. 104-132, 110 Stat. 1214 (1996). The AEDPA erected a legal framework designed by Congress to more carefully circumscribe federal habeas review and ensure that the responsibility of reviewing state criminal convictions remains properly, primarily, and in the first instance, with the state courts. *See Harrington v. Richter*, 131 S. Ct. 770, 786-87 (2011).

The statute generally bars federal habeas relief unless a petitioner has first properly exhausted available state court remedies. 28 U.S.C.A. § 2254(b)(1) ("An application for a writ of habeas corpus on behalf of a person in custody pursuant to

---

[5] This record includes Teleguz's evidentiary submissions contained in an appendix to his state habeas petition (cited herein as "Pet'r's State App.") and the joint appendix filed by the parties in Teleguz's direct appeal (cited herein as "J.A.").

The exhibits filed by the petitioner with his petition in this court are cited herein as "Pet'r's App."

the judgment of a State court shall not be granted unless it appears that . . . the applicant has exhausted the remedies available in the courts of the State; or . . . there is an absence of available State corrective process.").  To meet the statute's exhaustion requirement, a petitioner must provide the state court with the "opportunity to correct the constitutional violation in the first instance" by presenting to the state court "the operative facts and the controlling legal principles associated with each claim."  *Longworth v. Ozmint*, 377 F.3d 437, 448 (4th Cir. 2004) (internal quotation marks and citations omitted).

A claim is also exhausted for § 2254(b)'s purposes if it is clear that a petitioner would be barred from receiving state review because the claim would be deemed procedurally barred under state law.[6]  *Gray v. Netherland*, 518 U.S. 152, 161-62 (1996) (finding that claims that are procedurally defaulted under state law are exhausted under the AEDPA because the statute only requires exhaustion of "available" state remedies).  However, although exhausted under the AEDPA's definition, a claim that is procedurally defaulted under state law provides an adequate and independent state-law ground for the conviction and sentence, and therefore it cannot be reviewed by the federal court.  *Id.* at 162.

---

[6]  For example, Virginia law generally prohibits successive habeas petitions, because habeas relief cannot be obtained on the basis "of any allegation the facts of which petitioner had knowledge at the time of filing any previous petition."  Va. Code Ann. § 8.01-654(B)(2) (2007).

Thus, federal habeas review is precluded when a claim is procedurally defaulted before the state courts, unless a petitioner can demonstrate that cause and prejudice or a fundamental miscarriage of justice excuse the default. *Fisher v. Angelone*, 163 F.3d 835, 844 (4th Cir. 1998). To show cause, a petitioner must demonstrate some objective factor external to his defense that impeded his counsel's efforts to comply with the state's procedural rule. *Murray v. Carrier*, 477 U.S. 478, 488 (1986). To demonstrate prejudice, a petitioner must show not merely that there was a possibility of prejudice, but that the error worked to his actual and substantial disadvantage, infecting his entire trial with an error of constitutional magnitude. *Id*. at 494.

Alternatively, a petitioner may assert that his case falls into the narrow class of cases implicating a fundamental miscarriage of justice by arguing that he is actually innocent of the crime of which he was convicted. *Schlup v. Delo*, 513 U.S. 298, 314-15 (1995). To show actual innocence that would excuse procedural default, a petitioner must show that an alleged constitutional error probably resulted in his conviction although he was actually innocent. *Id.* at 327 (citing *Murray v. Carrier*, 477 U.S. at 496). To establish the requisite probability, a petitioner must show that it is more likely than not that no reasonable juror would have convicted him in the light of the new evidence. *Id.* In assessing a petitioner's claim of actual innocence, the court may consider all relevant evidence, including

evidence that was excluded or unavailable at trial. *Id.* Newly presented evidence may call into question the credibility of witnesses, and the habeas court may have to make credibility assessments. *Id.* at 330. The AEDPA does not procedurally bar a *Schlup* claim of actual innocence. *Sharpe v. Bell*, 593 F.3d 372, 378 (4th Cir. 2010).

A capital habeas petitioner may also attempt to excuse a defaulted claim by showing that he is actually innocent of the death penalty. *See Sawyer v. Whitley*, 505 U.S. 333 (1992). To demonstrate that he is actually innocent of the death penalty for the purpose of excusing a default, the petitioner must present clear and convincing evidence that, but for the alleged constitutional error, he would have been ineligible for the death penalty. *Id.* at 348.

If a claim was properly presented in state court and therefore not defaulted, the AEDPA provides for a deferential federal review of the state court's decision as outlined in § 2254(d). When reviewing such claims, the AEDPA provides that a federal court may grant habeas relief only if the state court's adjudication resulted in a decision that: (1) was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or (2) was "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C.A. § 2254(d)(1), (d)(2).

Section 2254(d)'s provisions are disjunctive and have independent meaning. *Bell v. Cone*, 535 U.S. 685, 694 (2002). Under § 2254(d)(1)'s "contrary to" clause, a federal court may issue the writ if "the state court applies a rule different from the governing law set forth in [Supreme Court] cases, or if it decides a case differently than [the Supreme Court] ha[s] done on a set of materially indistinguishable facts." *Id.* Under § 2254(d)(1)'s "unreasonable application" clause, I may grant relief if the state court correctly identifies the governing legal principle but "unreasonably applies it to the facts of the particular case." *Id.* The Supreme Court has stressed that an unreasonable application is different from an incorrect one and that a district court may not issue a writ under the unreasonable application clause simply because it "concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Williams v. Taylor*, 529 U.S. 362, 411 (2000). Rather, the state court's adjudication must be "objectively unreasonable" for a federal court to grant habeas relief. *Lockyer v. Andrade*, 538 U.S. 63, 75-76 (2003).

Furthermore, the AEDPA provides that a state court's factual determinations are entitled to a "presumption of correctness" that may only be rebutted by clear and convincing evidence that the state court based its decision on "an unreasonable determination of the facts," in light of the evidence as presented in the state court

proceeding. 28 U.S.C.A. §§ 2254(d)(2), 2254(e)(1); *see also Schriro v. Landigran*, 550 U.S. 465, 473-74 (2007).

Finally, the AEDPA addresses how this court must view evidence never presented before the state courts. Section 2254(e)(2) provides that if a petitioner has "failed to develop the factual basis of a claim" in the state court proceedings, this court "shall not hold an evidentiary hearing on the claim" unless a petitioner shows that the claim relies on either (1) a new, previously unavailable rule of constitutional law or (2) facts that could not have been previously discovered through the exercise of due diligence. 28 U.S.C.A. § 2254(e)(2)(A). Moreover, the newly obtained facts must be "sufficient to establish by clear and convincing evidence that[,] but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense." 28 U.S.C.A. § 2254(e)(2)(B). Thus, § 2254(e) incentivizes habeas petitioners to diligently investigate and pursue their claims in state court, because unless a petitioner "made a reasonable attempt, in light of the information available at the time, to investigate and pursue claims in state court," he is prohibited from introducing new evidence in his federal petition. *Williams*, 529 U.S. at 435.

After the state's Motion to Dismiss was argued in this case, the Supreme Court issued an important opinion clarifying the role of newly obtained evidence in federal habeas review. *Cullen v. Pinholster*, 131 S. Ct. 1388 (2011). The parties

have filed supplemental briefs on the meaning of *Pinholster* and its effect on existing Fourth Circuit jurisprudence.

As discussed above, § 2254(e) bars the introduction of new evidence by a non-diligent petitioner. However, the circuits have split on how to treat a diligent petitioner offering new evidence in his federal case that bolsters claims previously rejected on the merits by the state courts. Putting the issue in the language of the AEDPA's provisions, the question is how to deal with the interplay between § 2254(d)(1)'s deferential standard of review and § 2254(e)'s directives regarding newly obtained evidence.

The Fourth Circuit recently addressed this issue and found that, "[i]f the record [developed before the state courts] ultimately proves to be incomplete, deference to the state court's judgment would be inappropriate because judgment on a materially incomplete record is not an adjudication on the merits for purposes of § 2254(d)." *Winston v. Kelly*, 592 F.3d 535, 555-56 (4th Cir.), *cert. denied*, 131 S. Ct. 136 (2010). The *Winston* court accordingly found that "[n]ew, material evidence, introduced for the first time during federal habeas proceedings, may therefore require a de novo review of petitioner's claim." *Id.*; *see also Monroe v. Angelone*, 323 F.3d 286, 297-98 (4th Cir. 2003) (finding that the AEDPA's deference requirement does not apply when a claim made on federal habeas review

is premised on material that has surfaced for the first time during federal proceedings and citing to similar holdings by the Sixth, Ninth, and Tenth Circuits).

Other courts of appeal, however, had found that § 2254(d)'s deferential standard continues to apply, but that so long as the evidence was otherwise admissible under the AEDPA, the new evidence was "properly considered in evaluating whether the legal conclusion reached by the state habeas court was a reasonable application of Supreme Court law." *Pinholster v. Ayers*, 590 F.3d 651, 668 (9th Cir. 2009) (en banc); *see also Wilson v. Mazzuca*, 570 F.3d 490, 500 (2d Cir. 2009); *Pecoraro v. Walls*, 286 F.3d 439, 443 (7th Cir. 2002); *Valdez v. Cockrell*, 274 F.3d 941, 952 (5th Cir. 2001). Under this approach, newly obtained evidence that met the AEDPA's other procedural strictures could be considered, albeit with some murkiness as to how much consideration the evidence was entitled.

In its recent *Cullen v. Pinholster* opinion, the Supreme Court spoke to this issue in a manner directly relevant to Teleguz's petition. Pinholster was convicted of first degree murder and sentenced to death after killing two men during an interrupted burglary. After an evidentiary hearing on Pinholster's federal habeas petition, the district court found that Pinholster suffered constitutionally ineffective assistance of counsel, and the Ninth Circuit affirmed. *Pinholster v. Ayers*, 590 F.3d at 666. The holding was largely based on facts that had not been previously

presented indicating that Pinholster's trial counsel ignored or failed to pursue significant available mitigation evidence. The Supreme Court granted certiorari to resolve the question of "whether review under § 2254(d)(1) permits consideration of evidence introduced in an evidentiary hearing before the federal habeas court." *Pinholster*, 131 S. Ct. at 1398.

The Supreme Court held that such new evidence could not be considered and that review under § 2254(d)(1) is "limited to the record that was before the state court that adjudicated the claim on the merits." *Id.* The Court reasoned that limiting the review to the evidence before the state court best comports with the language and the intent of the AEDPA and is consistent with federal review of only "what a state court knew and did." *Id.* at 1399. To hold otherwise, the Court found, would be "to ask federal courts to analyze whether a state court's adjudication resulted in a decision that unreasonably applied federal law to facts not before the state court." *Id.*

Despite this limitation, § 2254(e)(2) continues to have force where § 2254(d) does not apply. *Id.* at 1401. The Court found that, at a minimum, § 2254(e)(2) "still restricts the discretion of federal habeas courts to consider new evidence when deciding claims that were not adjudicated on the merits in state court." *Id.* Of course, such claims continue to be subject to the strictures of § 2254(a)-(c)'s requirements, discussed above. *Id.* at 1401 n.9.

In his supplemental briefing, Teleguz argues that *Pinholster* does not fully foreclose review of new evidence in his case. Teleguz seizes on a footnote in the *Pinholster* opinion suggesting that, under certain circumstances, newly uncovered evidence may transform a claim previously adjudicated on the merits by the state courts into a "new claim." *See id.* at 1401 n.10 (citing *id.* at 1417-18 (Sotomayor, J., dissenting)). However, the Court expressly declined to establish how to distinguish claims adjudicated on the merits from such new claims. *Id.* at 1401-02 ns.10, 11. Teleguz contends that *Winston v. Kelly* remains good law in drawing this distinction. *See Winston*, 592 F.3d at 555-56 ("[J]udgment on a materially incomplete record is not an adjudication on the merits for purposes of §2254(d).") He contends that, because the state habeas court refused an evidentiary hearing, the record before it was materially incomplete, and his new evidence thus merits consideration under *Pinholster*.

The state argues that *Pinholster's* holding, not the footnote's dicta, governs Teleguz's new evidence. The state points out that the Fourth Circuit, in an opinion following *Pinholster*, reversed a grant of the writ that was based on evidence first heard at a federal evidentiary hearing, holding that "evidence introduced in federal court has no bearing on §2254(d)(1) review." *Jackson v. Kelly*, Nos. 10-1, 10-3, 2011 WL 1534571, at *12 (4th Cir. Apr. 25, 2011) (internal quotation marks and

citation omitted). The state argues that the *Jackson* opinion indicates that the Fourth Circuit has retreated from *Winston* in light of *Pinholster*.

Wherever the line between §2254(d)-reviewable claims and those potentially meriting broader review, this is a distinction that need not be made here. As is evident, the new evidence presented by Teleguz to this court is cumulative in support of arguments made before and adjudicated by the state courts.

Thus, *Cullen v. Pinholster* significantly restricts my review of Teleguz's current claims. Whereas under this circuit's prior precedent, I would have granted de novo review to newly obtained evidence bolstering claims previously adjudicated before the state court, *Pinholster* instructs me that I now may not consider this evidence. *See also Jackson*, 2011 WL 1534571, at *12. Newly obtained evidence is only pertinent in my review of claims that, while not properly procedurally presented for state adjudication, merit consideration under the procedural default exceptions.

Lastly, I note that this new development in our habeas jurisprudence does not affect the requirement that a petitioner is not entitled to relief unless he can show that any constitutional error committed had a "substantial and injurious effect or influence on the verdict." *Wilson v. Ozmint*, 352 F.3d 847, 855 (4th Cir. 2003) (internal quotation marks and citation omitted).

With this legal framework in mind, I address each of Teleguz's claims in turn.

### A.    CLAIM I — INEFFECTIVE ASSISTANCE OF COUNSEL AT THE GUILT PHASE OF TRIAL.

In his first claim for relief, Teleguz contends that he was denied his Sixth Amendment right to effective assistance of counsel during the guilt phase of his trial. Specifically, Teleguz raises three subclaims roughly centered around the testimony of the state's primary witnesses: Aleksey Safanov, Michael Hetrick, and Edwin Gilkes. Teleguz argues that these three witnesses were essential in persuading the jurors to convict Teleguz, because their testimony provided the details — including the motive, solicitation, advanced preparation, and final consummation — of Teleguz's plot to have Stephanie Sipe murdered. Teleguz claims that two of these witnesses have since recanted much of their trial testimony, and that effective advocacy by trial counsel would have impeached their false testimony from the outset and exposed the implausibility of their stories.

In order to succeed on an ineffective assistance of counsel claim, Teleguz must show both that (1) his counsel's performance was deficient and (2) that the deficiency was prejudicial. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). Counsel's performance is deficient if it "fell below an objective standard of reasonableness" as measured by prevailing professional norms. *Id.* at 688. A deficiency is prejudicial if "there is a reasonable probability that, but for counsel's

unprofessional errors, the result of the proceeding would have been different." *Id.* at 694.

As a preliminary matter, the parties contest the procedural posture of these *Strickland* claims. Although organized slightly differently than was presented before the state courts, I find that Teleguz has raised substantially the same arguments as were addressed in his earlier appeals, and thus these arguments have been properly adjudicated on the merits in those decisions.[7] Any exceptions to this procedural posture are specifically addressed in pertinent part below. Finally, I note that Teleguz has substantially supplemented his claim with new evidence and affidavits not put before the state courts. As discussed above, *Pinholster* prohibits me from considering that evidence for the purposes of my review under § 2254(d).

### 1. ALEKSEY SAFANOV.

First, Teleguz claims that trial counsel were ineffective in failing to effectively impeach the testimony of Aleksey Safanov. Teleguz presented this claim to the Supreme Court of Virginia in his state habeas petition, and that court found that it met neither the performance nor prejudice prong of *Strickland*. *Teleguz II*, 688 S.E.2d at 871-72. Under § 2254(d), Teleguz is entitled to relief

---

[7] Before the state courts, Teleguz organized his *Strickland* guilt phase arguments into separate claims relating to the testimony provided as to certain substantive topics, for instance Teleguz's motive and his alibi. Here, Teleguz compresses these arguments into a single claim for relief that is divided into subclaims based on the testimony of each individual witness.

only if this decision was contrary to or involved an unreasonable application of *Strickland*, or was based on an unreasonable determination of the facts, in light of the evidence submitted before the state court. *See* 28 U.S.C.A. § 2254(d)(1), (2).

The Sixth Amendment right to effective counsel "does not require that representation be flawless, only that all decisions materially affecting [the] defendant's representation be the product of informed judgment, not neglect or ignorance." *Sallie v. North Carolina*, 587 F.2d 636, 640 (4th Cir. 1978). In evaluating counsel's strategic choices, judicial second-guessing is particularly inappropriate. *See id.* Although strategies based upon counsel's unreasonably insufficient preparation can, in some circumstances, constitute deficient performance under *Strickland*, "[s]trategic choices made after thorough investigation of law and facts relevant to [the] plausible options are virtually unchallengeable." *Buckner v. Polk*, 453 F.3d 195, 202, 202 n.6 (4th Cir. 2006) (internal quotation marks and citations omitted).

Teleguz argues that he is entitled to habeas relief because, although defense counsel had at hand information that would call Safanov's credibility into question, counsel failed to use it. Namely, Teleguz asserts that his counsel failed to effectively highlight to the jury that because Safanov was facing severe criminal penalties for a federal firearms charge, he had a powerful incentive to lie to authorities. Teleguz also argues that effective investigation by counsel would have

revealed that Safanov had a suspiciously intimate level of knowledge regarding the Sipe family's involvement in drugs and other criminal activity. Teleguz contends that this evidence could have been used to show an alternative theory of the crime, such as the robbery of a drug house gone awry. Moreover, Teleguz argues that had counsel fully investigated Safanov, they would have uncovered a history of personal animus between Safanov and Teleguz, Safanov's pattern of lying to and intimidating law enforcement, and other authorities' general concerns regarding Safanov's credibility as a state witness. Specifically, Teleguz refers to an audiotape and transcript of a telephone call conducted between Investigator Whitfield and an FBI agent, in which the agent made several pointed comments questioning Safanov's credibility. Although Teleguz's counsel had access to this call from discovery, they did not utilize it at trial. Finally, Teleguz presents new affidavits of several attorneys working on this petition relating conversations they have had with Safanov in which he has allegedly recanted much of his testimony against Teleguz.[8] These affidavits were not part of the state court record.

The Supreme Court of Virginia found that the trial record demonstrated that counsel thoroughly cross-examined Safanov on these subjects. *Teleguz II*, 688 S.E.2d at 871. Furthermore, the court found that counsel made strategic decisions regarding how deeply to question Safanov about his involvement with criminal

---

[8] These interviews were conducted remotely because Safanov has since left the United States and is allegedly living in Eastern Europe.

activity, as such testimony could also lend credence to Teleguz's own supposed involvement in organized crime. Finally, the court found that counsel extensively probed Safanov regarding gaps in his recollections. Given the depth of counsel's cross-examination, the court found that Teleguz could not demonstrate deficiency or explain how additional questioning would have affected the outcome of the proceedings. *Id.* at 871-72. The court further rejected Teleguz's claim of ineffective assistance based on the FBI telephone call. The court found that Teleguz failed to authenticate the evidence or show how the telephone call would have changed the jury's verdict. *Id.* at 872.

Because the Supreme Court of Virginia correctly identified the *Strickland* factors as the appropriate law governing Teleguz's ineffective assistance of counsel claims, I must now examine whether the court's application of *Strickland* was reasonable under the AEDPA's deferential standard. I reemphasize that, in order for me to grant federal habeas relief, the state court's determination must have been more than incorrect or erroneous; it must have been "objectively unreasonable." *Lockyer v. Andrade*, 538 U.S. 63, 75-76 (2003).

The record clearly shows that a prime tenet of Teleguz's defense strategy was to aggressively cross-examine the state's three primary witnesses, including Aleksey Safanov, in an attempt to impeach their credibility. Furthermore, counsel's cross-examination covered every subject that Teleguz now alleges that

Safanov testified falsely to. Safanov was questioned about his criminal record, his pending charges, and any deal he hoped to strike with the state in exchange for his testimony. Counsel explored Safanov and Teleguz's relationship, alternative theories of the crime, and the believability of Teleguz's alleged motive as supplied by Safanov. Counsel's cross-examination painted a picture of Safanov as a career criminal of dubious reliability, and while the FBI telephone call would have added to that picture, Teleguz has not shown it would have been dispositive. That the jury evidently believed Safanov's testimony, despite counsel's concerted efforts, does not demonstrate that counsel's representation was deficient or prejudicial.

Finally, I note that the state court had no evidence before it that Safanov's testimony had changed or would change. Teleguz's *Strickland* claim as presented to the Supreme Court of Virginia was restricted to the theory that his trial counsel was ineffective in impeaching the credibility of Safanov's, at that point consistent, testimony. Therefore, I find that the Supreme Court of Virginia reasonably applied *Strickland* to Teleguz's ineffective assistance claim, and I must deny relief.

## 2. MICHAEL HETRICK.

Teleguz also claims that his trial counsel was ineffective for failing to impeach the testimony of Stephanie Sipe's admitted murderer, Michael Hetrick. Teleguz presented this claim in his state habeas petition, but the Supreme Court of Virginia found that Teleguz did not show that his Sixth Amendment right to

counsel had been violated. *Teleguz II*, 688 S.E.2d at 869-72. I again review the state court's determination for reasonableness under § 2254(d).

Teleguz contends that counsel failed to capitalize on critical opportunities to undermine Hetrick's credibility, particularly in regard to Hetrick's account of how and why Teleguz solicited the murder. Hetrick testified that his participation in the murder was solicited at the birthday party of Dave Everhart, one of Hetrick's good friends and an acquaintance of Teleguz. Hetrick testified that Teleguz had approached him and Edwin Gilkes at the Everhart party and offered them a thousand dollars to murder Teleguz's ex-girlfriend. He additionally testified that Teleguz had told them that he did not want to pay child support and that Teleguz had specifically requested that Sipe's throat be cut.

Teleguz also highlights inconsistencies in Hetrick's testimony regarding the details of the murder itself. Hetrick testified substantially to the logistics of the crime, including to details of the timeline and of a phone call made by Hetrick and Gilkes to Teleguz in the days following, informing Teleguz that they had murdered Sipe according to their arrangement.

Teleguz argues that effective investigation and advocacy by trial counsel would have revealed many details of Hetrick's story to be false and that highlighting these inaccuracies would have significantly undermined Hetrick's testimony. In support of his argument, Teleguz primarily relies upon

inconsistencies between Hetrick's and Gilkes' trial testimony and earlier interviews given to authorities over the course of the investigation. Teleguz also presents affidavits by Latesha and Dave Everhart, asserting that Teleguz was not present at the birthday party. Teleguz submits telephone records, testimony by neighbors, and medical reports that he contends refute Hetrick's account of the time of death and undermine the prosecution's theory that Teleguz actively planned to establish a false alibi for the murder.[9]

The state habeas court rejected Teleguz's arguments. *Teleguz II*, 688 S.E.2d at 869-71. The court found that counsel cross-examined Hetrick regarding the inconsistencies between his trial testimony and his prior statements to police — including inconsistencies regarding Teleguz's motive and alibi, Sipe's time of death, and Hetrick's call to Teleguz after the crime. Addressing Hetrick's testimony regarding the murder itself, the court found that such peripheral details were especially unlikely to affect Teleguz's case because the prosecution's theory rested on Teleguz having hired the killers, not on Teleguz ever having been present at or having participated in the murder itself. *Id.* at 869. Finally, the court rejected Teleguz's ineffective assistance claim as to the Everhart birthday party testimony,

---

[9]  I have discounted the affidavits submitted by Gene Popov, Sarah Deaver, and Edwin Gilkes that are new to this petition and were not presented to the state court. *Pinholster*, 131 S. Ct.  at 1398.

on the basis that Teleguz failed to show how the Everharts' testimony would have changed the outcome of the trial.

Hetrick testified at trial and was subject to significant cross-examination, much of which focused on the inconsistencies of his testimony and Hetrick's particularly strong motive to avoid the death penalty himself. Defense counsel's strategy for questioning Hetrick's credibility was one of death by a thousand cuts. That counsel did not pursue a thousand and one, particularly regarding ancillary subjects, does not show a deficient performance. Moreover, counsel's thorough cross-examination only undermines Teleguz's assertion of prejudice. For these reasons, I find that the Supreme Court of Virginia's application of *Strickland* was reasonable.

### 3. EDWIN GILKES.

Finally, Teleguz contends that the testimony of Edwin Gilkes would have been vulnerable to vigorous impeachment and that trial counsel was constitutionally ineffective for failing to impeach him. Teleguz relies on the evidence described above, as well as an affidavit by Gilkes submitted before the state habeas court that recanted significant portions of Gilkes' testimony.[10]

---

[10] Teleguz has also submitted a second affidavit by Gilkes confirming his recantation, but I do not consider this affidavit for purposes of my § 2254(d) review. *Pinholster*, 131 S. Ct. at 1398.

Gilkes' affidavit recants his testimony that he and Hetrick were hired at the Everhart birthday party and asserts that Teleguz was not present at the party. Gilkes also recants any knowledge of Teleguz having a motive to kill Sipe. Finally, Gilkes indicates that Gene Popov and Anatoly Rymarenko, two men with personal animus towards Teleguz, assisted in setting Teleguz up for the crime. Finally, Gilkes stated that his trial testimony was based on prosecutorial pressure and his desire to avoid the death penalty.

As noted above, although the Supreme Court of Virginia addressed Teleguz's *Strickland* claims, he presented them differently in his state habeas action. In that petition, Teleguz challenged counsel's effectiveness in impeaching certain substantive topics, instead of individual witnesses. The court appears to have addressed Gilkes' recantation primarily in relation to Teleguz's claims that counsel was ineffective for failing to challenge the prosecution's theory of motive, failing to present alternative theories for the crime, and failing to impeach the testimony that Teleguz solicited the murder at the Everhart birthday party.

The Supreme Court of Virginia found that counsel was not ineffective in failing to impeach Gilkes' testimony regarding any of these subjects. *Teleguz II*, 688 S.E.2d at 869-71. The court held that Teleguz failed to meet the *Strickland* standards because he did not provide affidavits from witnesses that should have been called, and he failed to allege prejudice. *Id.* at 869. The court also found

that, for similar reasons related to these subjects above, counsel acted strategically in their attempts to impeach Gilkes and that, particularly in regard to the peripheral issues, Teleguz could not show that effective impeachment would have changed the jury's verdict.

Although the differing structure between petitioner's claim here and the state habeas decision somewhat obfuscates my review, I do find that the Supreme Court of Virginia was presented with and ultimately reached the substantive issues of this *Strickland* claim and that it applied federal law reasonably. *See Longworth v. Ozmint*, 377 F.3d 437, 448 (4th Cir. 2004). Gilkes' recantation, while significant, does not by itself demonstrate that counsel was ineffective in failing to impeach him at trial. Teleguz has not shown how counsel could have exposed Gilkes' false testimony on the stand. Gilkes faced criminal liability for his own participation in the murder, and his trial testimony dealt largely with circumstantial evidence. Aside from highlighting inconsistencies and Gilkes' motivation to testify on the prosecution's behalf, there does not appear to be much, particularly under *Strickland's* deferential review, that counsel could have done to secure Gilkes' favorable testimony at trial. Moreover, the fact that Gilkes' testimony provided only one of three consistent accounts of the crime undercuts Teleguz's ability to show prejudice. Thus, I find that the state habeas application of *Strickland* to Gilkes' testimony was reasonable under § 2254(d) review.

4.    CLAIMS OF GENERAL INEFFECTIVENESS.

Finally, Teleguz also argues that his counsel was generally incompetent and prejudiced him at trial.  He particularly singles out his lead counsel, Paul Maslakowski, as being embroiled in personal career drama during the period in which he should have been developing Teleguz's defense.  Teleguz alleges that Maslakowski's inattention and hostility to Teleguz's case created a dysfunctional defense team.  He contends that novice investigators and mitigation specialists were left with no effective leadership or advice to direct their efforts, and that this lack of leadership explains why weaknesses in the state's case were not exposed at trial.

The evidence supporting this claim consists of affidavits by members of Teleguz's defense team describing Maslakowski's deficiencies as lead counsel, the internal problems plaguing Teleguz's defense, and the barriers these issues erected in developing an effective defense for Teleguz.  These affidavits were submitted to the state habeas court.  Although the Supreme Court of Virginia did not address these allegations independently, I assume that the court considered this evidence as underlying all of Teleguz's ineffective assistance claims, and I make note that it has informed my § 2254(d) review throughout.

Despite any internal strife, Teleguz's team presented a full, thorough defense for Teleguz before the jury.  For this reason, claims of internal problems do not

change my assessment that the state court acted reasonably when it found that Teleguz received constitutionally sufficient counsel at the guilt phase of his trial.

B.     CLAIM II — INEFFECTIVE ASSISTANCE OF COUNSEL AT THE PENALTY PHASE OF TRIAL — FAILURE TO REBUT EVIDENCE OF FUTURE DANGEROUSNESS.

In his second claim, Teleguz asserts that his trial counsel's failure to reasonably address evidence of future dangerousness, an aggravating factor that can make a defendant eligible for the death penalty, constituted ineffective assistance of counsel at the penalty phase of the trial.  Particularly, Teleguz argues that his trial counsel should have done more to prevent the introduction of and disprove statements that he was associated with the Russian Mafia, that he was responsible for another murder, and that he could be a danger to the community even if sentenced to life imprisonment.  Additionally, Teleguz argues that defense counsel did not request funds for an expert to conduct an individualized risk assessment, did not properly object to the trial judge's answer to a question from the jury, and did not undermine Hetrick's claim that Teleguz chose the manner of Sipe's death.

1.     "RUSSIAN MAFIA" REFERENCES.

Teleguz argues that his trial counsel failed to effectively object to and rebut statements indicating that he was involved with the Russian Mafia.  Prior to trial, Teleguz's counsel filed a motion in limine to bar references to the Russian Mafia.

The motion in limine was denied. At the guilt phase of the trial, Gilkes twice stated that he feared Teleguz because he had heard that Teleguz was a member of the Russian Mafia. The court gave a limiting instruction that the testimony about the Russian Mafia was only to be considered for its effect on Gilkes' state of mind and not for its truth. Hetrick also testified that he believed that Teleguz was involved in the Russian Mafia and had been afraid that Teleguz would kill him if he did not go through with the murder. In its closing argument at the guilt phase, the prosecution reiterated that the witnesses were afraid of Teleguz.

The argument that trial counsel failed to successfully object to and rebut these statements was presented during the state habeas proceedings. The argument was supported by affidavits as well as the official presentence investigation report. The Supreme Court of Virginia rejected the argument, determining that *Strickland* had not been met. It reasoned that petitioner's trial counsel was not delinquent in the failure to successfully object. Trial counsel filed a motion in limine to exclude evidence about the Mafia and made cogent arguments that comments about the Russian Mafia should not be admissible. *See Teleguz II*, 688 S.E.2d at 873. Furthermore, Teleguz failed to demonstrate that trial counsel's failure to question police officer Dan Comer about the Russian Mafia amounted to ineffective assistance of counsel. *Id.* at 874. Teleguz failed to present an affidavit from Comer verifying how he would have testified. *Id.*

Teleguz also seeks to introduce additional evidence in the form of new affidavits and a report from a risk assessment expert. However, I may not consider this new evidence when determining whether the Supreme Court of Virginia's decision was reasonable. *See Pinholster*, 131 S. Ct. at 1398. Based on the evidence before the state court, the court's decision was reasonable. Trial counsel argued that references to the Russian Mafia were irrelevant and prejudicial and asserted that Teleguz was not Russian and had no connection to the Russian Mafia or other criminal organization. Furthermore, Teleguz has not shown that additional objections would have limited the references or that there is a reasonable probability that, but for the alleged errors, the result of the proceeding would have been different. For these reasons, Teleguz has not shown that his trial counsel's performance was constitutionally ineffective.

2. Ephrata Murder Testimony.

Teleguz argues that his trial counsel failed to effectively rebut statements tying him to an alleged murder in Ephrata, Pennsylvania. Prior to trial, Teleguz's counsel filed a motion in limine to bar references to this alleged murder. The court excluded evidence of the alleged murder during the guilt phase, but allowed it during the penalty phase. However, defense counsel asked Gilkes during the guilt phase about the alleged murder, but Gilkes denied remembering telling police about the event. The prosecution then asked Gilkes about the alleged murder, and

he testified about the details. During the penalty phase, the prosecution highlighted Gilkes' earlier testimony.

Teleguz did not assert this claim before the Supreme Court of Virginia. He now offers affidavits and other evidence in support of the claim that the murder did not occur. Although *Pinholster* left open the option of considering new evidence when a claim was not exhausted in state court, a district court may only consider such a claim and evidence if the default is excused when the requirements of § 2254(e)(2) are met. *Pinholster*, 131 S. Ct. at 1400. Here, such conditions are not met. Teleguz has failed to show cause for the default and has failed to show that the facts could not have been previously discovered through the exercise of due diligence. Furthermore, Teleguz has not shown a fundamental miscarriage of justice that would excuse the default. Therefore, this claim may not be considered on the merits.

### 3. "DIAL UP A MURDER" REFERENCES.

Teleguz argues that his counsel was ineffective for failing to rebut the prosecution's assertion that Teleguz could have someone killed by a telephone call from prison. During the state's closing argument at the penalty phase of the trial, the prosecutor stated that Teleguz was a future danger because "he can pick up a phone . . . and dial up a murder because he can call another Aleksey Safanov or another Edwin Gilkes or another Michael Hetrick." (J.A. 3454-55.) Defense

counsel responded by saying that a phone call would be insufficient because it would take money to hire a contract killer, which Teleguz would not have if incarcerated. Teleguz asserts that counsel neglected to explain telephone procedures that would apply to Teleguz while in prison, in that inmates may only call certain pre-approved individuals, and telephone calls are monitored.

During the state habeas proceedings, Teleguz raised the argument that counsel was ineffective for failing to object to the prosecution's statement. The Supreme Court of Virginia rejected the argument, maintaining that the statement outlined the facts of the case and was not improper. *Teleguz II*, 688 S.E.2d at 875. Teleguz also argued that counsel was ineffective for failing to request that the trial court re-open the evidence so that he could present testimony regarding inmate phone privileges. The Supreme Court of Virginia rejected the argument because Teleguz "fail[ed] to proffer what evidence would have been gained from presenting testimony regarding inmate phone privileges." *Id.* at 877. Therefore, Teleguz had not shown that counsel's performance was deficient. *Id.*

To the extent that the argument presented here is the same as those presented before the state courts, I find that the Supreme Court of Virginia's decision was reasonable. However, much of the substance of this claim, relating to the failure to rebut the prosecution's statement, is different from that advocated during the state habeas proceedings. Therefore, Teleguz's rebuttal claim was not exhausted in state

court and therefore is defaulted here. Teleguz has not asserted a cause for the default, and there is no fundamental miscarriage of justice to excuse that default.

### 4. RISK ASSESSMENT.

Teleguz asserts that his trial counsel was ineffective for failing to present a risk assessment expert to rebut the claim of future dangerousness. Teleguz asserts that testimony from such experts is common and that such an expert would have testified that Teleguz would have been less likely to be dangerous in prison than the average inmate. Teleguz asserts that a risk assessment expert, rather than a witness to testify about prison conditions generally, could have offered individualized testimony about Teleguz's personal propensity to be dangerous.

This claim was raised during the state habeas proceedings. The Supreme Court of Virginia rejected the argument, maintaining that Teleguz failed to proffer the specific testimony such an expert would have provided. *Teleguz II,* 688 S.E.2d at 879. Furthermore, the court reasoned that the evidence would likely have been inadmissible because a determination of future dangerousness revolves around a specific individual, and general information about the penal system is not relevant mitigation evidence. *Id*.

Teleguz now presents an analysis from a risk assessment expert to support his claims. However, I may not consider this new evidence when determining whether the Supreme Court of Virginia's decision was reasonable. *See Pinholster,*

131 S. Ct. at 1398. Based on the evidence presented to the Supreme Court of Virginia, its decision was reasonable. The court did not know what particular testimony such an expert would have offered because Teleguz did not provide an expert report or affidavit. The court, therefore, did not have the means to determine whether the expert testimony would have had probative value and would have been admissible. Additionally, although such experts have been used in previous cases, Teleguz has not shown that the failure to present a risk assessment expert would constitute ineffective assistance of counsel under prevailing professional norms.

5. JUROR QUESTION.

Teleguz argues that his trial counsel was ineffective for failing to timely object to the judge's answer to a question from the jury.

During penalty phase jury deliberations, a female juror asked a bailiff whether Teleguz knew her identity and location. The trial court addressed the comment with counsel outside the jury's presence, observing, "Now, obviously this is a repercussion of the references to the Russian Mafia." (J.A. 3521.) The court proposed an additional instruction:

> As required by law, defense counsel and the Commonwealth's Attorney are provided with the name, address, and occupation of each person in the venire (in this case, approximately 125 individuals). In common practice, defense counsel go over this list with the client to determine if the client knows any member of the venire.

As a matter of course, attorneys do not provide copies of this master list to their clients.

(J.A. 3531.)  Defense counsel objected to the instruction, requesting that the court include a statement that "the jury should base their decision [on] . . . the evidence and the instructions of law and that this [instruction] is something outside of that." (J.A. 3522.)  The court overruled the objection, submitted the instruction, and directed the jury to continue their deliberations.[11]

This claim was raised during the state habeas proceedings.  Teleguz presented an affidavit from a student in the University of Virginia Capital Post-Conviction Clinic who helped with the habeas case.  The student stated that one of the jurors interviewed said that she feared personal repercussions from her involvement in the case.  (Pet'r's State App. 108.)  The student also said that the juror answered, "I mean, my family, they mean the world to me.  I'll just leave it at that," when asked if she was referring to the idea that Teleguz was a part of the Russian Mafia.  (*Id.*)  The Supreme Court of Virginia rejected the argument that counsel was ineffective for not moving for a mistrial or timely objecting.  *Teleguz II,* 688 S.E.2d at 873, 877.  The court determined that that there was no basis for a mistrial and that Teleguz had not suggested such a legal ground.  *Id.*  Furthermore, it found that trial counsel acted reasonably in not interviewing jurors for a post-trial

---

[11]  After sentencing, defense counsel again objected to the instruction, on the basis that Teleguz never in fact had access to the juror's information.  The judge rejected the objection as untimely.

motion and held that Teleguz had not presented evidence to support the claim that jurors were so focused on the Russian Mafia statements that they feared for their lives. *Id.* at 874. The instruction should have been sufficient to quiet the jurors' concern. *Id.* at 877. Therefore, counsel's performance was not unacceptably deficient. *Id.*

Teleguz has not shown that the Supreme Court of Virginia's determination was unreasonable. The only evidence in support of Teleguz's claim presented to the state habeas court was an affidavit containing inconclusive hearsay statements from a juror.[12] The juror did not affirmatively state that the Russian Mafia references affected her decision to impose a death sentence.

### 6. MANNER OF DEATH.

Teleguz argues that his trial counsel was ineffective for not casting doubt on Hetrick's testimony that Teleguz ordered him to cut Sipe's throat. Teleguz asserts that the prosecution's portrayal of Teleguz as a future danger and its contention that the crime met the definition of "vile" was enhanced by this testimony. Teleguz contends that there was unused evidence that would have shown that Hetrick had threatened to cut another woman's throat, had killed someone in the past, and had described how he would kill someone by cutting them. He also asserts that counsel should have informed the jury that Hetrick originally stated

---

[12] A post-trial statement from another juror was not presented to the Supreme Court of Virginia and may not be considered here. *See Pinholster*, 131 S. Ct. at 1399.

that he cut Sipe's throat because he was angered when she fought back and caused the knife to cut him.

Teleguz raised a similar, but not identical, argument during the state habeas proceedings. There, Teleguz asserted that his counsel was ineffective for failing to secure the testimony of Kimberly Woods and Jessica Swartz, who would have testified about threats and comments made by Hetrick that would have undermined his claim that Teleguz chose the manner of death.

The Supreme Court of Virginia rejected the argument that trial counsel was ineffective, maintaining that neither the performance nor the prejudice prong of *Strickland* had been met. *Teleguz II*, 688 S.E.2d at 878. The defense was unable to obtain Swartz's appearance because a Pennsylvania court determined that Swartz would have been caused undue hardship by being compelled to travel to Virginia and testify. Trial counsel asked for a continuance to secure Woods' presence, but the motion was denied because the trial court determined that her testimony would be irrelevant. Trial counsel argued that the testimony would be relevant because Woods would testify that Hetrick had threatened to kill Woods by cutting her throat. The trial court held that the testimony would not show that it was Hetrick's idea, and not Teleguz's, to cut Sipe's throat. Teleguz also asserted to the Supreme Court of Virginia that his appellate counsel was ineffective for failing to preserve or adequately brief the issues relating to Woods' proffered

testimony, but the argument was rejected because Teleguz had not shown that Woods' testimony would have been relevant. *Id.*

The Supreme Court of Virginia's decision was reasonable. Teleguz has not shown that his trial counsel was deficient in the attempts to secure the testimony of the witnesses and has not shown that Woods' testimony would have been admissible if it had been secured. To the extent Teleguz asserts new arguments, and presents new evidence, relating to his counsel's failure to offer other evidence that Hetrick chose the manner of Sipe's death, the claim is defaulted because it was not raised in state court. Teleguz has not shown cause and prejudice or a fundamental miscarriage of justice to excuse the default.

### C. CLAIM III — INEFFECTIVE ASSISTANCE OF COUNSEL AT THE PENALTY PHASE OF TRIAL — FAILURE TO PRESENT MENTAL HEALTH EVALUATION AND OTHER LITIGATION EVIDENCE.

In his third claim for relief, Teleguz asserts that his counsel was ineffective in failing to present at the penalty phase the mental health evaluation and testimony of Jeffrey Aaron, Ph.D. Prior to trial, Dr. Aaron was hired by the defense to evaluate Teleguz and assist in the preparation and presentation of information concerning Teleguz's history, character, and mental condition. Dr. Aaron submitted a pretrial draft report to Teleguz's counsel summarizing his initial impressions and making recommendations to counsel about additional information that would assist in Teleguz's defense.

Under Virginia law, if a defendant chooses to present in mitigation expert testimony related to the defendant's history, character, or mental condition, the state may seek its own evaluation. Va. Code Ann. § 19.2-264.3:1(F)(1) (Supp. 2010). If the defendant refuses to submit to the state's expert, the trial court may, in its discretion, admit the defense evidence but inform the jury of his refusal to comply, or alternatively bar the defendant from presenting his expert's evidence entirely. Va. Code Ann. § 19.2-264.3:1(F)(2) (Supp. 2010). Such was the series of events in this case. Teleguz failed to submit to the evaluation of the state's expert, and following a motion by the state, the court excluded Dr. Aaron's testimony.

In his present petition, Teleguz asserts that his counsel was deficient in relation to Dr. Aaron in two respects. First, Teleguz claims that counsel failed to follow the recommendations made by Dr. Aaron in his initial report, and that by failing to do so, counsel squandered the opportunity to develop critical connections with Teleguz and his family. Relatedly, Teleguz contends that trial counsel failed to follow Dr. Aaron's recommendations that counsel should diligently pursue evidence related to Teleguz's Ukrainian background and seek culturally sensitive liaisons on his behalf. These failures, he asserts, would have furthered his mitigation evidence and explained to jurors Teleguz's seemingly stoic demeanor at trial. Second, Teleguz argues that when he refused to submit to the state's expert,

counsel should have zealously advocated for the statutorily available alternative that allowed for admission of Dr. Aaron's testimony.

Teleguz presented this claim to the Supreme Court of Virginia in his state habeas petition, and the court found that the evidence did not satisfy either of *Strickland's* two elements. *Teleguz II*, 688 S.E. 2d at 876. The court found that the record clearly reflected Teleguz's knowing noncompliance, despite multiple warnings by the trial court that his refusal risked the exclusion of Dr. Aaron's findings. *Id.* In the face of the trial court's evident disinclination to admit Dr. Aaron's testimony absent compliance, the Supreme Court of Virginia found that Teleguz could not demonstrate that more vigorous argument from counsel would have likely affected the trial court's decision. *Id.* Furthermore, Teleguz failed to adequately allege how the sentencing outcome would have been different had Dr. Aaron been permitted to testify. *Id.*

In support of his *Strickland* claim before this court, Teleguz relies on three documents: a pre-trial letter by Dr. Aaron to counsel summarizing his initial impressions, a post-trial affidavit from Dr. Aaron summarizing his relationship with the defense team, and Dr. Aaron's final report. Of these documents, the letter and the affidavit are new evidence to this court that were not submitted to the state courts. In reviewing whether the state habeas court's decision was reasonable under § 2254(d)'s deferential review, my consideration is limited to the evidence

as submitted to the state courts, and I restrict my review appropriately. *Pinholster*, 131 S. Ct. at 1398.

Because I find that Teleguz has not shown that the state habeas court's application of *Strickland* was unreasonable, I must deny relief on this claim under § 2554(d). Although the state trial court had the discretion to admit Dr. Aaron's report, the court repeatedly indicated an unwillingness to do so should Teleguz not submit to the state's expert. Teleguz has not shown that highlighting other available alternatives under the Code would likely have persuaded the court. I therefore find the Supreme Court of Virginia's application of *Strickland* reasonable and deny relief on this claim.

### D. CLAIM IV — INEFFECTIVE ASSISTANCE OF COUNSEL AT THE PENALTY PHASE OF TRIAL — FAILURE TO PRESENT CULTURAL EXPERT TESTIMONY AND TO SECURE CONSULAR ASSISTANCE.

Teleguz asserts several claims relating to his trial counsel's failure to properly present mitigating evidence about his background, the testimony of a cultural expert, or consular assistance for the penalty phase of his trial.

### 1. BACKGROUND AND UPBRINGING EVIDENCE.

Teleguz claims that his trial counsel failed to adequately investigate and present evidence of his background and character, including the persecution he and his family faced in the Ukraine. He asserts that his trial counsel was aware that his

Pentecostal Christian faith resulted in persecution of his family in the Ukraine of the time and that this persecution may have exerted a negative impact on his social and emotional functioning. Nevertheless, trial counsel failed to fully investigate the effects of the persecution. As evidence in support of his claim, Teleguz offers documents, including affidavits from various family members, which were not presented in the state habeas action.

Although claims relating to specific kinds of mitigation evidence from particular experts were presented to the Supreme Court of Virginia, this more general claim about Teleguz's upbringing, particularly from family members, was not. The defendant has not asserted cause for the default and has not shown a fundamental miscarriage of justice. *See Sawyer*, 505 U.S. at 347.

Teleguz nevertheless argues that he is entitled to an evidentiary hearing to present his argument and the newly gathered evidence. A petitioner may only receive an evidentiary hearing if he: (1) alleges additional facts which, if true, would entitle him to relief and (2) satisfies one of the six factors identified in *Townsend v. Sain*, 372 U.S. 293, 313 (1963). *See Walker v. True*, 401 F.3d 574, 584 (4th Cir. 2005). Even if a petitioner can make such a showing, however, any failure to develop the factual basis of a claim in state court bars an evidentiary hearing. *Id.* (citing 28 U.S.C.A. § 2254(e)(2) and *Fullwood v. Lee*, 290 F.3d 663,

681 (4th Cir. 2002)).  Because I have found that Teleguz failed to develop the factual basis of this claim, an evidentiary hearing on the issue is precluded.

### 2. CULTURAL EXPERT.

Teleguz argues that his trial counsel was ineffective for not requesting a cultural expert to testify about Ukrainian cultural norms and Teleguz's lack of emotion.  He asserted this claim during the state habeas proceedings.  The Supreme Court of Virginia rejected this argument, maintaining that the claim satisfied neither prong of the test enunciated in *Strickland*.  *Teleguz II*, 688 S.E.2d at 874. The court asserted that Teleguz failed to provide any evidence to support his theory that a cultural expert would have testified as he contended.  *Id.* at 875.

I agree that the evidence before the state habeas proceedings was insufficient to pass the *Strickland* test.  Particularly, Teleguz did not show that counsel's performance fell below an objective standard of reasonableness.  Trial counsel made an effort to secure testimony regarding Ukrainian cultural norms and attempted to explain Teleguz's purported lack of emotion.  Teleguz now offers new evidence to support his claim.  Particularly, he offers documents from a clinical psychologist, a mitigation specialist, and experts on the Ukraine. However, pursuant to *Pinholster*, my review is limited to the record that was before the state court.  Teleguz has failed to show that the Supreme Court of

Virginia's decision was unreasonable based on the evidence presented during the state habeas proceedings.

### 3. CONSULAR ASSISTANCE.

Teleguz argues that his trial counsel's failure to enlist and make use of consular assistance amounted to ineffective assistance of counsel. He concedes that this claim is procedurally defaulted because he did not assert it in state court. He does not argue that the default should be excused because of cause and prejudice. However, he argues that the claim should be considered to avoid a fundamental miscarriage of justice because he is actually innocent of the death penalty.

I find that Teleguz has not established by clear and convincing evidence that, but for the alleged constitutional violation, he would have been ineligible for the death penalty. *See Sawyer*, 505 U.S. at 347. First, Teleguz posits that Ukrainian officials could have assisted his trial counsel in discovering and developing information about his childhood in the Ukraine. Teleguz does not assert that the evidence that might have been uncovered could have made him ineligible for the death penalty by negating the aggravating factors found by the jury. Second, he suggests that the Ukrainian consulate might have approached the proper authorities to request that the death penalty not be imposed. This, too, fails to undermine the aggravating factors found by the jury. Furthermore, the argument is speculative;

Teleguz cites no evidence indicating that the Ukrainian government could have affected whether the death penalty was sought in this case. Therefore, the default is not excused due to actual innocence.

### E. CLAIM V — VIOLATION OF THE VIENNA AND CONSULAR CONVENTIONS.

In his fifth claim for relief, Teleguz contends that the state violated rights provided him under international treaties, namely the Vienna Convention on Consular Relations and Optional Protocol on Disputes ("Vienna Convention"), art. 36, Apr. 24, 1963, 21 U.S.T. 77, 596 U.N.T.S. 262, *available at* 1969 WL 97928, and the Consular Convention, U.S. – U.S.S.R. ("Bilateral Convention"), art. 12(2), June 1, 1964, 19 U.S.T. 5018, 655 U.N.T.S. 213, *available at* 1968 WL 89521. The Vienna Convention and the Bilateral Convention both require that diplomatic representatives from the nation of citizenship be notified upon the arrest of a foreign national.

The Vienna Convention is a seventy-nine article, multilateral treaty defining the functions of a consulate and governing the establishment of consular relations between nations. *United States v. Emuegbunam*, 268 F.3d 377, 388 (6th Cir.

2001).  Article 36 is entitled "Communication and contact with nationals of the sending State"[13] and provides:

      1.    With a view to facilitating the exercise of consular functions relating to nationals of the sending State:

> (a) consular officers shall be free to communicate with nationals of the sending State and to have access to them. Nationals of the sending State shall have the same freedom with respect to communication with and access to consular officers of the sending State;
>
> (b) if he so requests, the competent authorities of the receiving State shall, without delay, inform the consular post of the sending State if, within its consular district, a national of that State is arrested or committed to prison or to custody pending trial or is detained in any other manner.  Any communication addressed to the consular post by the person arrested, in prison, custody or detention shall also be forwarded by the said authorities without delay.  The said authorities shall inform the person concerned without delay of his rights under this sub-paragraph;
>
> (c) consular officers shall have the right to visit a national of the sending State who is in prison, custody or detention, to converse and correspond with him and to arrange for his legal representation.  They shall also have the right to visit any national of the sending State who is in prison, custody or detention in their district in pursuance of a judgment.  Nevertheless, consular officers shall refrain from taking action on behalf of a national who is in prison, custody or detention if he expressly opposes such action.

---

[13]    The "sending state" is the nation of the arrested foreign national, and the "receiving state" is the arresting nation.  *United States v. Chaparro-Alcantara*, 226 F.3d 616, 620 n.1 (7th Cir. 2000).

2.    The rights referred to in paragraph 1 of this Article shall be exercised in conformity with the laws and regulations of the receiving State, subject to the proviso, however, that the said laws and regulations must enable full effect to be given to the purposes for which the rights accorded under this Article are intended.

1969 WL 97928, at *1.

The Bilateral Convention is a thirty article, multilateral treaty entered into between the United States and the former Soviet Union to regulate consular relations between those countries.  Per customary international practice, the Ukraine is a party to the Bilateral Convention as a successor state of the Soviet Union.  U.S. Dep't of State, *Consular Notification and Access*, 43-44 (3d ed. Sept. 2010).  Article 12 of the Bilateral Convention provides:

1.    A consular officer shall have the right within his district to meet with, communicate with, assist, and advise any national of the sending state and, where necessary, arrange for legal assistance for him.  The receiving state shall in no way restrict the access of nationals of the sending state to its consular establishments.

2.    The appropriate authorities of the receiving state shall immediately inform a consular officer of the sending state about the arrest or detention in other form of a national of the sending state.

3.    A consular officer of the sending state shall have the right without delay to visit and communicate with a national of the sending state who is under arrest or otherwise detained in custody or is serving a sentence of imprisonment.  The rights referred to in this paragraph shall be exercised in conformity with the laws and regulations of the receiving state, subject to the proviso, however, that the said laws and regulations must not nullify these rights.

1968 WL 89521, at *1.  The Bilateral Convention further provides that while immediate consular notification upon arrest is preferred, notification shall be made at least within one to three days, depending on the conditions of communication. *Id.*

Teleguz claims that these provisions confer judicially enforceable individual rights upon detained foreign nationals and that his rights were violated when the state's authorities failed to promptly notify him upon arrest of his rights to communicate with the Ukrainian consulate.  Additionally, Teleguz claims that the state violated the treaties because it never formally notified Ukrainian authorities of the charges against Teleguz.  Teleguz argues that these violations call for a new trial.

Prior to trial, Teleguz filed a motion to strike the death penalty due to the alleged Vienna Convention violations.  The trial court denied the motion, and on direct appeal, Teleguz renewed the claim.  The Supreme Court of Virginia rejected his argument, finding that it was "extremely doubtful that a violation of the Vienna Convention would require a conviction to be overturned absent a showing that the trial was affected by the violation." *Teleguz I*, 643 S.E. 2d at 720-21 (internal quotation marks and citation omitted).  The court went on to conclude that, even assuming a violation, Teleguz could not show that he was prejudiced, particularly given a six-month continuance granted by the trial court for the specific purpose of

allowing Teleguz's counsel the opportunity to convene with Ukrainian authorities. Moreover, the Supreme Court of Virginia found the Ukraine's alleged interest unconvincing. It found that the trial court indicated its willingness to entertain motions from the Ukrainian consulate, such as motions to replace Teleguz's counsel or for additional continuances, should the consulate demonstrate an interest in assisting Teleguz. *Id.* However, the Ukraine never made any interest known. These facts, the Supreme Court of Virginia held, undercut any belated claim of government concern in the case. *Id.* Accordingly, the court rejected Teleguz's Vienna Convention claim, and Teleguz did not raise it in his state habeas appeal. *Id.*

Although a claim decided by the trial court and on direct appeal is barred from state habeas review, *Henry v. Warden*, 576 S.E.2d 495, 496 (Va. 2003), such a claim may be considered by this court on federal habeas review by virtue of its presentation on direct appeal. *See Goins v. Angelone*, 226 F.3d 312, 320 n.3 (4th Cir. 2000). Because this claim was adjudicated in a state court on its merits, § 2254(d)'s deferential review applies, and I may grant relief only if the state court decision contravened or unreasonably applied clearly established federal law.

The evidence related to this claim shows that the Harrisonburg Police Department was put on notice of Teleguz's international connection upon his arrest, when he indicated on intake forms his citizenship and place of birth as the

Ukraine. Despite this notice, state authorities did not inform Teleguz of his right to contact the Ukrainian consulate until almost a year later. Furthermore, Teleguz has submitted evidence by the Ukrainian government that it never received formal notification, either by trial counsel or by Virginia authorities, of the capital charges against him. The Ukrainian government has indicated that it only became aware of Teleguz's capital sentence when contacted by federal habeas counsel. [14]

Teleguz argues that the state's violations plainly harmed him because the Ukrainian government would have offered substantial assistance to Teleguz had it been properly notified. Teleguz asserts, and the government of Ukraine affirms, that the Ukraine would have helped Teleguz to understand the intricacies of the American judicial system, lobbied the state against seeking the death penalty, assisted Teleguz's counsel in the investigation of his case and background, and

---

[14] At oral argument in this case, counsel representing the Ukrainian Parliament Commission for Human Rights submitted to the court the written statement of one Nina Karpachova. Karpachova, a Ukrainian official, asserted that Ukrainian authorities learned of Teleguz's death sentence in August of 2010 when they were notified by Teleguz's federal habeas counsel. Karpachova additionally stated that thereafter Ukrainian consulate officers have been expediting the process of Teleguz's application for registration as a Ukrainian citizen and she requested that the court stay the case until a "final decision" has been made by the Ukraine on Teleguz's application, "in order for him to have appropriate legal protection of Ukraine." (Karpachova Statement ¶ 8.) The state argues that this new information shows that even after five years, Teleguz has still not established that the Ukraine would have been in a position to assist him. In response, Teleguz contends that his trial counsel was ineffective for not starting this "bureaucratic [citizenship] registration process" earlier. (Reply to Resp. in Opp'n to Statement of Nina Karpachova ¶ 3 (misnumbered as ¶ 2).)

facilitated the development of mitigation evidence. This assistance, Teleguz asserts, would have substantially affected the outcome of his case.

Under § 2254(d) review, I cannot say that the state court's decision to deny Teleguz's Vienna Convention claim was unreasonable. Although Teleguz argues that his trial was indeed prejudiced by the failure to notify the Ukraine, I agree with the Supreme Court of Virginia that the facts belie such a finding. The trial court recognized the importance of consular notification and attempted to rectify any deficit Teleguz may have suffered from being denied the Ukraine's immediate participation in his defense. The court held Teleguz's trial in abeyance for a significant period to enable him to seek consular assistance and additionally noted its openness to consider Ukrainian interest in the case. Moreover, I cannot credit the Ukraine's belated assertion of interest in the case over the state courts' findings, where both the trial court and the direct appeal court had no evidence before them suggesting that the Ukraine would have interceded on Teleguz's behalf.

Finally, the related Bilateral Convention claim does not change my finding. Although the Bilateral Convention protects the same pertinent rights at issue as does the Vienna Convention (albeit with more stringent notification requirements), counsel did not cite to its provisions before the state courts. Thus, I cannot grant relief on its basis, for the dual reasons that a claim based on provisions that

substantially parallel those of the Vienna Convention would likely have been unsuccessful, and also because this claim was not properly brought before the state courts. *See Fisher v. Angelone*, 163 F.3d 835, 844 (4th Cir. 1998). Thus, because I find that the state courts' resolution of Teleguz's Vienna Convention assistance claim was reasonable under § 2254(d), I deny relief. [15]

## F. CLAIM VI — *BRADY* AND *GIGLIO* VIOLATIONS.

In *Brady v. Maryland*, the Supreme Court held "that the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." 373 U.S. 83, 87 (1963). The three necessary elements of a Brady claim are: "(1) the evidence must be favorable to the accused; (2) it must have been suppressed by the government, either willfully or inadvertently; and (3) the suppression must have been material." *Monroe v. Angelone*, 323 F.3d 286, 299-300 (4th Cir. 2003) (citing *Strickler v. Greene*, 527 U.S. 263, 281-82 (1999)). In this context, "favorable evidence is material, and constitutional error results from its suppression by the government, 'if there is a

---

[15] The state has also argued that Teleguz lacks standing to bring these claims because the Vienna and Bilateral Conventions are not self-executing treaties conferring domestically judiciable individual rights. *See Bell v. True*, 413 F. Supp. 2d 657, 731-32 (W.D. Va. 2006) (discussing issue), *aff'd*, 260 F. App'x 599 (4th Cir. 2008) (unpublished). Neither the trial court nor the Supreme Court of Virginia on direct appeal relied on this argument to reject Teleguz's claims. Because my review is limited by § 2254 and the decisions by those courts were reasonable, it is not necessary for me to reach this alternate argument.

reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.'" *Kyles v. Whitley*, 514 U.S. 419, 433 (1995) (quoting *United States v. Bagley*, 473 U.S. 667, 682 (1985)). The disclosure requirement covers both impeachment material and other exculpatory evidence. *Id*. In *Giglio v. United States*, 405 U.S. 150, 155 (1972), the Supreme Court held that failure to disclose a promise of leniency made to a witness was a violation of a criminal defendant's due process rights.

Teleguz asserts that the state violated his rights under *Brady* and *Giglio* by failing to disclose certain evidence prior to trial. Most of the undisclosed evidence was subsequently provided to Teleguz pursuant to a motion to compel after the completion of the guilt and penalty portions of the proceedings. Teleguz then asked the trial court to set aside the verdict or impose only a life sentence, arguing that the evidence was material and that he had been denied a fair trial because of its nondisclosure. The state argued that Teleguz had been given portions of the evidence and at least had notice that some of the evidence existed. It also argued that Teleguz was not prejudiced by the failure to disclose the evidence. The trial court ruled that there was no violation because there was no likelihood that the verdict would have been different. Teleguz's specific arguments are discussed below.

## 1.   RYAN FERGUSON INTERVIEW NOTES AND PHOTO ARRAY.

Teleguz argues that the prosecution did not reveal notes from an interview with Ryan Ferguson, who claimed to have seen someone leaving Sipe's apartment the day before her body was found.  According to Teleguz, Ferguson told the police that the person he had seen was a Hispanic male.   Investigator Kevin Whitfield then showed Ferguson a photo array, which Teleguz claims was suggestive, and Ferguson stated that none of the photos were of the man he had seen.  According to Teleguz, the interview and photo array results were improperly used to support a claim of probable cause for a search warrant.  Teleguz argues that the notes could have been used to undermine the identification by another witness, Mark Moore, and the testimony of Investigator Whitfield.

Teleguz raised this argument on direct appeal to the Supreme Court of Virginia.  The court rejected the argument, holding that the evidence was not material.  *Teleguz I*, 643 S.E.2d at 727.  It assumed without deciding that the evidence was favorable to Teleguz and was suppressed.  *Id*.  The court determined that the suppression did not undermine confidence in the trial's outcome, *id.* at 727-78, noting that Teleguz had been provided with materials that referred to the interview with Ferguson and to Ferguson's identification of Teleguz from the photograph array.  *Id.* at 727.  Teleguz's presence at Sipe's apartment, which was the issue in Ferguson's interview and Moore's testimony, was not a central part of

the state's case because the theory was that Teleguz hired others to commit the murder. *Id.* Furthermore, efforts to impeach the credibility of Investigator Whitfield would not call into question the reliability of the police investigation as a whole. *Id.* at 728. The investigation was not initiated by Investigator Whitfield; rather, Deputy U.S. Marshal Michael Nelson initiated the investigation into Teleguz's role in the murder and made the key findings that led to confessions by Gilkes and Hetrick. *Id.* Finally, neither Moore nor Investigator Whitfield testified about any independent knowledge regarding the transaction between Teleguz, Gilkes, and Hetrick. *Id.* To find Teleguz guilty, the jury had to believe the testimony of Safanov, Gilkes, and Hetrick. *Id.*

Teleguz has not shown that the Supreme Court of Virginia's conclusion was unreasonable. The notes in question only undermine the testimony of Investigator Whitfield to the extent that he falsely swore an affidavit of probable cause for a warrant to search Teleguz. However, the search did not reveal any link between Teleguz and physical evidence found at the crime scene. For this reason and the reasons expressed by the Supreme Court of Virginia, it was reasonable to find that the suppressed evidence was not material.

## 2. MARK MOORE MATERIALS.

Sipe's neighbor, Mark Moore, testified at trial that he had seen Teleguz leaving Sipe's apartment the day before her body was discovered. The prosecution

produced a photo array and Moore testified that he had previously identified photo number three, which was a photo of Teleguz, as the person he had seen. Teleguz argues that the prosecution did not reveal evidence, such as notes, reports, a proffer agreement, letters, and photos, relating to Moore's testimony. He also claims that the prosecution did not disclose evidence that Moore's testimony was provided in exchange for immunity on unrelated charges.

Teleguz argues that if he had had access to the favorable material, he would have been able to undermine Moore's identification and testimony. Particularly, he would have shown that Moore offered information in exchange for immunity from prosecution pursuant to a proffer letter.[16] He also claims that he would have been able to undermine Moore's identification because the meeting notes indicated that Moore said the man he had seen had a mustache; Teleguz claims he was clean shaven at the time. Teleguz also argues that the notes contained valuable information that two other witnesses were present when Moore saw the man. Those other witnesses have since said that they did not see Teleguz at Sipe's apartment. Teleguz also argues that the evidence would have been useful to undermine the investigation as a whole and the credibility of Investigator Whitfield.

---

[16] The specific proffer letter that would apply to Moore had not been produced, but a form proffer letter had been disclosed.

This claim was presented on direct appeal. The court rejected the argument, maintaining that Teleguz was not prejudiced by the nondisclosure. *Teleguz I*, 643 S.E.2d at 727. The court assumed, without deciding, that the evidence was favorable to Teleguz and was suppressed. *Id.* The court noted that Teleguz knew before trial that Moore had been interviewed, that a proffer agreement had been signed, and that Moore and two others had seen someone coming from Sipe's apartment prior to her murder. *Id.* As was the case with regard to Ferguson, the identification of Teleguz at Sipe's apartment was not central to the state's case that Teleguz had hired others to commit the murder. *Id.* at 727-28. Because extensive investigation was done by Deputy Marshal Nelson, impeaching Investigator Whitfield would not undermine the entire investigation. *Id.* at 728. Furthermore, the testimony of Moore and Investigator Whitfield was less relevant to the state's case than the believable testimony offered by Safanov, Hetrick, and Gilkes. *Id.*

Teleguz has not shown that the Supreme Court of Virginia acted unreasonably. As stated by the court, whether Teleguz was seen at Sipe's apartment was not central to the question of whether he hired someone to commit the murder. Even if the jury discredited the testimony of Moore and Investigator Whitfield, it is unlikely that the evidence would have affected the impact of other key witnesses such as Safanov, Hetrick, and Gilkes.

### 3.  MEETING AND CORRESPONDENCE WITH ALEKSEY SAFANOV.

Teleguz also contends that the prosecution failed to disclose evidence relating to Aleksey Safanov, including details from conversations between Investigator Whitfield and a FBI agent about Safanov and from meetings with Safanov.  He claims that the conversations between the law enforcement agents would have been useful for impeaching Safanov's testimony because they would have expressed the agents' doubts about Safanov's credibility.  He asserts that the suppressed materials would have been useful to impeach Safanov because Safanov was inconsistent about whether he knew Gilkes.

This claim was presented at the state habeas proceeding.  The court rejected the claim, stating that Teleguz had not established that the allegedly withheld evidence existed, that it contained exculpatory information, or that it would have been valuable for impeachment purposes.  *Teleguz II*, 688 S.E.2d at 872-73.

Teleguz has not shown that the Supreme Court of Virginia was unreasonable in its decision.  He cites to a report that discusses information provided by Safanov to investigators and to a discussion between Investigator Whitfield and a FBI agent that was taped.  He appears to argue that the cited materials hint at the existence of other evidence, but the contents of the cited materials are insufficient to show that the other evidence exists.  Moreover, even if some evidence referenced in the cited materials, such as the photo array shown to

Safanov, did exist, Teleguz has not shown why that would be exculpatory or otherwise valuable for impeachment purposes.

### 4. WAL-MART SALES RECEIPT.

Teleguz also claims that the prosecution violated his rights under *Brady* by failing to provide him with a Wal-Mart receipt that he alleges would have established that he was in Ephrata, Pennsylvania, on the morning the murder took place. Teleguz's presence in Ephrata at that time, he contends, conflicts with the state's theory of the case. He claims that he provided the original receipt to Investigator Whitfield but neither the receipt nor a copy of it was disclosed to defense counsel or produced or mentioned at trial.

This claim was asserted at the state habeas proceeding, but the court rejected the claim, stating that it was barred because it could have been raised at trial and on direct appeal. *Teleguz II*, 688 S.E.2d at 872 (citing *Slayton v. Parrigan*, 205 S.E.2d 680, 682 (Va.1974)).

In this case, the Supreme Court of Virginia's application of *Slayton*'s procedural default rule provides an adequate and independent state law ground upon which to deny relief on federal habeas review, barring cause and actual prejudice or a miscarriage of justice. *See Mu'Min v. Pruett*, 125 F.3d 192, 196-97 (4th Cir. 1997) (rejecting petitioner's argument that the procedural default rule in

*Slayton* does not bar consideration of claims because the rule is not independent of federal law).

Accordingly, Teleguz's claim is barred from federal habeas review absent a showing of cause and prejudice. Teleguz knew about the existence of the receipt because he personally gave it to the police. Because nothing external to the defense prevented him from raising this claim on direct appeal, he has not demonstrated the requisite cause to excuse this default and I must deny this claim.

### 5. INTERVIEW WITH AND CONVERSATIONS ABOUT EDWIN GILKES.

Teleguz alleges that the state suppressed evidence of statements made prior to a recorded conversation between Gilkes and Investigator Whitfield as well as statements made in the prosecution's recorded interviews of Gilkes. Teleguz alleges that in the undisclosed statements Investigator Whitfield and the prosecutor made clear that they were interested in implicating him. Teleguz argues that this evidence would be relevant to undermine the testimony of Gilkes and show that the investigation inappropriately targeted Teleguz.

This claim was not raised before the Supreme Court of Virginia on direct appeal or in the state habeas proceeding. Therefore, it is procedurally defaulted. Unless Teleguz can show that either cause and prejudice or a fundamental miscarriage of justice excuse the default, the exhaustion requirement bars any further review by this court. *Fisher*, 163 F.3d at 844.

Teleguz argues that there was cause for the default because the prosecution incorrectly represented that all the *Brady* material had been disclosed. However, the evidence he now cites in support of his claim was presented to the Supreme Court of Virginia during the state habeas proceedings. Nevertheless, this *Brady* argument was not made during those proceedings. Therefore, Teleguz has failed to demonstrate the requisite cause to excuse the default.

6.   EPHRATA MURDER.

Teleguz claims that the prosecution suppressed evidence showing that he was not responsible for a murder in Ephrata, Pennsylvania. In 2003, Gilkes made a statement to federal investigators about an incident that allegedly occurred outside a recreation center in 2001 during which Teleguz allegedly shot and killed someone. At trial, the defense questioned Gilkes about the statement. On re-direct, Gilkes stated that he was at the recreation center with Popov and others when Teleguz, who he did not know by name at the time, and another man got out of a car and made a threat that if he was not paid money owed to him, "some of them would be killed." (J.A. 2870.) Gilkes testified that "three days to a week after that," a man associated with the group was killed. (J.A. 2871.) Teleguz now claims that the statements were false, that the prosecution had previously investigated the statements and found them to be false, and that the prosecution failed to reveal the results of its investigation.

This claim was not raised before the Supreme Court of Virginia on direct appeal or in the state habeas proceeding. Therefore, it is procedurally defaulted. Teleguz has failed to show cause and prejudice or a miscarriage of justice. Teleguz had knowledge of the statements Gilkes made at trial implicating Teleguz in a murder outside a recreation center. He has not presented any evidence that shows that the prosecution withheld evidence with regard to the alleged murder that was unattainable at the time of the direct appeal or state habeas petition. Teleguz alleges that evidence was withheld "on information and belief" (Am. Pet. at 175), but there is no explanation of why Teleguz could not have raised the claim during the state proceedings. Teleguz has not shown the requisite cause to excuse the default.

### 7. JOHN BELYY MURDER.

Teleguz claims that the prosecution withheld evidence that family and friends of one John Belyy were angry at Teleguz about Belyy's murder and held Teleguz responsible. Particularly, he alleges, on information and belief, that the prosecution or investigators possessed transcripts and police reports relating to the case against John Belyy's murderer, Valeriy Mezentev, that contained important information about Teleguz. Teleguz claims that the suppressed evidence would have shown that two other men, Eugene Popov and Anatoly Rymarenko, had motives to seek revenge against Teleguz.

This claim was not raised before the Supreme Court of Virginia on direct appeal or in the state habeas proceeding. Therefore, it is procedurally defaulted. Teleguz argues that there was cause for the default, namely, that he could not obtain Mezentsev's case documents containing the relevant information because Mezentsev did not grant consent until September 10, 2010.

Teleguz has failed to show that obtaining Mezentsev's case documents was necessary prior to making this *Brady* claim. The defense knew about the Belyy murder, that an investigation of the murder had occurred, and about the relationships of the people involved in the murder, prior to the state proceedings. Based on that knowledge, the defense could have asserted the claim during state proceedings. However, the failure to assert the claim was not sufficiently unreasonable or prejudicial to amount to ineffective assistance of counsel. Therefore, Teleguz has not shown the requisite cause to excuse the default.

### 8. "RUSSIAN MAFIA" REFERENCES.

Teleguz also claims that the prosecution failed to reveal that it knew he was not involved with the Russian Mafia. On information or belief, Teleguz claims that the prosecution questioned Safanov about whether Teleguz was a member of the Russian Mafia and that Safanov replied that he was not. He also alleges that the prosecution failed to disclose the conclusion of a state investigator, Dan

Comer, that the case had nothing to do with the Russian Mafia and Comer's supporting materials.

This argument was not raised on direct appeal or during the state habeas proceeding. Therefore, it is procedurally defaulted. Teleguz has failed to show cause and prejudice or a miscarriage of justice. He has offered no evidence to show why the defense could not have asserted its information or belief that Safanov was questioned about Teleguz being in the Mafia during one of the state proceedings. Furthermore, the evidence Teleguz now offers to support Comer's conclusion that the case had nothing to do with the Russian Mafia was in the record for the state habeas proceeding. (Pet'r's State App. 439.) Therefore, Teleguz had the supporting facts to make this claim before the state court. He has not shown the requisite cause to excuse the default.

G.   CLAIM VII — *NAPUE* VIOLATIONS.

In his seventh claim for relief, Teleguz contends that the state knowingly elicited and used false testimony in violation of his due process rights, pursuant to *Napue v. Illinois*, 360 U.S. 264 (1959). In *Napue*, the Supreme Court reaffirmed the principle that "a State may not knowingly use false evidence, including false testimony, to obtain a tainted conviction." 360 U.S. at 269. A *Napue* claim requires a showing of both (1) the falsity and materiality of the testimony and (2) the prosecutor's knowledge of the falsity. *Basden v. Lee*, 290 F.3d 602, 614 (4th

Cir. 2002). In this context, false testimony is material if there is "'any reasonable likelihood that the false testimony could have affected the judgment of the jury.'" *Id*. (quoting *United States v. Agurs*, 427 U.S. 97, 103 (1976)). As set forth in his Amended Petition, Teleguz's *Napue* claim encompasses six subclaims, which correspond largely to his *Brady* claims, resolved under the Claim VI heading above. I discuss each subclaim and its individual procedural posture below.

### 1. INVESTIGATOR WHITFIELD'S TESTIMONY.

Teleguz contends that Investigator Whitfield committed perjury regarding Mark Moore's identification. Teleguz specifically alleges that Investigator Whitfield testified falsely as to when Moore made the identification, the events that precipitated Moore's initial meeting with authorities, the circumstances surrounding the photo identification, and Moore's certainty in making the identification itself. Teleguz further claims that the prosecutor knew that Investigator Whitfield's testimony was false because she was present at the Moore meetings and acknowledged reviewing Investigator Whitfield's notes prior to trial. Finally, Teleguz argues that there is a reasonable likelihood that Investigator Whitfield's false testimony affected the trial's outcome, because his testimony corroborated the credibility of Moore's identification, as well as the testimony of Hetrick and Gilkes implicating Teleguz in the crime.

This argument was adjudicated on the merits on direct appeal. After examining the allegedly false statements made by Investigator Whitfield in detail, the Supreme Court of Virginia denied the claim in its entirety. *Teleguz I*, 643 S.E.2d at 729. The court found that at least two of the statements were made outside the presence of the jury and therefore could not have affected the trial's outcome under *Napue*. *Id.* As to the other statements, the court found that, while "inconsisten[t]" in some respects, they were "given in conjunction with [Investigator Whitfield's] own qualification that he was unable to remember or that he would need to consult his notes to refresh his recollection." *Id.* The court concluded that "[t]hese statements were not false, but rather were simply statements of what he believed to be true, accompanied by a qualification that he was not certain." *Id.*

The court separately addressed Investigator Whitfield's testimony regarding the impetus of Moore's initial meeting with police authorities. At a post-trial hearing, Investigator Whitfield contradicted his trial testimony regarding what events prompted the Moore identification. At trial, Investigator Whitfield testified that police had first interviewed Moore because he was Sipe's neighbor and the police knew him from previous interactions. Post-trial, Investigator Whitfield admitted that Moore independently contacted police after he was arrested on unrelated charges. Despite this inconsistency, the Supreme Court of Virginia

found that the record failed to establish that the prosecutor knew Investigator Whitfield's trial testimony was inaccurate. *Id.* at 729-30. Finally, the court dismissed the *Napue* claim on the basis that Investigator Whitfield's testimony was not reasonably likely to have prejudiced the trial's outcome. *Id.* at 730.

The Supreme Court of Virginia thus made several crucial findings: that Investigator Whitfield did not commit perjury when he admitted he could not remember certain details regarding the Moore identification; that the prosecutor did not know Investigator Whitfield's testimony contained falsities; and that the false testimony was not reasonably likely to have affected the jury's judgment. I must examine these findings pursuant to § 2254(d)'s deferential review. After such review, I find that the state court's factual findings and its decision to deny Teleguz's *Napue* claim on these grounds were not unreasonable.

Teleguz relies heavily on the fact that the prosecutor was present at the meetings with Moore and admitted to reviewing Investigator Whitfield's notes from those meetings pre-trial. However, as the state court noted, there is nothing in the written record that memorializes how those meetings were initiated. *Id.* at 730 n.8. Thus the notes do not necessarily prove that the prosecution was alerted to the inconsistencies Investigator Whitfield spontaneously made in his trial testimony. Secondly, the trial court thoroughly investigated the inconsistencies when it addressed Teleguz's post-trial *Brady* motion. Both the trial court and the

appellate court found that Investigator Whitfield's testimony regarding the Moore identification did not prejudice Teleguz's due process rights because this evidence was not a focal point of the prosecution's case against Teleguz. Without showing that these findings were unreasonable, Teleguz cannot succeed on his current claim before this court.

### 2.  "RUSSIAN MAFIA" REFERENCES.

Teleguz also raises a *Napue* claim regarding the trial testimony that referenced the Russian Mafia. Prior to trial, Teleguz filed a motion in limine seeking to preclude the state from commenting on or introducing evidence as to any alleged connection between Teleguz and the Russian Mafia. The trial court denied the motion, but issued a limiting instruction to the jury that such testimony could only be considered to show a witness' state of mind and not for the truth of the matter asserted. At trial, both Hetrick and Gilkes testified that they had believed Teleguz was a member of the Russian Mafia and that his connection to organized crime had made them fearful they would be killed if they did not participate in Teleguz's murder for hire scheme.

During jury deliberations in the penalty phase, a juror asked the bailiff whether Teleguz knew her identity and location. The judge addressed the question outside the jury's presence and commented that he believed that it was related to the Russian Mafia references. He proposed an instruction that defense counsel had

received the name, address, and occupation of each venire member and that it was common practice for the defense counsel to go over the list with the client but not to provide a copy of the list to the client. Defense counsel requested that the instruction be supplemented with an admonition that the jury needed to limit itself to the evidence before it, but that request was denied at that time and again after the jury reached its verdict.

In his state habeas action, Teleguz submitted the statement of a juror who indicated that she feared the Russian Mafia connection, stating, "I mean, my family, they mean the world to me. I'll just leave it at that." (Pet'r's State App. 108.) In his federal petition, Teleguz supplements this evidence with the affidavit of an additional juror, which is new to the record.

Teleguz challenged the Russian Mafia references on substantive grounds on direct appeal, but did not raise it under a *Napue* theory until his state habeas petition. On direct appeal, the Supreme Court of Virginia found that the limiting instruction cured any prejudice caused by the statements, and on state habeas, the court found the *Napue* argument procedurally defaulted. *Teleguz I*, 643 S.E.2d at 722-23; *Teleguz II*, 688 S.E.2d at 873. The habeas court also rejected Teleguz's related theory that he suffered ineffective assistance of counsel when counsel failed to successfully object to the Russian Mafia references, because the record showed

that counsel vigorously argued against the inclusion of this testimony. *Teleguz II*, 688 S.E.2d at 873.

Because Teleguz defaulted his state claim, he can only rely upon this *Napue* claim in the present action if he can show that cause and prejudice or a fundamental miscarriage of justice excuse the default. This *Napue* claim relies substantively and legally on much of the same grounds as does the related *Brady* claim, and Teleguz presented that legal theory to the state courts. Accordingly, he could have presented his *Napue* claim as well.

Nevertheless, the AEDPA does not forbid me from addressing the merits of a procedurally defaulted claim, when I find it appropriate to do so. 28 U.S.C.A. § 2254(b)(2). The record suggests that certain jurors may have impermissibly considered and been influenced by an issue outside the facts of Teleguz's case. In the face of the juror's question regarding Teleguz's access to her personal information, it may have been appropriate to remind the jury to limit their deliberations to the issues and facts properly before them. However, the jury did receive such an admonishment as part of their initial instructions (J.A. 3299, 3301) and as the Supreme Court of Virginia found on direct appeal, the jury is presumed to have followed that instruction. *Teleguz I*, 643 S.E. at 722-23. Moreover, I note that while the juror's affidavit before this court indicates that a fear of personal safety may have been a factor in the jury's decision, the juror does not indicate that

fear was a determinative factor.  Given the deferential lens of AEDPA review and the fact that I do not find this issue significant enough to excuse Teleguz's procedural default, I will deny relief on this ground.  *See* 28 U.S.C.A. §§ 2254(d)(1), (e)(1).

3.    E<span style="font-variant:small-caps">PHRATA</span> M<span style="font-variant:small-caps">URDER</span> T<span style="font-variant:small-caps">ESTIMONY</span>.

Teleguz makes a *Napue* claim regarding the trial testimony that suggested Teleguz was responsible for a murder that supposedly took place around a recreation center in Ephrata, Pennsylvania. The court addressed this issue pre-trial, granting a defense motion to bar this evidence prior to the penalty phase.  (J.A. 1819-20.)  Despite succeeding on this motion, Teleguz's counsel raised the subject while cross-examining Gilkes, prompting the prosecutor to further explore it on redirect.   Teleguz argues before this court that this testimony violated *Napue* because the prosecution could have readily verified that Gilkes' testimony was false, since no such murder in Ephrata ever took place.

Teleguz failed to present this claim to the state court either on direct appeal or on state habeas, and as such it is now procedurally defaulted.  He must therefore fail on this claim unless he can show cause and prejudice or a fundamental miscarriage of justice sufficient to excuse the procedural waiver.  Because, as Teleguz himself argues, the inaccuracy of Gilkes' allegation was readily verifiable, Teleguz could have raised this argument before the state courts below.   Therefore,

he cannot show cause and prejudice, and I furthermore, I find that Teleguz did not suffer a miscarriage of justice sufficient to excuse his procedural waiver. Thus, this *Napue* claim is also defaulted.

4. "DIAL UP A MURDER" REFERENCES.

In a claim that repeats substantially the same facts as that of the Russian Mafia claim above, Teleguz argues that the prosecutor violated *Napue* in a reference made during closing argument in the penalty phase. In her summation, the prosecutor argued that Teleguz remained a future danger because,

> [a]t any time he can pick up a phone when he has access to a phone and dial up a murder because he can call another Aleksey Safanov or another Edwin Gilkes or another Michael Hetrick. When a man can hire out a murder he can hire out a murder with a mere telephone when you have the abilities that Ivan Teleguz has shown.

(J.A. 3454-55.)

Teleguz argues that these statements constituted a *Napue* violation because the prosecution realized that Teleguz's access to the outside world would be sharply circumscribed in prison, and thus the prosecutor's statement was improper and prejudicial. He previously raised this argument in his state habeas petition. There, however, he styled it as an ineffective assistance of counsel claim based on counsel's failure to object to the prosecutor's statements. The state habeas court rejected his claim, finding that the prosecutor's comments recounted "the facts of the case" and were not improper. *Teleguz II*, 688 S.E.2d at 875.

Although Teleguz relies on the same facts, he has substantially shifted his legal theory to one never put before the state court. Thus, Teleguz has procedurally defaulted this claim. Without a showing of a proper excuse, I may not review it further.

5.    EVERHART BIRTHDAY PARTY TESTIMONY.

Teleguz argues that the prosecution violated *Napue* by presenting false evidence that Teleguz solicited Sipe's murder at a birthday party hosted by the Everhart family. Teleguz raised this argument in his state habeas petition, but the Supreme Court of Virginia found it to be non-cognizable, as Teleguz could have raised it at trial or on direct appeal. *Teleguz II*, 688 S.E.2d at 865. This adequate and independent state law finding forecloses further review of his claim before this court. 28 U.S.C.A. § 2254(b); *Teague v. Lane*, 489 U.S. 288, 298 (1989).

Notwithstanding the fact that Teleguz failed to properly exhaust available state remedies, I find that this *Napue* claim additionally cannot succeed on the merits. The evidence supporting this claim consists of affidavits, only some of which were put before the state courts, that Teleguz was not present at the Everhart party. Teleguz contends that this evidence, withheld in violation of *Brady*, also violated *Napue* when the key witnesses testified to these events at trial. However, even if I were to assume the veracity of this newly-produced evidence, these affidavits do not show that the prosecution was aware of false testimony, or that

Teleguz has met the requirements for excusing procedural default. Because neither procedural posture nor the underlying merits justify granting relief on this claim, I find that this claim is without merit.

### 6.     ALEKSEY SAFANOV'S TESTIMONY.

Finally, Teleguz argues that the prosecution generally violated *Napue* by offering the testimony of Aleksey Safanov. Teleguz argues that the prosecution knew Safanov was not a credible witness and should have known that his testimony would be false. He presented this claim before the state habeas court, but that court rejected it as procedurally defaulted. *Teleguz II*, 688 S.E.2d at 872.

Teleguz has not provided cause or prejudice, or a showing of a fundamental miscarriage of justice, sufficient to excuse this procedural default. Furthermore, I find that Teleguz could not meet *Napue*'s requirements on the merits, based on much of the same reasoning on which I have rejected his other claims related to Safanov's testimony. (See Claims I, VI, and VIII.)

### H.     CLAIM VIII — ACTUAL INNOCENCE.

In addition to his procedural claim of actual innocence to excuse his defaulted claims, Teleguz makes a free-standing substantive claim of actual innocence based on the Eighth Amendment. The Supreme Court of Virginia rejected Teleguz's free-standing actual innocence claim during the state habeas

proceedings. *See Teleguz II*, 688 S.E.2d at 868-69 (citing *Lovitt v. Warden*, 585 S.E.2d 801, 826-27 (Va. 2003)).

Neither the United States Supreme Court nor the Fourth Circuit has ever found facts sufficiently compelling to grant a writ of habeas without an underlying constitutional violation. *See Buckner v. Polk*, 453 F.3d 195, 199 (4th Cir. 2006). The Supreme Court has suggested that an independent claim of actual innocence could theoretically be made, but the showing that would be required "would necessarily be extraordinarily high." *Herrera v. Collins*, 506 U.S. 390, 417 (1993). In *House v. Bell*, 547 U.S. 518, 555 (2006), the Supreme Court expressly declined to resolve the issue of whether a free-standing claim of actual innocence is cognizable in a federal habeas proceeding. Teleguz argues that his claim is legally cognizable because the execution of an innocent person would violate the Constitution. *See Herrera*, 506 U.S. at 419 (O'Connor, J., joined by Kennedy, J., concurring), 431 (Blackmun, J., joined by Stevens and Souter, JJ., dissenting).

Although the case law weighs against a petitioner making a free-standing claim of actual innocence, I have considered Teleguz's arguments. First, Teleguz argues that the investigation against him was prejudiced. Second, he argues that the case against him relied on false evidence and untrustworthy testimony of snitches. Third, he argues that exculpatory information was concealed from the defense. He then suggests alternative theories of how and why Sipe was murdered.

Teleguz suggests that Hetrick and Gilkes were hired by someone else. He also suggests that the murder occurred during "a robbery gone bad." (Am. Pet. 208.)

### 1. PREJUDICED INVESTIGATION.

Teleguz alleges that investigators persisted in pursuing their theory that Teleguz was involved in the murder of Sipe despite a lack of evidence and that they declined to investigate evidence that would have undermined their theory. Particularly, Teleguz asserts that investigators ignored a Wal-Mart receipt that showed that he was in Ephrata, Pennsylvania, on the morning of the murder and ignored the fact that he could not be tied to the DNA evidence found at the crime scene. As further evidence of prejudice, Teleguz argues that Investigator Whitfield swore out a false affidavit to get a search warrant and ignored indications that Safanov was not credible or could have been a suspect in the murder. Teleguz also argues that investigators improperly encouraged witnesses, such as Safanov and Gilkes, to implicate him.

### 2. UNRELIABLE WITNESSES.

Teleguz argues that the state's case was primarily based on the testimony of three witnesses, Safanov, Hetrick, and Gilkes, who had powerful incentive to testify favorably in support of the state's case against Teleguz and were unreliable. He argues that Safanov had credibility problems that were not fully disclosed to the jury and received a substantial benefit in return for his testimony against Teleguz.

Safanov was sentenced below the sentencing guideline range after consideration of his substantial assistance in the prosecution. Teleguz alleges that Safanov has now admitted that Teleguz never told him he had Sipe killed.

Teleguz also argues that Gilkes was unreliable and changed his story several times prior to trial. Since his sentencing, Gilkes has claimed that he never overheard Teleguz hire Hetrick to kill Sipe. Teleguz asserts that Gilkes sent a note to him explaining that the prosecutor made him testify the way he did.

Hetrick admitted to killing Sipe and testified in return for a deal from the state. Teleguz argues that he was unreliable, as evidenced by his inconsistent statements about whether he was using drugs at the time of the murder. Teleguz also contends that although Hetrick testified at trial that Teleguz told him to cut Sipe's throat, evidence that was not available at trial reveals that Hetrick had a history of threatening to cut women's throats.

Additionally, Gilkes and Hetrick both testified at trial that Teleguz discussed hiring them to kill Sipe while at Dave Everhart's birthday party. Teleguz argues that he was not at that party and supports his argument with affidavits from Dave and Latesha Everhart.

### 3.    EXCULPATORY INFORMATION.

Teleguz alleges that the prosecution withheld exculpatory information to which the defense was entitled. He asserts that the state withheld information that

could have been used to impeach Safanov, Investigator Whitfield, and witness Mark Moore. He also argues that the state withheld a receipt that would have placed Teleguz in Pennsylvania on the morning of the murder. According to Teleguz, the evidence conflicts with the state's theory that Teleguz went with Hetrick and Gilkes to Harrisonburg early on the morning of the murder to show them where Sipe lived.

4.    ALTERNATIVE THEORIES.

Teleguz suggests two alternative theories about Sipe's murder. The first theory is that someone other than Teleguz hired Hetrick and Gilkes to kill Sipe. Particularly, he suggests that Eugene Popov or Anatoly Rymarenko may have been such a person. He asserts that Popov, Rymarenko, and Safanov sometimes engaged in criminal activity together and that Popov and Gilkes were good friends. Popov, Rymarenko, Safanov, and Gilkes socialized together. Popov and Safanov knew that Sipe's family was involved in drug trafficking, and both admitted to traveling to Harrisonburg with Teleguz and going to Sipe's house.

Teleguz asserts that the men may have had several motives. He asserts that Rymarenko was angry about Teleguz's new girlfriend and that Rymarenko and Popov, who are Russian, did not approve of Teleguz, a Ukrainian, dating a Russian woman. Popov and Rymarenko also held Teleguz responsible for the death of their friend, John Belyy. They also believed he was stealing from them.

According to Gilkes, Rymarenko and Popov wanted him to "take Ivan out." (Pet'r's State App. 435.) Gilkes stated that two days after the murder, Popov, Rymarenko, and two other Russians came to his apartment and said they had to disappear.

The second alternative theory suggested by Teleguz is that the murder accidentally resulted from a robbery attempt. Teleguz asserts that Sipe's mother had been robbed of drug proceeds in the past and Safanov had been to Harrisonburg before and after Sipe's death to rob her family. Rymarenko and Popov knew that Sipe and her family dealt drugs, and Popov had been to her home in the past. Teleguz suggests that Gilkes and Hetrick independently decided to commit the robbery or that they may have been hired by Safanov, Rymarenko, or Popov to commit the robbery. Teleguz argues that even if he set in motion the robbery, doing so should not result in a conviction for capital murder.

Teleguz asserts that this theory is most consistent with the evidence. Hetrick and Gilkes purchased a knife, gloves, and duct tape at Wal-Mart. He suggests that the purchase of restraining materials is inconsistent with a planned murder. The crime was committed in broad daylight and Hetrick had no means of concealing his identity. A quick or stealthy getaway was impossible; Hetrick and Gilkes had to call a taxi to leave. The lack of concern about being seen or leaving evidence

would be more consistent with a plan to steal drugs or drug proceeds because such a crime would likely not be reported.

Teleguz argues that this theory is also supported by Hetrick's statement that he and Sipe struggled for the knife, resulting in him being cut, and that was when he "got angry." (Pet'r's State App. 283.) According to Teleguz, Hetrick may have panicked after the robbery resulted in a murder, causing him to leave without stealing money or drugs as planned. Hetrick also left behind the murder weapon and clothes and made no effort to clean up his blood. The botched robbery theory would be consistent with Hetrick's demand for an additional $500 after the crime occurred.

5.    ANALYSIS.

Even considered together, these arguments are insufficient to support a free-standing claim of actual innocence. Much of the evidence Teleguz offers, such as Investigator Whitfield's allegedly false affidavit to test Teleguz's DNA, casts no doubt on the evidence relied upon by the jury to convict. The Wal-Mart receipt, which Teleguz argues would have exculpated him, does not necessarily conflict with the state's account of the facts, given that Harrisonburg, Virginia, is only approximately four hours away from Ephrata, Pennsylvania. Furthermore, many of the facts raised in Teleguz's claim were known to the jury at trial and were considered in light of all the evidence presented.

Although Teleguz relies extensively on an affidavit from Gilkes, which was presented for the first time during the state habeas proceedings, the conclusions that can be drawn from it are unclear. Although Gilkes recants some of the testimony he made against Teleguz, he also states that he has no idea why Hetrick killed Sipe or whether he received money to do so. He does not deny that he was present with Hetrick when the murder occurred, but he provides no information about what happened. The affidavit also does not endorse Teleguz's theory that the murder was a consequence of a botched robbery. Gilkes offers no explanation of the early-morning trip to Wal-Mart to purchase gloves, a knife, and duct tape. The affidavit fails to fully explain Gilkes' prior testimony and the circumstances of Sipe's death.

Evidentiary support for the alleged motive for Rymarenko and Popov to kill Sipe is also unclear. If Rymarenko and Popov disliked Teleguz and wanted someone to get rid of Teleguz, as alleged, it is unclear why they would kill his former girlfriend. It is possible that they wanted to commit the crime and then implicate Teleguz in the murder, but Teleguz has not offered significant evidence to support that theory. For example, the Gilkes affidavit does not indicate that Gilkes was told by Popov or Rymarenko to implicate Teleguz in the murder. Rather, Gilkes says that he implicated Teleguz because of encouragement from law enforcement.

The Supreme Court of Virginia rejected Teleguz's claim as not appropriate for habeas review. Because whether a free-standing claim of actual innocence must be heard to avoid running afoul of the Eighth Amendment is an open question, the Supreme Court of Virginia did not act unreasonably. Furthermore, even if a free-standing claim of actual innocence is cognizable when the evidence presented is truly persuasive, *see Herrera*, 506 U.S. at 417, Teleguz has not presented evidence that demonstrates actual innocence entitling him to relief. Because the decision of the Supreme Court of Virginia was reasonable, I will deny relief on this claim.

## I.  CLAIM IX — IMPROPER JURY INSTRUCTIONS.

In his next claim for relief, Teleguz contends his trial counsel was ineffective for failing to challenge a Virginia pattern sentencing instruction submitted to the jury. He argues that the sentencing instruction invited the misunderstanding that should the jury find an aggravating circumstance, death was the only appropriate sentence. In other words, Teleguz contends that the instructions did not adequately instruct the jury that, even if an aggravating factor was proved, a sentence of life without parole remained an available sentencing option.[17] Furthermore, he contends that his trial counsel was ineffective in failing

---

[17] The jury instruction read as follows:

to challenge the sentencing instruction or to offer a clarifying instruction.  Teleguz

---

You have convicted the defendant of an offense which may be punished by death.  You must decide whether the defendant shall be sentenced to death or to imprisonment for life or to imprisonment for life and a fine of a specific amount, but not more than $100,000.00.  Before the penalty can be fixed at death, the Commonwealth must prove beyond a reasonable doubt a[t] least one of the following aggravating circumstances.

(1) That, after consideration of his history and background, there is a probability that he would commit criminal acts of violence that would constitute a continuing serious threat to society; or

(2) That his conduct in committing the offense was outrageously or wantonly vile, horrible or inhuman, in that it involved depravity of mind or aggravated battery to the victim beyond the minimum necessary to accomplish the act of murder.

If you find from the evidence that the Commonwealth has proved beyond a reasonable doubt both of these circumstances, then you may fix the punishment of the Defendant at death.  But if you believe from all the evidence, including evidence in mitigation, that the death penalty is not justified, then you shall fix punishment of the defendant at: (1) Imprisonment for life; or (2) Imprisonment for life and a fine of a specific amount, but not more than $100,000.00.

If you find from the evidence that the Commonwealth has proved beyond a reasonable doubt either of these circumstances, then you may fix the punishment of the defendant at death.  But if you believe from all the evidence, including evidence in mitigation, that the death penalty is not justified, then you shall fix the punishment of the defendant at: (1) Imprisonment for life; or (2) Imprisonment for life and a fine of a specific amount, but not more than $100,000.00.

If the Commonwealth has failed to prove beyond a reasonable doubt at least one of these circumstances, then you shall fix the punishment of the defendant at: (1) Imprisonment for life; or (2) Imprisonment for life and a fine of a specific amount, but not more than $100,000.00.

Any decision you make regarding punishment must be unanimous.

(J.A. 3504-05.)

contends that there was no strategic reason for failing to do so, and had the confusion been cured, there was a reasonable probability that the jury would not have fixed his sentence at death.

Teleguz's trial counsel did not challenge the instruction at trial, post-trial, or on direct appeal. Teleguz first raised this issue as a *Strickland* claim in his state habeas proceeding. In support, Teleguz submitted the affidavit of the jury foreperson, who asserted that he understood the jury instructions, "to create an 'if-then' premise: If no aggravators, then life was the appropriate choice; if aggravators were present, then death was the appropriate choice." (Pet'r's State App. 58.) Teleguz argued that this affidavit showed a reasonable probability that at least one juror would have voted differently had the jury properly understood the law.

The Supreme Court of Virginia rejected the argument, finding Teleguz failed to meet either the performance or the prejudice prong of *Strickland*. *Teleguz II*, 688 S.E.2d at 876. The court found that the evidence showed only that a juror misunderstood the instructions, but not that the jurors were improperly instructed under the law. The court went on to note that the overall record demonstrated that the jury received proper instruction, and according to the presumption that jurors are expected to have followed the court's instructions, Teleguz could not show that his counsel's performance was deficient or prejudicial.

Teleguz argues that the court unreasonably applied *Strickland* by failing to address counsel's performance in its analysis. Teleguz contends that the court erred in assuming that because the jurors were properly instructed under the substantive law, there could be no deficiency on counsel's part. He claims that counsel was on notice that Virginia's pattern jury instruction was at significant risk of misinterpretation and that such notice should have prompted counsel to seek at least a clarifying instruction. Teleguz further argues that the evidence shows that the jurors did, in fact, misinterpret the sentencing instruction. On this point, he relies on the juror affidavit submitted before the state habeas court, as well as a new supplementary affidavit of a juror indicating she similarly misunderstood the sentencing instructions. Teleguz contends that this evidence demonstrates that he was negatively prejudiced under *Strickland*.

As a preliminary matter, the United States Supreme Court has upheld the pertinent Virginia pattern jury instruction against Teleguz's present challenge. *Buchanan v. Angelone*, 522 U.S. 269, 277 (1998). In *Buchanan*, the Court rejected the notion that Virginia's pattern instruction invited an "if-then" misinterpretation. The state argues that the *Buchanan* decision effectively forecloses Teleguz's ability to bring a successful *Strickland* claim before this court. However, Teleguz focuses on the fact that *Buchanan* was a six-to-three decision, with the dissent finding the misinterpretation claim persuasive. Teleguz argues that the *Buchanan*

Court's divided opinion should have put trial counsel on notice of the severe risk for juror confusion regarding this instruction and prompted trial counsel to seek a clarifying instruction. Teleguz accuses the Supreme Court of Virginia, as well as the state, of "presum[ing], without reasoning or supporting authority, that counsel have no duty to advocate on behalf of their clients with respect to jury instructions unless the instruction itself amounts to reversible error." (Pet'r's Resp. Br. 91.)

While Teleguz is correct that the unlikelihood of an argument's success should not necessarily dissuade trial counsel from making it, he incorrectly supposes that the probability of the argument's success at trial has no bearing on later *Strickland* analysis. To the contrary, *Buchanan* decreases the likelihood that the trial court would accept any clarifying instruction counsel could have submitted. The doubtfulness of such a motion's success thus affects both the reasonableness of counsel's trial strategy and the overall risk that the trial was prejudiced. *See Reid v. True*, 349 F.3d 788, 798 (4th Cir. 2003) (applying *Hill v. Lockhart*, 474 U.S. 52, 59 (1985)), and finding that whether counsel's ineffectiveness prejudiced the outcome "will often turn on an assessment of the likelihood of success of a particular investigation or strategy"). Thus, despite the evidence that certain jurors actually misunderstood the instruction, these post-trial affidavits do not speak to counsel's performance or *Strickland's* prejudice analysis. Because strategic considerations could have driven counsel's choice not to

challenge the instruction, and because the trial court could safely have exercised its discretion in denying any such challenge, I find that the Supreme Court of Virginia's holding that Teleguz cannot meet either *Strickland* element on this claim was reasonable.

### J.  CLAIM X — FAILURE TO REMOVE JUROR FOR CAUSE.

Teleguz claims that the trial court erred by failing to remove a juror for cause.  He argues that a potential juror, James Liptrap, stated during voir dire that he was unwilling to consider Teleguz's childhood and culture as mitigating evidence and that therefore he should have been removed for cause.

During voir dire, the potential jurors were asked whether they would have difficulty understanding or considering someone's personal experiences if they came from a different background.  The potential jurors were asked whether they would consider where Teleguz was from in their sentencing decision.  In response, Liptrap indicated that he did not see how Teleguz's background would be pertinent.  He stated that he would listen to the evidence but did not see where it would sway his decision.  He also stated, "I'm going to listen to everything if I would be there with the equity that it's given, you know."  (J.A. 2118.)  During the discussion, another potential juror stated, "Yeah.  I mean I can't look at somebody's background and where they came from or whatever and say they're guilty because he's from Russia."  (*Id*.)  Another potential juror said, "It's not

sinking in the way you're saying it. It makes no difference where he's from."
(J.A. 2119-20.) When asked by the defense attorney if he would consider the
evidence being discussed, Liptrap replied, "No, I wouldn't. I don't think it's
relevant." (J.A. 2121.) The prosecutor objected to the phrasing of the question
and sought to "register the confusion factor." (J.A. 2120.) The judge replied,
"Well, I'm taking that into account in evaluating their answers." (*Id.*) The judge
went on to say to the defense counsel, "[W]hat they're trying to say to you is they
don't care where he's from, they'll listen to all the evidence no matter what it is."
(J.A. 2121.)

The defense then moved to strike Liptrap for cause on the basis that he could
not consider mitigation evidence. The judge refused, maintaining that it would be
inappropriate for the jurors to be more lenient solely on the basis of Teleguz being
from the Ukraine. Liptrap ultimately did not serve on the jury.

This issue was presented on direct appeal and the Supreme Court of Virginia
fully considered the claim. *Teleguz I*, 643 S.E.2d at 719. The court noted that the
questions referred to country of origin, rather than personal experiences, as the
relevant consideration and that there was obvious juror confusion. *Id.* The court
applied the abuse of discretion standard and acknowledged that the trial court was
in a better position to weigh the juror's tenor, tone, and demeanor. *Id.* Based on

the record, the Supreme Court of Virginia determined that the trial court did not abuse its discretion.  *Id*.

Teleguz has not presented evidence that the state court's decision was based on an unreasonable determination of the facts or an unreasonable application of law under § 2254(d).  Teleguz argues that the fact that he was raised in the Ukraine is relevant mitigation which Liptrap refused to consider.  However, the isolated fact that Teleguz is from the Ukraine is not particularly relevant.  I agree with the trial court and the Supreme Court of Virginia with regard to Liptrap's confusion about the question. Details about poverty, isolation, or persecution that Teleguz faced during his childhood may be relevant mitigation evidence, but those details were not clearly the subject of the question presented to Liptrap.  The record indicates that Liptrap believed he was being asked about whether he would be biased by the fact that Teleguz had been raised in the Ukraine.  Rather than refusing to consider relevant evidence, Liptrap was asserting his impartiality.

Accordingly, I will deny relief on this claim.

### K.    CLAIM XI — TRIAL COURT'S DENIAL OF CONTINUANCE.

Teleguz next argues that his constitutional rights were violated when the trial court did not grant him a continuance after learning that Investigator Whitfield was prepared to testify that Sipe's neighbor, Mark Moore, identified Teleguz and placed him near the crime scene in the days before the murder.

At trial, Mark Moore, one of the first to arrive at Sipe's apartment after Sipe's mother discovered the body, testified at trial that he had seen Teleguz leaving Sipe's apartment in the days before the murder. He additionally testified that he identified Teleguz to police in a photo array. Investigator Whitfield corroborated these details in his testimony. In response to this testimony, Teleguz called for a mistrial or a continuance, claiming that counsel first learned of Moore's purported identification at trial and that the defense required time to investigate it. The trial court denied counsel's motion for a mistrial, but never ruled on the continuance request, and counsel failed to call for a ruling on it.

Teleguz presented this claim to the Supreme Court of Virginia, both on direct appeal and in his petition for a writ of habeas corpus. On direct appeal, Teleguz presented the underlying substantive argument that it was error for the trial court to refuse the continuance. The Supreme Court of Virginia found that Teleguz had waived this argument by failing to timely request a ruling on the motion. *Teleguz I*, 643 S.E.2d at 716-717. In his state habeas proceeding, Teleguz argued that his counsel's failure to seek the ruling constituted ineffective assistance of counsel. The Supreme Court of Virginia once again rejected his argument, finding that Teleguz had failed to demonstrate that counsel's performance was deficient or the outcome of the trial was prejudiced by counsel's alleged error.

*Teleguz II*, 688 S.E.2d at 877-78. Regardless of Teleguz's current legal theory, I will deny relief.[18]

Section 2254(b) bars a federal court from granting habeas corpus relief unless the petitioner has exhausted all available remedies in the courts of the state. Where a claim has been found to be procedurally defaulted by the state court, that default provides an independent and adequate state-law ground barring this court's review. This bar stands unless the petitioner can demonstrate cause and prejudice for the default. Because the Supreme Court of Virginia found Teleguz's underlying substantive claim procedurally waived, I may not review that decision for error.

The only way I can reach this substantive claim is if Teleguz can show that ineffective assistance of counsel or some other issue provides cause and prejudice sufficient to excuse the procedural default. As the Supreme Court of Virginia reasonably found when it addressed Teleguz's ineffective assistance claim in the state habeas proceeding, he cannot meet this showing.

The state habeas court found that Teleguz could not meet either the performance or prejudice prongs of his *Strickland* claim. *Id.* The court found that because Teleguz was not alleged to have been the actual perpetrator of the murder,

---

[18] In his petition to this court, Teleguz contends that the failure to grant the continuance by the state trial court constituted error of a constitutional magnitude. In his reply brief to the state's Motion to Dismiss, Teleguz houses this argument in an ineffective assistance of counsel claim. Regardless, it fails under either legal theory.

impeaching Moore's testimony "would not have undermined the testimony that [Teleguz] hired others to do the killing." *Id.* at 877. The court also noted that counsel moved for the continuance during Moore's testimony, by which time Investigator Whitfield had already testified regarding the identification. Therefore, the court rejected Teleguz's argument.

Reviewing this analysis under § 2554(d), I find that the Supreme Court of Virginia's holding was reasonable. I agree with its assessment that Moore's identification was not of central importance to the trial's outcome, and thus, Teleguz cannot meet *Strickland's* prejudice prong. I further note that "[w]hether a continuance should be granted or denied is a matter within the sound discretion of the trial court, and a decision one way or the other will not be disturbed on appeal in the absence of a showing that the discretion has been abused." *Thomas v. Commonwealth*, 419 S.E.2d 606, 612-13 (Va. 1992). Teleguz thus faces a high hurdle to show how counsel's insistence on a ruling would have favorably affected the trial court's discretion. Because he cannot do so, and because he has also failed to show that counsel's performance fell below an objective standard of reasonableness, I conclude that the Supreme Court of Virginia reasonably applied *Strickland*, and deny relief on this claim.

L.    CLAIM XII — CONSTITUTIONALITY
      OF VIRGINIA'S DEATH PENALTY.

Teleguz argues that Virginia's death penalty scheme is unconstitutional.  He asserts several defects in this regard, which are discussed below.

1.    AGGRAVATING FACTORS.

First, Teleguz argues that the state statute fails to adequately direct jurors on how to evaluate statutory aggravating factors in a way that would prohibit arbitrary or capricious imposition of the death penalty.  Particularly, he asserts that the "future dangerousness" and "vileness" factors are unconstitutionally vague and were unconstitutionally implemented.

Imposition of the death penalty in Virginia is predicated on proof beyond a reasonable doubt of at least one of two aggravating factors as set out in the Virginia Code.  Under the future dangerousness factor, the state must prove that there is "a probability that the defendant would commit criminal acts of violence that would constitute a continuing serious threat to society."  Va. Code Ann. § 19.2-264.2 (2008).  Under the vileness factor, the state must prove beyond a reasonable doubt that there is "a probability . . . that his conduct in committing the offense for which he stands charged was outrageously or wantonly vile, horrible or inhuman in that it involved torture, depravity of mind or an aggravated battery to the victim."  *Id.*

An aggravating factor must be defined in terms that provide sufficient guidance to the jury, or else it will be unconstitutionally vague. *See Tuilaepa v. California*, 512 U.S. 967, 972 (1994). The factor must have "some 'common-sense core of meaning'" that criminal juries may capably understand. *Id.* at 973 (quoting *Jurek v. Texas*, 428 U.S. 262, 279 (1976)).

Teleguz's argument was raised on direct appeal. The Supreme Court of Virginia rejected it, holding it unmeritorious. *Teleguz I*, 643 S.E.2d at 718-19. The argument that the statute is unconstitutionally vague has been repeatedly rejected. *See, e.g.*, *Wolfe v. Commonwealth*, 576 S.E.2d 471, 480 (Va. 2003) (rejecting arguments that the future dangerousness aggravator and the vileness factor are unconstitutionally vague); *Mickens v. Commonwealth*, 442 S.E.2d 678, 684 (Va. 1994) (addressing an argument that the statute is vague because of its use of the word "probability").

The Fourth Circuit has found Virginia's sentencing scheme to be constitutional, even in light of a vagueness challenge like the one Teleguz brings here. *See Briley v. Bass*, 750 F.2d 1238, 1245 (4th Cir. 1984) (stating that "[t]he constitutionality of [Virginia's future dangerousness aggravator] is beyond question" in light of *Jurek*); *Barnabei v. Angelone*, 214 F.3d 463, 472 (4th Cir. 2000) (rejecting the argument that the vileness aggravator is unconstitutionally

vague).  Teleguz has failed to show that the Supreme Court of Virginia acted unreasonably.

### 2.    PROPORTIONALITY REVIEW.

Second, Teleguz argues that the proportionality appellate review required by Virginia law is unconstitutional on its face and as applied.  He argues that state statute governing proportionality review gives too much discretion to the state supreme court and that the review excludes consideration of many capital cases where the death penalty is not imposed because there is no automatic appeal when a life sentence is imposed.

Under Virginia law, the Supreme Court of Virginia on appeal in a capital case must consider "[w]hether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant."  Va. Code Ann. § 17.1-313(C)(2).  The court "may accumulate the records of all capital felony cases tried within such period of time as the court may determine."  Va. Code Ann. § 17.1-313(E).  To assist the Supreme Court of Virginia's review, there is an archive of the records of all appeals of convictions of capital murder.  *See Bailey v. Commonwealth*, 529 S.E.2d 570, 580 (Va. 2000).  Teleguz argues that this database fails to include many capital cases where the death penalty is not imposed because such cases are not

directly appealable to the Supreme Court of Virginia and therefore rarely reach that court.

In conducting its proportionality review as required in Teleguz's direct appeal, the Supreme Court of Virginia examined all capital murder cases in which murder for hire was the predicate offense, where the state sought the death penalty, and where either one or both aggravating factors were found. *Teleguz I*, 643 S.E.2d at 731-32. The court also reviewed cases in which the defendant was convicted of murder for hire and received a life sentence. *Id*.

On direct appeal, Teleguz challenged the appellate review procedures on the basis that the Supreme Court of Virginia's proportionality and passion/prejudice review were not conducted in accordance with the Eighth Amendment. The Supreme Court of Virginia rejected his argument, holding it unmeritorious under existing case law. *Teleguz I*, 643 S.E.2d at 719 (citing *Satcher v. Commonwealth*, 421 S.E.2d 821, 826 (Va. 1992), and *Smith v. Commonwealth*, 389 S.E.2d 871, 876 (Va. 1990)). The court previously addressed and rejected the specific argument that the archived cases are not an accurate representation of the outcome of all capital cases. *See Bailey*, 529 S.E.2d at 580 n.3. In *Bailey*, the court determined that many of the cases that are not appealed involved guilty pleas and therefore had limited value for proportionality analysis. *Id.* Teleguz has offered no evidence to rebut that determination.

Teleguz's argument has also been rejected by the Fourth Circuit. *Roach v. Angelone*, 176 F.3d 210, 216 (4th Cir. 1999). Individual states are not constitutionally required to provide defendants with proportionality reviews, and, as in *Roach*, Teleguz has not shown a due process violation in the proportionality review conducted in his case. *Id.* at 216-17. The record shows that the Supreme Court of Virginia conducted a thorough review of Teleguz's sentence in compliance with state law and the Constitution.

### 3. NO STANDARD FOR SETTING ASIDE A CAPITAL SENTENCE.

Third, Teleguz argues that the state death penalty statute is unconstitutional because there is no standard for a capital sentence to be set aside. The statute provides that a probation officer must thoroughly investigate the history of the defendant and all other relevant facts and create a report with the findings. Va. Code Ann. § 19.2-264.5. After consideration of the report, the court may set aside the capital sentence if good cause is shown. *Id.*

Teleguz's argument was raised on direct appeal. The Supreme Court of Virginia rejected his argument, holding it unmeritorious under existing case law. *Teleguz I*, 643 S.E.2d at 719. The court cited *Breard v. Commonwealth*, 445 S.E.2d 670, 675-76 (Va. 1994), in which it held that the provisions of § 19.2-264.5 "are clear and provide a meaningful review by a trial court of a death sentence." Teleguz has failed to show that this finding was unreasonable.

### 4. UNADJUDICATED CRIMINAL ACTS.

Fourth, Teleguz argues that the statute is unconstitutional because it permits jurors to consider evidence of unadjudicated criminal acts without providing a necessary standard of proof.

This issue was raised on direct appeal. The Supreme Court of Virginia rejected Teleguz's argument, holding it unmeritorious under existing case law. *Teleguz I*, 643 S.E.2d at 718-19 (citing *Stockton v. Commonwealth*, 402 S.E.2d 196, 206 (Va. 1991)). As it held, "[c]ourts have routinely considered evidence of prior unadjudicated bad acts in assessing future dangerousness." *Eaton v. Angelone*, 139 F.3d 990, 998 (4th Cir. 1998) (citing Supreme Court and Fourth Circuit cases upholding sentences based on unadjudicated prior bad acts, and finding the practice permissible). Teleguz has failed to show that the Supreme Court of Virginia acted unreasonably.

### 5. HEARSAY IN POST-SENTENCE REPORTS.

Fifth, the defendant challenges the use of hearsay evidence in the so-called post-sentence report prepared by a probation officer and used by the trial court in reviewing the death penalty imposed by the jury. *See* Va. Code Ann. § 19.2-264.5 (2008). This argument was raised by Teleguz on direct appeal and the Supreme Court of Virginia rejected it. *Teleguz I*, 643 S.E.2d at 719.

The relevant Virginia statue, Va. Code Ann. § 19.2-264.5 (2008), requires the probation officer to thoroughly investigate and report upon the history of the accused and other relevant facts. The Supreme Court of Virginia has repeatedly held that using hearsay in a post-sentence report does not violate a defendant's constitutional rights. *See, e.g., Juniper v. Commonwealth*, 626 S.E.2d 362, 389 (Va. 2006). This holding is consistent with analogous findings by other courts. *See, e.g., United States v. Roberts,* 881 F.2d 95, 105-06 (4th Cir. 1989) (rejecting argument that use of hearsay in a presentence report violates constitutional right of confrontation); United *States v. Carmona*, 873 F.2d 569, 574 (2d Cir. 1989) (finding that due process is not violated by a judge's consideration of hearsay for purpose of sentencing).

Teleguz has not offered any case law or legal reasoning in support of his argument that the Supreme Court of Virginia acted unreasonably. I find that the claim is without merit.


IV.    CONCLUSION.

As Congress and the Supreme Court have made abundantly clear, my review of a state criminal case as a federal judge is exceedingly limited, even where, as here, the case involves our society's ultimate criminal penalty. I am not permitted to function as a super-appellate court, merely second-guessing the decisions of the

many state judges who have already reviewed Teleguz's trial and the jury's decision to convict and impose the death penalty. I have carefully reviewed all of the arguments made on behalf of Teleguz and for the reasons stated in this Opinion, I must reject them.

I express the court's sincere appreciation to appointed counsel for their excellent representation of the petitioner.

The respondent's Motion to Dismiss will be granted and the Amended Petition for a Writ of Habeas Corpus will be denied. A separate order will be entered forthwith carrying out this decision.

DATED: August 1, 2011

/S/ JAMES P. JONES
United States District Judge