# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
### ROANOKE DIVISION

IVAN TELEGUZ,          )
                                   )
           Petitioner,     )
                                   )
v.                          )     Case No. 7:10CV00254
                                   )
KEITH W. DAVIS, WARDEN,   )
SUSSEX I STATE PRISON,    )
                                   )
           Respondent.   )

## OPINION SETTING FORTH
## FINDINGS OF FACT AND CONCLUSIONS OF LAW

*Michael F. Williams, K. Winn Allen, William Kimmitt, and Maryam Mujahid, Kirkland & Ellis LLP, Washington, D.C., Matthew C. Stiegler, Philadelphia, Pennsylvania, and Elizabeth Peiffer, Virginia Capital Representation Resource Center, Charlottesville, Virginia, for Petitioner; Matthew P. Dullaghan, Senior Assistant Attorney General, Alice T. Armstrong, Senior Assistant Attorney General, and Benjamin H. Katz, Assistant Attorney General, Office of the Attorney General of Virginia, Richmond, Virginia, for Respondent.*

This opinion sets forth the court's findings of fact and conclusions of law relating to a petition for habeas corpus by a state prisoner under sentence of death.

The petitioner, Ivan Teleguz, was convicted by a Virginia jury in 2006 of murder-for-hire. The jury heard testimony that in 2001 Teleguz had hired two petty criminals, Edwin Gilkes and Michael Hetrick, to kill 20-year-old Stephanie

Sipe, his former girl friend and mother of his young child, to whom he was paying child support.

Gilkes and Hetrick testified that Teleguz drove them the 200-plus miles from Lancaster, Pennsylvania, to Harrisonburg, Virginia, where Sipe lived, showed them her apartment, and then left them so that he could return to Pennsylvania to establish an alibi. After waiting a few hours, and while Gilkes waited outside, Hetrick surprised Sipe in the apartment and slit her throat, as Teleguz had directed. Sipe fought back and in the struggle, Hetrick's hand was cut with his own knife. Afterwards, while cleaning his wound in the apartment's bathroom, he discovered the couple's 21-month-old son Zachary in the bathtub, where Sipe had been bathing him. Hetrick turned off the water and left. Sipe's dead body was not discovered for two days. The child was miraculously unharmed.

Although Teleguz was an immediate suspect based upon accusations from Sipe's family, the murder remained a cold case until a third man, Aleksey Safanov, a Russian emigrant in trouble with federal authorities in Boston, confided to a deputy U.S. marshal that Teleguz had told him that he had hired someone to murder Sipe. This information led Harrisonburg police to Gilkes, who implicated Teleguz and Hetrick. Upon being questioned, Hetrick in turn confessed to having been hired by Teleguz to commit the murder. Gilkes and Hetrick thereafter entered into plea agreements in which they promised to cooperate in the

-2-

prosecution of Teleguz in return for agreed sentences for their participation in the murder. In accord with the agreement, Gilkes was sentenced to 15 years imprisonment and Hetrick, who had actually murdered Sipe, received a life sentence. Gilkes, Hetrick, and Safanov all testified against Teleguz at trial.

Teleguz's direct appeal was unsuccessful, *Teleguz v. Commonwealth*, 643 S.E.2d 708 (Va. 2007), and after exhausting his state post-conviction remedies, *Teleguz v. Warden of the Sussex I State Prison*, 688 S.E.2d 865 (Va. 2010), he filed the present federal habeas petition pursuant to 28 U.S.C. § 2241. I denied relief, finding that Teleguz's claims had been either properly decided by the state court, or were unavailable for review in federal court because they had not been raised in the earlier state court proceedings. *Teleguz v. Kelly*, 824 F. Supp. 2d 672 (W.D. Va. 2011).

Teleguz noted an appeal and the court of appeals granted a certificate of appealability and remanded the case to this court for consideration of Teleguz's contention that his actual innocence of the crime allowed him to present new claims that had otherwise been procedurally defaulted, in accord with the principles of *Schlup v. Delo*, 513 U.S. 298 (1995). The court of appeals found that I had inadequately analyzed the *Schlup* gateway innocence claim and had erred in applying the *Schlup* doctrine individually to each defaulted claim rather than "the totality of the evidence." *Teleguz v. Pearson*, 689 F.3d 322, 329 (4th Cir. 2012).

-3-

In directing a remand, the court of appeals suggested that because Teleguz's *Schlup* argument was bottomed on his contention that two of the three principal witnesses against him had recanted their testimony, "an evidentiary hearing may be necessary to assess whether [the] recantations are credible." *Id.* at 331.

The court of appeals further directed that upon remand this court "may make determinations about the probative force of relevant evidence that was either excluded or unavailable at trial, and assess how reasonable jurors would react to the overall, newly supplemented record, but the district court may not reject the factual findings of a state court absent clear error." *Id.* at 332 (internal quotation marks and citations omitted).

In his appeal, Teleguz had complained about the lack of an evidentiary hearing on his *Schlup* claim, but after the remand, both Teleguz and the respondent Warden opposed such a hearing, contending that the issues could be decided on the existing record. Nevertheless, as suggested by the court of appeals, I scheduled an evidentiary hearing in order that I could properly evaluate the reliability of the new evidence. *Teleguz v. Pearson*, No. 7:10CV000254, 2012 WL 6151984, at *2 (W.D. Va. Dec. 11, 2012). That hearing was held on November 12 through 14, 2013.[1] Hetrick, the actual killer, confirmed his trial testimony that he had been

---

[1] A delay in the hearing occurred because Teleguz obtained additional counsel following the remand. I take this opportunity to thank not only Teleguz's initial federal habeas counsel, who remained in the case, but also the major national law firm that

hired by Teleguz. Gilkes appeared but refused to testify. Safanov, now a resident of Kazakhstan in Central Asia and not amenable to subpoena, refused to appear either by deposition, Skype, or telephone.[2]

After preparation of the hearing transcript, the parties have briefed the issues and the case is now ripe for decision.

In summary, I find that Teleguz has not shown that he is actually innocent of the murder-for-hire of Stephanie Sipe. Based upon my consideration of all of the new evidence, and without regard to whether it would necessarily be admissible under the rules of evidence, *see Wolfe v. Johnson*, 565 F.3d 140, 170 (4th Cir. 2009), I find that it is not likely that any reasonable juror would have had a reasonable doubt as to Teleguz's guilt of this crime.

In addition, I find that Teleguz's alternative ground for removing the bar on one of the defaulted claims — his state habeas attorney's failure to raise an issue as to Teleguz's trial counsel's handling of an implication that Teleguz had been involved in another murder — is insufficient.

---

joined the case on a pro bono basis after remand. It has provided essentially unlimited legal and investigative resources on Teleguz's behalf. Not only is work by all of these attorneys in the highest traditions of the legal profession, but it assures the court that no stone has been left unturned.

[2] Prior to the hearing, and over Teleguz's objection, I appointed counsel for Hetrick and Gilkes, in light of the possible penal consequences to them of their testimony at a hearing in this court. Because of Safanov's location out of the country and reported refusal to cooperate, I did not appoint counsel for him.

Case 7:10-cv-00254-JPJ   Document 318   Filed 07/17/14   Page 5 of 62   Pageid#: 7491

Finally, I find that Teleguz has not demonstrated cause sufficient to overcome the procedural default of his claim that the prosecution knowingly used false testimony.

I. THE MURDER OF STEPHANIE SIPE.

The following facts surrounding the murder and its investigation and the resulting prosecution of Teleguz are undisputed.

On Monday, July 23, 2001, Stephanie Sipe's mother, Pamela Woods, went to her daughter's apartment after she had been unable to reach her by telephone that day or the day before. Woods discovered Sipe's body in the entryway and found her grandson unharmed in the bathroom.

Harrisonburg Police Detective Michael Whitfield was assigned to lead the homicide investigation. His first and primary suspect was Teleguz. Whitfield based this lead on reports from Sipe's family of a strained relationship between Sipe and Teleguz, primarily precipitated by a court order requiring Teleguz to pay child support. On July 24, 2001, Whitfield interviewed Teleguz at his home in Pennsylvania, and he denied involvement in the murder. He claimed that he been staying at his current girlfriend's apartment in Pennsylvania from July 20 through July 23, but could not establish an alibi from 10:30 p.m. on July 21, 2001 until 8:30 a.m. on July 22, 2001. On December 14, 2001, Investigator Whitfield

executed a search warrant, collecting samples of Teleguz's blood, hair, and saliva. The blood evidence from the crime scene did not match the samples taken from Teleguz. Despite canvassing Sipe's apartment complex and collecting DNA samples from other individuals of interest, more than one year passed without any major developments.

On February 3, 2003, Deputy United States Marshal Mike Nelson in Springfield, Massachusetts, contacted Whitfield and told him that a confidential informant had come forward with information about a murder in Harrisonburg. The informant was Aleksay Safanov, who had been charged and detained in connection with a federal gun trafficking case in Springfield. Nelson was not involved in the investigation of the Sipe murder, nor was he involved in the prosecution of Safanov in Massachusetts, and he and Safanov had "developed a relationship where [they] talked about family, hockey, girlfriends, [and] life in general." (Hr'g Tr. 142:16-17, Nov. 13, 2013.) Safanov had approached Nelson with information that "indicated that [Safanov] had some information that may assist in a homicide investigation in Harrisonburg, Virginia." (Resp't's Ex. 3, at 1.) According to Whitfield's report of the investigation, Safanov said that

> Teleguz told Safanov that on or about 07-01 he had hired a black male from the Lancaster, Pennsylvania, area to kill Sipe because he, Teleguz, was angry about having to make child support payments to Sipe. The information regarding child support payments had never been released to the public or to the news media.

-7-

(Pet'r's Ex. 198, at 7.) Safanov returned a few days later and added that "the black male from Lancaster, PA lives on the same one way street as the Lancaster County Jail," which was East King Street. (Resp't's Ex. 3, at 1.) Whitfield later delivered telephone records to Nelson, who uncovered five calls from Teleguz's known number to an East King Street address. It turned out to be the residence of Edwin Gilkes, who had a prior criminal record. After Safanov identified Gilkes from a photographic array, Whitfield questioned Gilkes on July 17, 2003. He claimed no personal knowledge of the murder but said that he had heard that Teleguz had paid Hetrick to travel to Virginia and kill Sipe.

In May 2004, Hetrick was initially interviewed by the Pennsylvania State Police and denied involvement. Right before Whitfield interviewed Hetrick on June 30, 2004, Whitfield served him with a search warrant for a blood sample and DNA cheek swabs. After reviewing the attached probable cause affidavit, which detailed Safanov's and Gilkes' statements implicating him and Teleguz, Hetrick confessed that he and Gilkes had been hired by Teleguz to murder Sipe for $2,000. In this interview, he never confirmed the child support motive but instead claimed that "[Teleguz] stated that [Sipe] had been robbing him of drug money and drugs, and there would be drugs on the premises, and I would be able to get money and drugs and stuff to [inaudible] my losses in the situation." (Pet'r's Ex. 20, at 68.) He further reported that Teleguz "had a friend that was going to cover for him, say

he was there all night or something. Whatever the time period that he drove us down there and came back." (Pet'r's Ex. 20, at 71.) The samples taken from Hetrick that day were later matched to blood found at the crime scene.

Teleguz was arrested in Pennsylvania on July 1, 2004, and extradited to Virginia. He was represented by two court appointed attorneys, lead counsel Paul A. Maslakowski, the acting head of the Virginia Capital Defender office for northern Virginia, and co-counsel John S. Hart, Jr. The prosecutor was Marsha L. Garst, the long-serving Commonwealth's Attorney for Rockingham County and the City of Harrisonburg.

After a four-day trial in the Circuit Court of Rockingham County the jury found Teleguz guilty of capital murder-for-hire on February 9, 2006. Following a penalty phase proceeding on February 13 and 14, 2006, the jury fixed Teleguz's punishment at death, finding that the Commonwealth had proved the aggravating factors of "future dangerousness" and "vileness" beyond a reasonable doubt. The trial court entered judgment on July 20, 2006, sentencing Teleguz to death in accordance with the jury's verdict.

## II. ACTUAL INNOCENCE CLAIM.

The governing statute, 28 U.S.C. § 2254, as amended by the Antiterrorism and Effective Death Penalty Act of 1996, generally bars federal habeas relief

unless a petitioner has first properly exhausted available state court remedies. 28 U.S.C. § 2254(b)(1). Proper exhaustion requires that the petitioner provide the state court with the "opportunity to correct the constitutional violation in the first instance" by presenting to the state court "the operative facts and the controlling legal principles associated with each claim." *Longworth v. Ozmint*, 377 F.3d 437, 448 (4th Cir. 2004) (internal quotation marks and citations omitted). If the petitioner's claims were not presented to the state court, they are generally procedurally defaulted, and a federal court cannot adjudicate them. *See Vinson v. True*, 436 F.3d 412, 417 (4th Cir. 2006). A federal habeas claim is also barred where procedurally defaulted because a state court relied upon an adequate and independent state procedural rule to deny relief on that claim. *See Gray v. Netherland*, 518 U.S. 152, 162 (1996).

Accordingly, a federal court generally cannot review such claims in a habeas proceeding in the absence of cause and prejudice. *See Coleman v. Thompson*, 501 U.S. 722, 750 (1991). However, "in appropriate cases, the principles of comity and finality that inform the concepts of cause and prejudice must yield to the imperative of correcting a fundamentally unjust incarceration." *Murray v. Carrier*, 477 U.S. 478, 495 (1986) (alterations, internal quotation marks, and citation omitted). In accord with this principle, the *Schlup* Court concluded that as an alternative to the cause and prejudice standard, a petitioner may reach procedurally

defaulted claims if he can "establish sufficient doubt about his guilt to justify the conclusion that his execution would be a miscarriage of justice *unless* his conviction was the product of a fair trial." 513 U.S. at 316. A habeas petitioner may demonstrate a "miscarriage of justice," through "[a] proper showing of actual innocence." *Wolfe*, 565 F.3d at 160.

A credible claim of actual innocence "requires petitioner to support his allegations of constitutional error with new reliable evidence — whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence — that was not presented at trial."[3] *Schlup*, 513 U.S. at 324. The Supreme Court has held that those petitioners claiming innocence as a gateway to their defaulted claims must demonstrate that, given their newly presented evidence, "it is more likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt." *Id.* at 327. As such, a claim of actual innocence will succeed only in a "severely confined category [of] cases." *McQuiggin v. Perkins*, 133 S. Ct. 1924, 1933 (2013). In evaluating the evidence, "[t]he court's function is not to make an independent factual determination about what likely occurred, but rather to assess the likely impact of the evidence on reasonable jurors." *House*, 547 U.S. at 538.

---

[3] This is a nonexhaustive list of appropriate evidence that a petitioner may produce in support of his allegation of constitutional error. *See House v. Bell*, 547 U.S. 518, 537 (2006) ("the habeas court's analysis is not limited to such evidence.").

In this case, Teleguz has offered three categories of new evidence in support of his *Schlup* gateway innocence claim:

> (1) affidavits in which Safanov and Gilkes recanted their trial testimony and claimed to being coerced into testifying falsely; (2) affidavits of multiple third-party witnesses who affirmed that Teleguz did not attend the birthday party at which he allegedly hired Hetrick; and (3) police reports and affidavits establishing that — contrary to the evidence presented at his trial — Teleguz was not involved in a murder in Ephrata, Pennsylvania.

(Pet'r's Post-Hr'g Br. 10.) The petitioner also has provided a fourth category of evidence that he contends further undermines the trial testimony of Hetrick. Each category will be addressed in turn.[4] First, however, I will summarize the testimony

---

[4] Although an evidentiary hearing was held, the bulk of the evidence in support of the petitioner's actual innocence claim is proffered as affidavits. Indeed, neither Safanov nor Gilkes — the recanting witnesses — testified at the hearing. The Warden has objected to the admissibility of all of the affidavits submitted by the petitioner. It is certainly true that Teleguz's nearly exclusive reliance on affidavits, while not wholly devoid of probative value, may be "disfavored because the affiants' statements are obtained without the benefit of cross-examination and an opportunity to make credibility determinations." *Herrera v. Collins*, 506 U.S. 390, 417 (1993) (discussing the use of affidavits to support a free-standing claim of actual innocence); *see Raines v. United States*, 423 F.2d 526, 530 (4th Cir. 1970) ("When the issue is one of credibility [in a § 2255 action], resolution on the basis of affidavits can rarely be conclusive, but that is not to say they may not be helpful.") All of the affidavits relied upon in the instant proceedings were prepared by third parties, including counsel, and only Jennifer Givens, one of Teleguz's state habeas counsel who prepared the Everhart affidavits, was called to testify at the evidentiary hearing as to their preparation. Michael Millay also authenticated his affidavit but was unable to recount its preparation. Furthermore, because they serve primarily as recantations of prior testimony, the pivotal affidavits executed by Safanov and Gilkes may be "looked upon with the utmost suspicion." *United States v. Johnson*, 487 F.2d 1278, 1279 (4th Cir. 1973) (internal quotation marks and citations omitted). While I am "not bound by the rules of admissibility that would govern at trial," *Schlup*, 513 U.S. at 327, I must consider the evidence "with due regard to

-12-

of state's principal witnesses linking Teleguz to the murder — Michael Hetrick, the actual killer; his accomplice, Edwin Gilkes; and the informant who ultimately led investigators to the conspirators, Aleksay Safanov.

## A. THE KEY WITNESSES.

### *Aleksay Safanov.*

Safanov testified at Teleguz's trial through a Russian language interpreter.[5] He testified that he had met Teleguz in 1998 while both were working in construction. He stated that in the spring of 2001 Teleguz had asked him to kill Sipe in order to avoid his child support obligation. They discussed a fee between $3,000 and $5,000, but Safanov "took this as a joke and [he] declined." (J.A. at 2660:15.)[6] Safanov also had a discussion with Teleguz after the murder, in which Teleguz was concerned about "blood evidence" left at the scene of the crime. (J.A. at 2661:12.) Teleguz told Safanov that he had paid the "black man," and that he had "to be taken out." (J.A. at 2661:17.) This was a reference to Gilkes, whom Safanov later identified in a lineup. On cross-examination, defense attorney Maslakowski suggested that Safanov "told [investigators] this story because [he]

---

any unreliability of it," *id.* at 328. Accordingly, I will overrule the Warden's blanket objection to the affidavits, although for the specific reasons stated in this Opinion, I have given little or no weight to certain of the evidence presented solely by affidavits.

[5] It appears that Safanov speaks some English, but is more comfortable in Russian.

[6] The reference is to the Joint Appendix in Teleguz's direct appeal to the Virginia Supreme Court, which is part of the record in this case.

wanted to get out from under the charges," and Safanov agreed. (J.A. at 2681:17-18.)

*Edwin Gilkes.*

According to his testimony, Gilkes had known Teleguz for four years, but saw him infrequently. At the time of the murder, Gilkes was living at his sister Latesha Everhart's house on East King Street in Lancaster, Pennsylvania. Teleguz approached him and "said he wanted a murder done. He didn't specify who, female, or where it was going to be . . . [and] he offered a price from $3,000.00 to $10,000.00." (J.A. at 2820:15-16;18-19.) Gilkes refused the offer and that was the last the two men spoke of a murder-for-hire scheme. However, in June or July 2001, Gilkes overheard a conversation in his home "about a murder," in which Teleguz "was speaking of a price from $3,000.00 to $4,000.00 and Hetrick was basically trying to get him to go up and down." (J.A. at 2821:25; 20-22.) When Teleguz realized that Gilkes was listening, he warned Gilkes to remain silent, and this concerned him because he had heard "that [Teleguz] had ties with the Russian mob at the time." (J.A. at 2822:24-25.) He noticed Teleguz and Hetrick speaking once again at his brother-in-law David Everhart's birthday party but he "didn't hear them talking about anything that had to do with the murder." (J.A. at 2825:21-22.)

On some later date around 10:00 or 10:30 p.m., Teleguz appeared at Gilkes'

residence. Gilkes claimed that he was unaware that Sipe's murder was the true

intention of that evening's trip, because "Hetrick . . . said that he wanted [Gilkes]

to go with him to watch his back on a drug run because it was the first time [he

was] doing a drug run with the Russians." (J.A. at 2826:12-14.) Gilkes recalled

that Teleguz was driving, and that he did not know where they were going but

eventually arrived at a Walmart in Harrisonburg, Virginia. Both Hetrick and

Gilkes entered the store but Gilkes did not see what was purchased. When they

returned to the car where Teleguz was waiting, Hetrick opened the shopping bag to

reveal "a hard plastic container with a handle." (J.A. at 2828:10.) Teleguz then

dropped the two men off at an apartment complex and handed Hetrick a picture of

what "looked to be a female." (J.A. at 2828:21.) After realizing the true purpose

of the trip, Gilkes panicked. Hetrick attempted to persuade him to assist in the

murder of Stephanie Sipe, but Gilkes refused to participate. Hetrick and Gilkes

returned to Walmart by taxi, and Gilkes did not understand why Hetrick was

waiting to commit the murder. Once back at the apartment complex, Hetrick

removed a knife and clothes from the Walmart shopping bag, approached Sipe's

apartment, and returned "about fifteen minutes later and [had] a shirt wrapped

around his hand." (J.A. at 2835:15-16.)

When Gilkes asked how they were to get back to Pennsylvania, Hetrick told him that Teleguz had already returned to Pennsylvania to establish an alibi. Hetrick and Gilkes called a taxi from a local restaurant, which took them to a train station but no train was running. However, "[t]here was a white male there with three young females and they were telling [Hetrick and Gilkes] about some bus that was supposed to be coming so they drove [them] to the bus station." (J.A. at 2837:20-23.)

On cross-examination, Gilkes admitted that he had initially told Detective Whitfield that he had not been involved in the murder and that he had only learned of it through two Russians — Eugene Popov and Anatoly Rymarenko. Defense counsel then asked, "Do you remember telling the investigators that you were at the recreation center in this small town and that Ivan Teleguz and two other people came in, walked up to some guy, blew him away and told you they'll be back for the other two?" (J.A. at 2852:6-10.) Gilkes said that he did not so recall. On redirect, Gilkes explained that he did not actually witness a murder at the recreation center in Ephrata but, rather, witnessed the following:

> Well, there was two males that got out of the car. And the one walked up and said that, told Gene Papov [sic] if his boys didn't have the money at a certain time that in a couple of days that some of them would be killed. And then after they left Gene explained the situation to me a little bit. But at the time I did not realize that, I didn't know Teleguz so I didn't know that that was him at the time until he showed up at the party for the first time.

(J.A. at 2870:7-15.) Gilkes testified that it had not been Teleguz who had made the threat although he had been present. He reported that "[s]ome other Russian" was murdered on Main Street in Ephrata approximately three days to one week after the confrontation, remarking that "you can check the records on that." (J.A. at 2871:4-5;10.)

*Michael Hetrick.*

Hetrick testified that he had met Teleguz about three months before the murder. At that time, he was living with David Everhart, Latesha Everhart, and Gilkes on East King Street in Lancaster, Pennsylvania. According to Hetrick, in June 2001, at David Everhart's birthday party, Gilkes "had approached [him] in the living room, [and] stated that [Teleguz] had this murder for hire that he wanted done and he'd stated that he was offering a thousand dollars." (J.A. at 2879:23-25.) Moving the conversation to the back porch, "Teleguz then stated to [Hetrick] that he would give [Hetrick and Gilkes] a thousand dollars to murder his ex-girlfriend." (J.A. at 2880:3-4.) Hetrick stated that Teleguz had been motivated to murder the mother of his child because "she had robbed him of some drugs and money [and because] she had asked him for child support, but that . . . didn't seem like the main point at the time." (J.A. at 2880:6-9.) Teleguz told Hetrick that he "wanted her dead, that he wanted her throat cut" and Hetrick and Teleguz bartered for a period of time." (J.A. at 2880:14-17.) The men ultimately arrived at a $2,000

fee for Gilkes and for Hetrick. They did not decide on a specific date, but Teleguz stated that "he would contact [them] whenever he was prepared." (J.A. at 2881:4.) Hetrick stated that he had been under the impression that he was to "oversee" the murder and that Gilkes actually intended to commit the crime. (J.A. at 2881:14.) However, if Gilkes failed to follow through, Hetrick would murder Sipe in his place, because "[i]t was understood that the act was to be done one way or another." (J.A. at 2881:18-19.)

Hetrick recalled that Teleguz came to the East King Street residence about a month after this conversation, on July 21, 2001, at approximately 9:00 or 10:00 p.m. He gave Hetrick $1,000 in advance, which Hetrick split evenly with Gilkes, and they began their trip to Harrisonburg. Hetrick claimed that he had never been to Harrisonburg nor did he know Stephanie Sipe. Arriving at the Harrisonburg Walmart, Gilkes and Hetrick purchased a gym bag, rubber gloves, a filet knife, a pair of shorts, and a pair of shoes.[7] Hetrick showed Teleguz the knife and supplies upon returning to the car, and "he indicated that they were adequate for what was to be done." (J.A. at 2889:17-18.)

According to Hetrick, they subsequently drove to Deer Run Apartments where Teleguz pointed out Sipe's residence. Teleguz "wanted [Hetrick and

---

[7] The trial court admitted a photocopy of a receipt obtained from a Walmart store in Harrisonburg listing these purchases and dated July 22, 2001, at 3:58 a.m. (J.A. at 1864.)

Case 7:10-cv-00254-JPJ   Document 318   Filed 07/17/14   Page 18 of 62   Pageid#: 7504

Gilkes] to wait until he had time to get back to Pennsylvania so that he could meet up with a friend or whatever he had planned to do from there and establish his whereabouts at the time of the actual murder." (J.A. at 2891:23–2892:2.) Teleguz then dropped them about a quarter of a mile from the apartment and began his trip back to Lancaster. While they waited, Hetrick and Gilkes shopped at a nearby convenience store and returned to Walmart by taxi. According to Hetrick, both he and Gilkes panicked, but Hetrick felt that, if he did not murder Sipe, he "would die in her place." (J.A. at 2895:6.) He "was afraid of Ivan Teleguz" and "afraid that Mr. Teleguz was affiliated with the Russian Mafia." (J.A. at 2895:7; 20-21.)

Hetrick then collected his supplies, crossed the street, and knocked on Sipe's door. When she answered, he told her that his car had broken down and asked if he could use her phone. He attacked her when she opened the door. Sipe and Hetrick struggled, and at some point, the knife badly cut Hetrick's hand. After murdering Sipe, Hetrick left the knife in the kitchen sink and went to the bathroom to clean his wound, where he discovered Zachary, Sipe and Teleguz's child, in the bathtub. Hetrick turned off the water, tried to drain the tub, and left the child. He recalled fleeing the apartment and nearly colliding with "a brown skinned gentleman." (J.A. at 2901:21.) He estimated that it was "[e]arly morning" and "[r]ight around church time." (J.A. at 2901:23.)

Hetrick ran back to where Gilkes had been waiting, disposed of his clothing, and changed into the new clothes he had purchased at Walmart. The two men called a taxi from a nearby Exxon station and asked it to meet them at an adjacent restaurant. According to Hetrick, a middle-aged black taxi driver drove them to the train station but no train was running, so he then delivered them to a bus station in a nearby city, where they boarded a bus to Pennsylvania.

Hetrick and Gilkes phoned Teleguz the next day, and once he had received confirmation of Sipe's death, they were paid the balance of their fee. Hetrick recounted that Teleguz "noticed that [his] hand had been cut . . . [and] [h]e seemed upset by that." (J.A. at 2906:21-22.) Hetrick recalled being upset as well, "because [he] didn't expect the kid to be in the apartment. And [Teleguz] asked what was done and [Hetrick] said that [he] just left the child there. And there was really no concern for [the child]." (J.A. at 2907:13-16.)

On cross-examination, Teleguz's counsel highlighted that in his statement to Detective Whitfield, Hetrick had stated that he had been surprised to discover a child at Sipe's apartment and that Teleguz never mentioned his child support obligations as his motive. Hetrick also confirmed that he had asked Whitfield why Sipe had been killed and Whitfield then provided his theory of the case before Hetrick admitted any involvement. Additionally, state prosecutor Garst was telephoned during the interview, and she proposed a deal in exchange for Hetrick's

cooperation. She would not seek the death penalty if he fully cooperated in providing his "role and the role of Mr. Teleguz." (J.A. at 2950:22.) Hetrick estimated that it was approximately two hours into the interview before he recounted his version of Sipe's murder.

The prosecutor attempted to combat these assertions on redirect. Hetrick stated that, rather than having first heard of the child support motive from the detective, he had heard it from Teleguz but believed the primary motivation to be Sipe's alleged theft of drugs and drug money. According to Hetrick, Teleguz "seemed angry" when discussing the child support obligation at the Everhart party, "but . . . he was angry throughout the entire conversation." (J.A. at 2959:3-4.)

### B. Recantations of Gilkes and Safanov.

Because they both refused to testify, I did not have the opportunity to hear and observe, subject to cross-examination, any recantations by Gilkes or Safanov. A central question therefore is whether their affidavit recantations foreclose the likelihood that a reasonable juror could find the defendant guilty beyond a reasonable doubt.[8] The court of appeals counseled that this court "is permitted

---

[8] Teleguz points to the Supreme Court of Virginia's statement in its opinion in his direct appeal that, "in order to return a guilty verdict, the jury had to believe the testimony of Safanov, Gilkes, and Hetrick." *Teleguz v. Commonwealth*, 643 S.E.2d at 728. The petitioner interprets this language as a finding that no reasonable juror would have found him guilty beyond a reasonable doubt without finding the trial testimony of *all* three witnesses credible. The Warden disputes the petitioner's characterization of the Virginia court's decision, insisting that it did not foreclose the possibility of a reasonable

under *Schlup* to 'make some credibility assessments' when, as here, a state court has not evaluated the reliability of a petitioner's 'newly presented evidence [that] may indeed call into question the credibility of the witnesses presented at trial.'" *Teleguz v. Pearson*, 689 F.3d at 331-32 (quoting *Schlup*, 513 U.S. at 330). Of course, an ideal credibility determination is not possible here in the absence of in-court, cross-examined testimony. In any event, considering the affidavits with the limited ability to judge their truthfulness, and based upon all of the circumstances, I find that the petitioner has not shown that it is more likely than not that no reasonable juror would have convicted him.

Teleguz argues that Gilkes testified falsely at trial in exchange for favorable treatment from the prosecution. In two affidavits, one dated April 21, 2008, and the other September 24, 2010, obtained by Teleguz's habeas counsel, Gilkes recanted several pieces of his trial testimony, which he said were the product of coaching and intimidation. He recanted his claim that Teleguz was present at David Everhart's birthday party, where Hetrick contended that the murder-for-hire scheme was hatched. Gilkes further averred that he "never heard or overheard Ivan Teleguz hiring Michael Hetrick to kill his ex-girlfriend," (Pet'r's Ex. 22 ¶ 3) and

_____

juror finding the petitioner guilty beyond a reasonable doubt by relying on the testimony of less than all three witnesses. Because I find the recantations of Safanov and Gilkes not to be credible and Hetrick's testimony to be reliable, it is not necessary to resolve this dispute, but I agree with the Warden in any event.

-22-

did not "know who hired Hetrick to kill Ms. Sipe, or if anyone hired him." (Pet'r's Ex. 34 ¶ 6.) He also stated that Teleguz did not transport the two men to Harrisonburg but he could not affirmatively identify the driver of the car.

Gilkes claimed that "[m]ost of [his] testimony was fabricated," (Pet'r's Ex. 34 ¶ 2.) and that he "said those things because Marsha Garst told [him] that she was only interested in information that put this murder on Ivan Teleguz. . . . and she told [him] to give her as much about Ivan Teleguz as [he] could." (Pet'r's Ex. 22 ¶ 4.) In his second affidavit, he alleged, "Before I testified, Marsha Garst and Investigator Whitfield told me that I should say that Teleguz was responsible for Ms. Sipe's murder." (Pet'r's Ex. 34 ¶ 2.) At the evidentiary hearing before me, both prosecutor Garst and Detective Whitfield denied Gilkes' accusations of coaching and intimidation.

The recantations contained in Gilkes' affidavits are incomplete at best and at worst are contradictory. While Gilkes retracted his trial testimony implicating Teleguz, he failed to provide any explanation why he and Hetrick traveled to Harrisonburg to murder Sipe, who drove them there, or how they ultimately located Sipe.

Furthermore, during his initial interview with Whitfield, Gilkes denied any involvement in the murder but still implicated Teleguz with purported second-hand information from Rymarenko. Tellingly, in his second affidavit, Gilkes stated,

> During questioning, police told me that the Russian guy from Massachusetts was the one who told them about me. Since I only met that guy once, I figured Teleguz was the one who told that guy about me. That made me really angry at Teleguz. It was easier to make stuff up about Teleguz, because I believed that Teleguz threw me under the bus by telling police.

(Pet'r's Ex. 34 ¶ 3.) Thus, after all of his supposed recantations, I infer from this statement that, at a minimum, Teleguz had sufficient prior knowledge of the murder for Gilkes to suspect that he had led police to his door.

 For these reasons, I find Gilkes' affidavits unreliable.

The petitioner also contends that Safanov gave false testimony at trial. Before Teleguz's habeas counsel contacted him, Safanov was deported and living in Kazakhstan. Therefore, all interactions with Safanov have been remote. Teleguz has proffered an affidavit made by a person identifying himself as Safanov in 2012, in which it was claimed, "Ivan has never told me that he had arranged to have Stephanie Sipe killed, and my testimony at his capital murder trial, that he did tell me this, was false." (Pet'r's Ex. 48 ¶ 4.) [9]  In addition to promises of favorable treatment, Safanov also pointed to ill will he had felt for Teleguz, who had previously left him "stuck in jail for several months" after refusing to "put together money for [Safanov's] $2,500 bail." (Pet'r's Ex. 48 ¶ 8.) Safanov claimed that his

---

[9] Safanov's affidavit was in Russian, and the quotations are taken from the English translation of that affidavit; both were admitted as a single exhibit.

-24-

lies were primarily motivated by the prosecutor's representations that she would assist him in avoiding deportation:

> I was pressured by Marsha Garst, the Virginia prosecutor in Ivan's capital case, to testify that Ivan had arranged the murder so that Ivan would get the death penalty. In exchange for my testimony, Garst offered to help me in a number of ways, including help getting a good deal on federal criminal charges I was facing at the time.

(Pet'r's Ex. 48 ¶ 4.)

Teleguz's present counsel has represented that these statements are consistent with telephone conversations in 2010, when Safanov had expressed regret that he "did a bad thing," in testifying falsely against Teleguz. (Pet'r's Ex. 37 ¶ 10.) Lindsey Tripp, a lawyer with Virginia Capital Representation Resource Center, which has represented Teleguz in these proceedings as well as in the state habeas action, stated in an affidavit that Safanov told her on the telephone that he gave false testimony because "Marcia [sic] Garst . . . guaranteed she would get Safanov an S Visa." (Pet'r's Ex. 37 ¶ 4.)

At the evidentiary hearing, prosecutor Garst testified that no such promise was made. She denied discussing the possibility of securing an S visa, or Safanov's immigration issues generally, prior to his testimony at Teleguz's trial, but she did confirm that she had made an effort to prevent his deportation because "if there would be any sort of need within post-trial [she] wanted him present in the United States for the ability to call him as a witness." (Hr'g Tr. 242:3-5, Nov. 13,

-25-

2013.) Garst also testified that Safanov "was told up front there was no agreement. If he testified truthfully [she] would contact the U.S. Attorney's Office [about consideration in sentencing] in the form of Kevin O'Regan." (Hr'g Tr. 226:12-24, Nov. 13, 2013.) O'Regan was an assistant United States attorney in Springfield, Massachusetts, where Safanov was facing gun trafficking charges.

I find Garst's testimony to be credible. Garst's version of the events is reasonable and consistent with the other facts. She is an experienced prosecutor and is not likely to have made such an extravagant promise to Safanov. As with most cooperating witnesses, the prosecutor held out to Safanov the advantages of cooperation. Of course, Safanov naturally hoped for assistance in his own case, which doubtless motivated him to contact Deputy Marshal Nelson in the first place.

Safanov also claimed in his affidavit that Deputy Marshal Nelson "visited [him] in jail" and "told [him] all the details about the arrest of accomplices in [the] murder of Stephanie Sipe. . . . in order to keep [him] informed." (Pet'r's Ex. 48 ¶ 8.) At the evidentiary hearing, Irina Krokhmalyuk, Safanov's former girlfriend, testified that Nelson had assured her that Safanov was "not going to be deported and he should be out of the jail" after cooperating in the Teleguz prosecution. (Hr'g Tr. 43:23-24, Nov. 13, 2013.) When Safanov was not released from prison as promised, Krokhmalyuk attempted to contact Nelson several times but was

unsuccessful. Deputy Marshal Nelson testified at the hearing, and denied having had any discussions with Safanov about an S visa, stating that he had had no knowledge at the time of this program.[10] That testimony, like prosecutor Garst's, is reasonable under the circumstances and I find it also credible.

Even assuming the authenticity of his affidavit, the reliability of Safanov's recantation is suspect, given that it fails to explain how Safanov possessed information necessary to rejuvenate the stale investigation. Before speaking with anyone related to the investigation of Sipe's murder, Safanov provided information to Nelson, an uninterested party, which information was neither publicly available nor provided to him by any law enforcement officer. In particular, Safanov gave Nelson information that was unknown even to investigators assigned to the Sipe homicide — that "a Russian male hired a black male from Pennsylvania, Lancaster, Pennsylvania to kill his wife."[11] (Hr'g Tr. 143:9-10, Nov. 13, 2013.) A

_____

[10] "An S nonimmigrant is an individual who has assisted a law enforcement agency as a witness or informant. A law enforcement agency may submit an application for permanent residence (a green card) on behalf of a witness or informant when the individual has completed the terms and conditions of his or her S classification. Only a federal or state law enforcement agency or a U.S. Attorney's office may submit a request for permanent residence as an S nonimmigrant on behalf of a witness or informant." *Green Card for an Informant (S nonimmigrant)*, U.S. Citizenship and Immigration Services, Official Website of the Department of Homeland Security, http://www.uscis.gov/green-card/other-ways-get-green-card/green-card-informant-s-nonimmigrant (last visited June 24, 2014).

[11] Teleguz points out that Safanov described the perpetrator as a Russian male, rather than a Ukrainian, and that he described the victim as the Russian's wife. The Warden suggests that cultural and linguistic differences may likely explain these

few days later, Safanov reported to Nelson that "the black male from Lancaster, PA lives on the same one way street as the Lancaster County Jail." (Resp't's Ex. 3, at 1.) A cross-reference of the Lancaster County Jail address with Teleguz's phone records led law enforcement to Gilkes, who in turn implicated Hetrick as the murderer.

Safanov also confirmed investigators' non-public suspicion that Teleguz's murder-for-hire scheme was motivated by his anger over court-ordered child support payments. While it is certainly true that Safanov may have been motivated to cooperate in order to avoid deportation, he first approached Nelson with this information before any such assurances could have been made. Moreover, Nelson could not have provided "details about the arrest of accomplices" to Safanov before he led investigators to Gilkes in the first instance. Thus, while his trial testimony could have contained information fed to him by law enforcement, I find the pivotal information that he initially provided to Nelson — implicating Gilkes and Teleguz — was independent and reliable.

---

mischaracterizations. I agree that the inaccuracy of this statement is of little moment to the actual innocence claim. In his confession, Hetrick confirmed that Teleguz referred to Sipe as his wife. (Pet'r's Ex. 20, at 66 ("Ivan said he wanted someone killed for [PAUSE] — he said it was his wife that he wanted killed. [inaudible] is how he said it.").) Safanov's statement referring to Sipe as Teleguz's wife was not included in the probable cause affidavit nor was it otherwise available to Hetrick at the time of his confession. Moreover, Safanov had made clear earlier that he was referring to Teleguz when he indicated that court-ordered child support was the motive.

## C. David Everhart's Birthday Party.

At Teleguz's trial, Hetrick testified that he and Teleguz had negotiated the terms of the murder-for-hire scheme at David Everhart's birthday party. In his trial testimony, Gilkes also confirmed Teleguz's presence at the party but "didn't hear [Hetrick and Teleguz] talking about anything that had to do with the murder." (J.A. at 2825:21-22.) The petitioner has proffered affidavits in an effort to rebut this claim. In an affidavit from 2008 prepared by habeas counsel, David Everhart averred that "Ivan Teleguz was not at the party." (Pet'r's Ex. 11 ¶ 9.) Latesha Everhart also stated in an affidavit dated the same day, that "Ivan Teleguz was definitely not at [her] husband Dave's birthday party." (Pet'r's Ex. 10 ¶ 7.)

Prior to the evidentiary hearing in this court, the Everharts indicated that they would not appear and testify voluntarily. Because they resided outside of the geographical limits of a witness subpoena, I allowed Teleguz's counsel to take their depositions in Pennsylvania for possible use at the hearing. Neither side introduced David Everhart's deposition at the hearing, but the Warden introduced Latesha's. In it, Mrs. Everhart expressed suspicion that her affidavit had been altered "[b]ecause half of the stuff in [the affidavit] isn't true." (Resp't's Ex. 26, at 57:4-5.) She stated, "I don't know if Ivan [Teleguz] was at the party or not. . . . Edwin [Gilkes] could have let him in upstairs without coming through the front door." (Resp't's Ex. 26, at 63:1-2; 20-22.)

As to the preparation of the affidavits, Mrs. Everhart recalled that a young lady had visited her and her husband in regard to the affidavits (presumably Jennifer Givens, an attorney with the Virginia Capital Resource Center, Teleguz's state and federal habeas counsel). The young lady "wrote some things down and she left. And about two, three weeks later she came back and had us sign a paper. And that was it." (Resp't's Ex. 26, at 88:7-10.) Mrs. Everhart claimed that she simply "glanced over [the affidavit] and signed it," but was never given her own copy. (Resp't's Ex. 26, at 89:19, 20-23.) She also raised doubts about the accuracy of her husband's own affidavit when she asserted that David Everhart "was really drunk" at his birthday party. (Resp't's Ex. 26, at 83:21-22.)

Steven Corbally, an investigator who had assisted Teleguz's trial attorneys, testified at the evidentiary hearing that he had interviewed Mr. and Mrs. Everhart in 2005 together at their home in Pennsylvania, and they had told him that they "never saw Ivan [Teleguz] at this party." (Hr'g Tr. 62:25-63:1, Nov. 14, 2013.) However, this statement is significantly weaker than the assertion made in the later affidavits obtained by Ms. Givens that Teleguz was not present at the party.

Two other affiants made relevant statements but both are similarly weak denials of Teleguz's presence at the party. Sarah Deaver, Gilkes ex-girlfriend and the mother of his two oldest children, did not remember seeing Teleguz at the party, but could not "remember it very well because [she] drank a lot that night."

-30-

(Pet'r's Ex. 105 ¶ 9.) Popov also reported simply that he "did not see Ivan at the party." (Pet'r's Ex. 100 ¶ 14.)

Teleguz has not offered any evidence to establish that he was elsewhere during the party but instead has relied upon the affidavits of these attendees. According to Mr. Everhart's affidavit, only days after the murder, Hetrick "admitted that he had killed someone, and that while he was killing her, she turned the knife on him and he got cut," and Mr. Everhart relayed the confession to his wife.[12] (Pet'r's Ex. 11, ¶ 13.) The Everharts knew for years that Hetrick and Gilkes had been involved in a murder. They did not alert authorities, but instead merely "told Hetrick that he would have to leave very soon." (Pet'r's Ex. 11. ¶ 14.) This alone challenges their credibility, without considering the inability of Latesha Everhart to maintain a consistent account of who was present at her husband's birthday party.

The petitioner asserts that "[n]o reasonable juror who heard the evidence demonstrating that Teleguz was not present at David Everhart's birthday party would find Teleguz guilty beyond a reasonable doubt." (Pet'r's Reply 21.) However, Gilkes testified at trial that Teleguz hired Hetrick at an earlier meeting, and in fact, he had not heard Teleguz and Hetrick discuss the murder at the

---

[12] In her deposition, Mrs. Everhart also claimed that these allegations of being told about the murder — contained in both her and her husband's affidavit — were false.

Everhart party. Thus, even if the allegations of the attendees were credible, Teleguz's presence at the birthday party was not central to his murder-for-hire conviction.

## D. TELEGUZ'S INVOLVEMENT IN AN EARLIER MURDER.

On August 7, 2003, in an interview with officers with the Russian Organized Crime Task Force, Gilkes recounted that Teleguz had been involved in a 2001 murder outside of the Ephrata Recreation Center.[13] According to the interview notes, he reported that Teleguz, along with two other men, approached a group of Russian individuals at a "rec center" in Ephrata "because of a drug deal gone bad." (Resp't's Ex. 2 ¶ 17.) Gilkes recounted that he, Popov, Rymarenko, and others looked on as "the male with the pistol fired, killing the other guy." Teleguz then left with the shooter and the other man, but before leaving told those present, "'Tell your boys we'll be back for the other two.'" (Resp't's Ex. 2 ¶17.)

On a pretrial motion by defense counsel, the court excluded any such evidence at the guilt phase of the trial, but not the penalty phase. (J.A. at 1819-20.) Nevertheless, in the trial's guilt phase Teleguz's lead counsel Maslakowski asked Gilkes during cross-examination, "Do you remember telling the investigators that you were at the recreation center in [Ephrata] and that Ivan Teleguz and two other

---

[13] The Russian Organized Crime Task Force was comprised of ATF agents supervised by the Boston Field Office who were investigating illegal firearms trafficking involving Safanov, Teleguz, and others.

people came in, walked up to some guy, blew him away and told you they'll be back for the other two?" (J.A. at 2852:6-10.) Gilkes denied making such a statement, and explained on redirect as follows:

> Q. At the rec center. And if you would tell the jury about the situation. What occurred at the Ephrata rec center?
>
> . . . .
>
> A. Yes. What I stated is I didn't recall me being there watching them walk up inside of the rec center and shoot a dude in the head as you stated. What I recall is I was down in Ephrata one day with Gene and . . .
>
> Q. Gene Papov [sic] ?
>
> A. Gene Papov [sic] and [Rymarenko] and a couple of other Russians on Main Street were outside the parking lot of the rec center. There was two men that got out of the car. We figured they were both, they were both Russians to the best of my knowledge.
>
> . . . .
>
> A. Okay. Well, there was two males that got out of the car. And the one walked up and said that, told Gene Papov [sic] if his boys didn't have the money at a certain time that in a couple of days that some of them would be killed. And then after they left Gene explained the situation to me a little bit. But at that time I did not realize that, I didn't know Teleguz so I didn't know that that was him until he showed up at the party for the first time.
>
> . . . .
>
> Q. And he was the one that made the statement?
>
> A. No.
>
> Q. He was present during the statement.

-33-

A.    Yes, he was present.

Q.    To the respect that, excuse me, that if your boys don't get the money someone's going to be killed.

A.    Yes.

Q.    Was someone killed?

A.    Yes.

Q.    How much after that?

A.    It was about I would say a week, three days to a week after that in Ephrata Street, on Main Street and you can check the records on that.

(J.A. at 2869:4-2871:5.)

At the evidentiary hearing before me, David Lloyd, the director of the recreation center from 1992 until 2012, James Karl, the Chief Public Defender of Lancaster County, and local police detective Donald Brown all confirmed that there had never been such a murder at or near the Ephrata Recreation Center. Nonetheless, I find the petitioner's attempt to use this evidence to impeach Gilkes' trial testimony is unsuccessful. Gilkes did not testify at trial that he had witnessed a murder or that Teleguz had made a threat. He testified instead that Teleguz was present with another person who had made a threat and that he understood that an unidentified murder had later occurred.

In the Gilkes affidavits relied upon by Teleguz, Gilkes did not fully recant this portion of his trial testimony but in his second affidavit, revealed that his

-34-

knowledge of the purported murder was second-hand: "Gene Popov told me that Teleguz was involved in the rec center shooting. I remember hearing that someone got shot in Ephrata on the news. . . . I didn't actually witness anything. I was just trying to give the police more bad things on Teleguz." (Pet'r's Ex. 34 ¶ 8.)

In fact, Gilkes' testimony is consistent with the account introduced at the evidentiary hearing about the murder of Yevgeniy "John" Belyy, which occurred on April 6, 2001, in nearby Elizabeth Township, Pennsylvania. Belyy was murdered by Valeriy Mezentsev. Gerard Sauers of the Pennsylvania State Police, who investigated the Belyy homicide, testified at the evidentiary hearing that it was suspected that the murder was a "preemptive strike against the victim," (Hr'g Tr. 170:16, Nov. 13, 2013) and appeared to be linked to another event by "various individuals who talked about a fight or embarrassment at the Ephrata Rec Center or in that vicinity." (Hr'g Tr. 170:21-22, Nov. 13, 2013.) Sauers also testified that "Ivan Teleguz first came to light in the homicide investigation that we conducted regarding a victim named Evgeni [sic] Belyy." (Hr'g Tr. 169:17-19, Nov. 13, 2013.) He could not recall how Teleguz was involved in the investigation.

Several affiants have recounted rumors that Teleguz had supplied a gun used in that murder or aided Mezentsev in some manner. In his affidavit, Popov, who was present at the party, recalled "[r]umors [ ] that someone told told Mezentsev that [Popov's] group was at the party, and that Ivan was the one who told

-35-

Mezentsev where we were." (Pet'r's Ex. 100 ¶ 7.) He claimed this rumor "is what everyone [he knew] believed." (Pet'r's Ex. 100 ¶ 7.) He also claimed that "[p]eople said that Ivan gave Mezentsev one of the guns that was used to kill Belyy." (Pet'r's Ex. 100 ¶ 8.) Rymarenko also stated in his affidavit that he saw Mezentsev with two guns at the party, and "the one that was not registered was assumed to have been obtained from Ivan." (Pet'r's Ex. 101 ¶ 5.) In his affidavit, Dimitriy Schwartz, a friend of Mesentsev, reported hearing after the murder that Ivan had warned Mesentsev of a threat from Belyy, and he recalled that Belyy's family "considered Ivan responsible for [Belyy's] death." (Pet'r's Ex. 104 ¶¶ 4-5.)

Based on this background, Gilkes' testimony about a murder is likely the repetition of rumors and does not substantially undermine the portions of his trial testimony related to the murder of Stephanie Sipe.

These rumors have also been cited in support of a theory urged on behalf of Teleguz that Rymarenko and Popov were involved in Sipe's murder. In his brief to the Fourth Circuit, the petitioner speculated that "Popov and Rymarenko wanted to kill Teleguz because they believed (wrongly) that Teleguz was behind the death of Rymarenko's cousin [Belyy] less than four months prior to Sipe's murder." (Appellant's Br. 58.) Steven Corbally, the trial investigator, proposed a theory "that Gene Popov and Anatoly [Rymarenko] had hired Hetrick to rob or kill Stephanie Sipe, knowing that Ivan Teleguz, the ex-boyfriend, would be the prime

suspect." (Pet'r's Ex. 60 ¶ 21.)  However, the expanded record does not disturb my earlier finding that this alternative theory lacks evidentiary support.  *Teleguz v. Kelly*, 824 F. Supp. 2d at 714-715.  There is simply no evidence to indicate that Hetrick and Gilkes were hired by anyone other than Teleguz and this alternative theory does not support the petitioner's claim of actual innocence.

### E. OTHER GROUNDS SEEKING TO IMPEACH HETRICK.

The petitioner contends that Hetrick's testimony "was utterly unreliable and rife with inconsistencies."  (Pet'r's Post-Hr'g Br. 33, ECF No. 310.)  The petitioner attempts to undermine Hetrick's credibility by pointing to the tactics used when he was interrogated and by introducing several categories of so-called "independent evidence."  In addition to Teleguz's alleged absence from the Everhart birthday party, the petitioner asserts that Hetrick's timetable is implausible, given evidence as to Sipe's time of death and Teleguz's alibi.   I also find these efforts to be unsuccessful.

### *Interrogation Tactics.*

The petitioner contends that "[d]uring the first two hours of the interrogation, Whitfield and Garst . . . provided Hetrick with all the information and motivation he needed to implicate Teleguz — regardless of whether Teleguz actually was involved."  (Pet'r's Post-Hr'g Br. 34.)  At the evidentiary hearing, Dr. Richard Leo, "a nationally known expert on the science of false interrogations and

police psychology" (Hr'g Tr. 18:9-10, Nov. 12, 2013), and James Trainum, "a detective with 17 years [of] experience in homicide interrogations" (Hr'g Tr. 18:18-19, Nov. 12, 2013), opined that, due to improper interrogation tactics, Hetrick's confession and subsequent testimony were more likely to be unreliable. I disagree and do not accept their opinions.

Allegations of police intimidation and manipulation of this sort are often raised to challenge a self-incriminating statement by the accused. But here Hetrick has never challenged his confession to authorities and confirmed it later when he had counsel and testified at Teleguz's trial, a confirmation that continues to this day. Hetrick undisputedly murdered Sipe and I find that he confessed not because his will was overborne by improper police interrogation tactics, but because he understood that, in his words, he "was pinned into a corner, and everyone else had already snitched." (Hr'g Tr. 101:9-10, Nov. 13, 2013.) Leniency for government cooperators is common, and absent evidence of other misconduct, their motivation to help themselves does not render their statements necessarily unreliable. As for potential contamination, maximization, and minimization, Dr. Leo conceded that use of these techniques "might increase the risk, but they're not dispositive on the accuracy or inaccuracy of the resulting statements." (Hr'g Tr. 184:6-8, Nov. 12, 2013.)

The petitioner argues that it was Whitfield's single-minded focus upon Teleguz that forced Hetrick to falsely implicate him. Trainum opined that Whitfield "became obsessed with this theory of his, especially when he received information from Mr. Safanov, that confirmed, that seemed to confirm his theory." (Hr'g Tr. 220:13-16, Nov. 12, 2013.) He also challenged Safanov's credibility, calling him a "jailhouse snitch . . . inclined to either try to manipulate the truth or give information that they really didn't have." (Hr'g Tr. 220:20-221:3, Nov. 12, 2013.) However, Safanov, who was not subjected to the interrogation tactics at issue here, provided non-public facts to investigators that implicated Teleguz and provided the first viable lead in the investigation for over a year. Whitfield was pursuing the only viable, corroborated lead in the investigation, and there is no indication that, had Hetrick provided another viable alternative, Whitfield would not have pursued it.

The petitioner further contends that "the jurors did not hear Dr. Leo and Detective Trainum describe the improper interrogation tactics used against Hetrick and the ways and extent to which those improper tactics rendered Hetrick's statement and testimony unreliable." (Pet'r's Reply 20.) Nonetheless, Teleguz's trial counsel emphasized that Whitfield had provided his theory of the case to Hetrick before his confession. His trial counsel further cross-examined Hetrick regarding the inconsistencies between his trial testimony and his prior statements

Case 7:10-cv-00254-JPJ   Document 318   Filed 07/17/14   Page 39 of 62   Pageid#: 7525

to police.  Thus, the jury did consider and ultimately rejected similar arguments of contamination, self-preservation, and inconsistency.  As such, the expert opinions would have had little additional impact on the jurors.  The jury's credibility determination, in light of Hetrick's responses to rigorous cross-examination, is not unsurprising.

The fact is that Hetrick was a highly creditable witness, providing a coherent and complete narrative of the crime.  Indeed, having observed his demeanor and testimony first-hand, I believe that Hetrick's evidence alone was sufficient to have convinced the jury of Teleguz's guilt.  He indicated that he confessed because he felt he had no other choice: "Well, after I realized that I was pinned into a corner, and everyone else had already snitched, I had [Whitfield] get [Garst] on the phone."  (Hr'g Tr. 101:9-11, Nov. 13, 2013.)  Hetrick recalled that, based on his reading of the probable cause affidavit, he had understood that Teleguz had "spoke to his cousin, Aleksay Safanov, . . . and told him the exact parameters of the crime except [his] name, but he did give up Edwin, . . . and whenever they went to talk to Edwin, he led them right to [him]."[14]  (Hr'g Tr. 102:9-13, Nov. 13, 2013.)  Hetrick claimed that he was not supplied information about Teleguz's child support obligations by the probable cause affidavit, because "that was the reason [Teleguz] gave for hiring [him] was the child support payments."  (Hr'g Tr. 128:22-23;

---

[14] There is no evidence, other than Hetrick's statement, to indicate that Safanov and Teleguz are in fact cousins.

129:2-3, Nov. 13, 2013.) Indeed, as previously discussed, the child support motivation had not been concocted by Whitfield but based on the suspicions of Sipe's family and independently corroborated by Safanov.

For these reasons, I find that the petitioner has not shown that even armed with the opinions of Dr. Leo and Detective Trainum, no reasonable juror would have convicted him.

<em>The Victim's Time of Death.</em>

The petitioner also challenges Hetrick's trial testimony that he murdered Sipe on the morning of July 22, 2001, pointing to medical reports and to interviews of Sipe's neighbors. These allegations and evidence were before the Supreme Court of Virginia in connection with an ineffective assistance of counsel claim, and the court remarked, "Sipe's precise time of death was not relevant to whether petitioner hired the killers." *Teleguz v. Warden*, 688 S.E.2d at 870. I agree with this finding, and I also conclude that the evidence cited by the petitioner does not undermine Hetrick's testimony such that no reasonable juror would have convicted him in light of it.

In an investigative report the medical examiner concluded that Sipe's "[t]ime of death [was] believed to be around 20:00 [8 p.m.] on Jul 22, based on decedent's clothing, evidence that she was about to bathe child, condition of body and condition of child." (Pet'r's Ex. 13, at 75.) The report also indicated that Sipe

-41-

was last seen alive on the afternoon of July 22, 2001. In a statement to police, Jesenia Diaz, a neighbor of Sipe, recalled that she last had seen Sipe outside of Deer Run Apartments with her child on "the day before the mother found her . . . a few minutes before 3:pm," and she was confident in her recollection "because that's what time [Diaz's boyfriend] had a break." (Pet'r's Ex. 4.) Another neighbor, Debra Price, told investigators that "she was sure she had seen the victim at approximately 6:pm [1800 hours] on 07-22-01." (Pet'r's Ex. 14 (brackets in original).)

However, there is testimony and documentation to the contrary, which is corroborative of Hetrick's testimony. In a Certificate of Death, Dr. Folsom lists Sipe's time of injury as "unknown," and instead of stating a time of death, he noted the time that the body was discovered. (J.A. at 2711.) Moreover, Victor Sampson, a Harrisonburg taxi driver, testified at trial that he had "picked up two gentlemen at the Shenandoah Grille somewhere between 9:30 and 10:00" on the morning of July 22, 2001. (J.A. at 2997:14-15.) He subsequently identified them as Hetrick and Gilkes in a lineup. Sampson recalled first taking them to the Staunton train station, but no trains were running, so he delivered them to Charlottesville. He described the passengers as "both fairly thin, close cropped hair, both of them, one black, one white, medium height, somewhere between five seven and five ten." (J.A. at 2999:8-10.) He reported that he was paid by the white passenger, who had one

hand wrapped with a bandage, indicating that the murder had already occurred. His testimony aligned with Hetrick's trial testimony, and there is no reason to doubt his credibility or reliability. Neither Diaz, Price, nor the medical officials testified at the evidentiary hearing, and the petitioner's attempt to rely upon their unsworn statements fails in the face of sworn testimony and documentation to the contrary.

*Teleguz's Failed Alibi.*

The petitioner also challenges Hetrick's trial testimony that Teleguz drove the perpetrators to Harrisonburg and then returned to Pennsylvania on the evening of July 21, 2001, in order to establish an alibi. The Virginia Supreme Court considered this argument in the state habeas proceeding and found that "[l]eaving Harrisonburg at 4:15 a.m. and making a purchase at the Wal-Mart in Ephrata at approximately 8:14 a.m is not implausible, particularly in light of petitioner's contention that the trip takes under four hours if obeying all speed limits." *Teleguz v. Warden*, 688 S.E.2d at 869. Moreover, the court found that the inquiry "was not relevant to whether he had hired the killers, because no one contended that the petitioner was at the scene of the murder when it took place or otherwise participated in the actual killing." *Id.* It is well-established that "when a state court has made a factual determination bearing on the resolution of a *Schlup* issue, the petitioner bears the burden of rebutting the presumption by clear and

convincing evidence." *Teleguz v. Pearson*, 689 F.3d at 331 (internal quotation marks and citation omitted). The petitioner has not produced any such evidence.

On Saturday, July 21, Teleguz attended a cookout at Blue Marsh Park in Leesport, Pennsylvania, with his work supervisor, Michael Millay and Millay's family. Millay's affidavit was considered by the Virginia Supreme Court in the state habeas proceeding and he testified before me at the evidentiary hearing.

Teleguz and Millay spent the day fishing and preparing the cookout. At the evidentiary hearing, Millay estimated that they had left the park, in separate automobiles, "after 9:30 [p.m.] even because . . . I pulled my headlights on and the sky was doing that dark purple thing." (Hr'g Tr. 53:20-22, Nov. 13, 2013.) Millay also estimated that the travel time from Blue Marsh Park to Lancaster was "better than an hour." (Hr'g Tr. 50:12, Nov. 13, 2013.) He recalled that Teleguz had appeared "in no hurry," and "never indicated to me that . . . anything was pressing." (Hr'g Tr. 53:24-25, Nov. 13, 2013.) From this testimony, the petitioner's counsel concludes that "Teleguz could not possibly have picked Hetrick and Gilkes up in Lancaster, Pennsylvania before 10:30 p.m." (Pet'r's Post-Hr'g Br. 71.) Even if a correct assumption, it does not materially conflict with Hetrick's and Gilkes' trial testimony that Teleguz arrived at their East King Street residence between 9:00 and 10:30 p.m. that evening.

-44-

Hetrick and Gilkes also testified at Teleguz's trial that their initial stop in Harrisonburg had been at the Walmart store, and this testimony was corroborated by a Walmart receipt time-stamped at 3:58 a.m. Therefore, Teleguz had more than adequate time between at least 10:30 p.m. and 3:58 a.m. to drive from Lancaster, Pennsylvania, to Harrisonburg, Virginia.

Teleguz's mother, Ira, testified at the evidentiary hearing that she had seen her son in the kitchen of her home at "[a]pproximately 8:00 a.m." on Sunday, July 22, 2001. (Hr'g Tr. at 69:14, Nov. 13, 2013.) Teleguz's bank records also establish that he made a purchase at the Ephrata, Pennsylvania, Walmart store no later than 8:14 a.m. that morning. Therefore, Teleguz also had adequate time to drive from the Harrisonburg Walmart to Deer Run Apartments and then return in time to make a purchase at the Ephrata Walmart at 8:14 a.m.[15] Neither Michael Millay's testimony nor that of Ira Teleguz have altered the timeline that was considered and deemed plausible by the Supreme Court of Virginia.

F. SUMMARY.

The seminal cases in actual innocence jurisprudence relied on extremely compelling exculpatory evidence. In *Schlup*, a prison surveillance video "showed conclusively that Schlup was in the dining room 65 seconds before the guards

---

[15] In a Google Maps printout in the appendix to Teleguz's federal habeas petition, the estimated travel time from Deer Run Apartments in Harrisonburg, Virginia, to the Walmart store in Ephrata, Pennsylvania, is four hours, zero minutes. (App. 63-67.)

responded to the distress call," as a result of the charged murder, so at trial, "a critical element of Schlup's defense was determining when the distress call went out." 513 U.S. at 303. In support of his claim of actual innocence, the white petitioner supported his claim of actual innocence with (1) affidavits of black inmates all professing his innocence in a racially motivated murder and some identifying another inmate as the actual assailant; (2) the affidavit of an inmate-clerk who confirmed that the distress call sounded quickly after the murder establishing that Schlup physically could not have travelled from the crime scene to the dining room in that time; and (3) the affidavit of a prison lieutenant who observed Schlup on his way to the dining room, and who remarked that Schlup did not appear hurried or as if he had been rushing from the incident to the dining room.

The *Schlup* Court held that the habeas court should consider this evidence to determine whether it "raised sufficient doubt about Schlup's guilt to undermine confidence in the result of the trial without the assurance that that trial was untainted by constitutional error." *Id.* at 317. In *House*, "the central forensic proof connecting House to the crime — the blood and the semen — ha[d] been called into question, and House ha[d] put forward substantial evidence pointing to a different suspect." 547 U.S. at 554. In conjunction with testimonial evidence that the victim's husband had admitted to several people that he had in fact murdered

-46-

his wife, the Court found that, although it was a close question, the petitioner's evidence satisfied the gateway standard set forth in *Schlup*. *Id*. at 555.

Here, the evidence proffered by the petitioner does not rise to such a level. Teleguz has not submitted compelling exculpatory evidence to raise sufficient doubt about his guilt and undermine confidence in his conviction. Gilkes' affidavits are incomplete insofar as they provide no reasonable explanation for his involvement in the murder, and Safanov's affidavit fails to explain how he possessed the information necessary to reinvigorate a cold case, if his testimony implicating Teleguz was in fact false. Hetrick, the murderer, confirmed his trial testimony at the evidentiary hearing before this court and presented the only complete and coherent account of the murder. The affidavits of Safanov and Gilkes, assessed without the benefit of cross-examination and an opportunity to make a credibility determination, do not provide sufficient support for the petitioner's claim of actual innocence, particularly in comparison with Hetrick's consistency and impressive testimony before me. And as previously discussed above, the other evidence attempting to undermine Hetrick's testimony is insufficient.

The evidence of Stephanie Sipe's murder is incomplete without Teleguz's involvement, and he has offered no evidence to establish a credible alternative scenario. Speculations that the murder was the result of a drug robbery gone bad

or that it was conceived by others in order to cast the blame on Teleguz are simply farfetched. The idea that a jury would believe that two petty criminals like Gilkes and Hetrick would drive 200 miles to a strange city in another state to rob a 20-year-old they had never met of her drugs or money — or that Teleguz's Russian Mafia enemies would, instead of killing him, direct the murder of his former girl friend in the hope that it would get him in trouble — is unlikely at the least.

In short, the steep hill that the petitioner must climb to show his actual innocence has two peaks — Hetrick's powerful, credible testimony and the lack of any reasonable alternative to Teleguz's instigation of the murder. I cannot conclude that more likely than not, given the "overall, newly supplemented record," *Schlup*, 547 U.S. at 538, no reasonable juror would have found Teleguz guilty beyond a reasonable doubt. As such, the petitioner has not made a threshold showing of actual innocence to permit review of his procedurally-defaulted claims.

## III. The *MARTINEZ* CLAIM.

In a new argument, not presented earlier, the petitioner relies on the Supreme Court's decision in *Martinez v. Ryan*, 132 S. Ct. 1309 (2012), to overcome a procedural bar to his sentencing-phase ineffective assistance claim relating to a murder in Pennsylvania.

As explored earlier in Part I.D. of the this Opinion, Gilkes was asked in the guilt phase of the criminal trial on cross examination by Teleguz's attorney about his alleged statement to investigators that Teleguz had been an accomplice to a 2001 murder outside of the recreation center in Ephrata, Pennsylvania. Gilkes explained that he had not witnessed any such a murder, but only that he had observed Teleguz at the recreation center accompanying an unidentified individual and that the unidentified individual had made a threat that Gilkes believed had later resulted in a murder elsewhere. No mention was made of this incident in the closing arguments of the guilt phase, but in her closing argument to the jury in the sentencing phase, prosecutor Garst briefly referred to this and related evidence as follows:

> Future dangerousness, you heard the background of the defendant, *how Gilkes told you about this issue in Ephrata, how they had this situation with the Russian folks approaching and posturing about killing someone, and someone ends up dead.* How he talked about robbing Popov. How you heard from Safanov's mouth that after Gilkes did this and was involved with this act he wanted Gilkes killed. That's how he solves problems. . . . How would he be dangerous in prison? At any time he can pick up a phone when he has access to a phone and dial up a murder because he can call another Aleksey Safanov or another Edwin Gilkes or another Michael Hetrick.

(J.A. at 3454:9-3455:2 (emphasis addded).) While the jury was permitted in the sentencing phase of the trial to consider the evidence presented in the guilt phase (J.A. at 3344:1-7), Gilkes did not testify at the sentencing phase and there was no

other evidence presented — from either the prosecution or the defense — concerning another murder.

In his Amended Petition for a Writ of Habeas Corpus in this court, Teleguz, as one of his many claims, asserted in his Claim II that his trial counsel had failed to "reasonably address evidence of future dangerousness . . . at the sentencing phase." (Am. Pet. 55.) In one of several particulars of this claim, he contended that counsel had failed to "expose[] the prosecution's Pennsylvania murder story as pure fiction." (Am. Pet. 61.) In my opinion initially denying Teleguz's habeas petition, I rejected this claim on the ground that it had not been raised in state court and thus was procedurally defaulted. *Teleguz v. Kelly*, 824 F. Supp. 2d at 695.

In his appeal to the Fourth Circuit, Teleguz again raised this claim, as his Issue II. He conceded that the claim was procedurally defaulted, but contended that the court erred in not granting a *Schlup* evidentiary hearing to allow him to show his actual innocence in order to reach this defaulted claim. (Br. of Appellant 40.) The court of appeals did not grant a certificate of appealability as to Teleguz's Issue II, but instead granted a certificate of appealability as to Issue I, relating to the failure to grant a *Schlup* evidentiary hearing, and Issue III, relating to ineffective assistance of counsel claims at the guilt phase. *Teleguz v. Kelly*, No.

11-9, Order (4th Cir. Feb. 8, 2012.)  Teleguz made no mention in Issue III of the Pennsylvania murder.[16]

In its opinion remanding the case for further consideration of the actual innocence claim, the court of appeals stated, "We also granted a certificate of appealability on Teleguz's guilt phase ineffective assistance of counsel claim. Because this claim may be more fully developed on remand, we have not addressed that claim and will, accordingly, reserve judgment." *Teleguz v. Pearson*, 689 F.3d at 327 n.1.  This clearly meant that if on remand, I found that Teleguz *had* shown a case of actual innocence, I could then proceed to decide on their merits those issues relating to guilt phase ineffective assistance of counsel asserted as his Issue III.  Of course, since I have determined that Teleguz has not shown his actual innocence, the court of appeals' direction in this regard does not apply.

---

[16]     Claim III provided three bases for ineffective assistance in the guilt phase: (1) trial counsel's failure to use a federal agent's representations that Safanov was a liar and would be unable to give credible testimony; (2) trial counsel's failure to rebut accounts of Teleguz's presence at the Everhart party; and (3) trial counsel's failure "to uncover and present readily available, powerful evidence pointing to Anatoly Rymarenko and Eugene Popov, not Teleguz, as responsible for the murder." (Br. of Appellant 55.)  It should be noted that Teleguz has never made a claim — and still does not — that his trial attorney was constitutionally ineffective in the guilt phase by asking Gilkes concerning his prior statement to investigators about the Ephrata murder. Instead, it has been asserted that the alleged ineffective assistance occurred at the sentencing phase, by failing to find and present evidence at that phase that Teleguz was not involved in any such murder.  It seems clear that the question was asked to try to impeach Gilkes by showing that he had made a false claim to police about Teleguz.  While doubtless a mistake, as hereafter discussed, it did not prejudice Teleguz.

Relying on *Martinez*, Teleguz now wishes to resurrect a portion of Issue II — the failure of defense counsel to show that there was no Ephrata murder.

A federal court sitting in habeas cannot consider a petitioner's procedurally defaulted claim "unless the prisoner can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law." *Coleman*, 501 U.S. at 750. Until *Martinez*, the ineffective assistance of counsel in state post-conviction proceedings could not serve as cause to excuse the procedural default of a claim. However, under the "narrow exception" elaborated in *Martinez*, the Supreme Court provided a habeas petitioner with a previously unavailable avenue to demonstrate such cause, as follows:

> Where, under state law, claims of ineffective assistance of trial counsel must be raised in an initial-review collateral proceeding, a procedural default will not bar a federal habeas court from hearing a substantial claim of ineffective assistance at trial if, in the initial-review collateral proceeding, there was no counsel or counsel in that proceeding was ineffective.

132 S. Ct. at 1320. Ineffective assistance of counsel claims in Virginia fall within the *Martinez* holding, since they can only be raised in an initial-review collateral proceeding. *See Lentz v. Commonwealth*, 544 S.E.2d 299, 304 (Va. 2001).

The Warden contends that "[t]he *Martinez* argument is beyond the scope of the hearing and the remand" and thus is not properly before this court. (Resp't's Post-Hr'g Br. 43.) *Martinez* was decided by the Supreme Court on March 20,

2012, prior to oral argument in Teleguz's appeal to the Fourth Circuit, but was not raised there nor mentioned in the court's decision.

In response, Teleguz contends that because the court of appeals did not expressly forbid me from entertaining other issues, I am free to do so. (Pet'r's Reply Br. 22-23.) At the hearing before me, counsel for Teleguz indicated that the petitioner wished to present evidence relevant to the holding of the "new case" of *Martinez* (Hr'g Tr. 7, Nov. 12, 2013) and while I initially expressed reluctance in that regard, I eventually did allow the petitioner to present such evidence. It came in the form of the testimony of Jennifer Givens, one of Teleguz's attorneys in his state habeas proceedings. In summary, Givens testified that she could not explain why she and his other state habeas attorneys had not investigated whether Teleguz had been involved in a murder in Ephrata; that the issue had been simply overlooked.

Contrary to Teleguz's argument, I think the consideration of this new issue does implicate the so-called mandate rule, a "more powerful version of the law of the case doctrine." *Invention Submission Corp. v. Dudas,* 413 F.3d 411, 414 (4th Cir. 2005). The mandate rule restricts a district court on remand from considering any issue decided by the court of appeals as well as "any issue that could have been but was not raised on appeal." *Doe v. Chao*, 511 F.3d 461, 465 (4th Cir.

2007) (internal quotation marks and citation omitted). Here, the court of appeals declined to grant a certificate of appealability as to the Ephrata murder claim.

Nevertheless, in order to prevent any possible injustice,[17] I will consider Teleguz's argument that *Martinez* allows a gateway to the otherwise defaulted claim that his trial counsel was constitutionally deficient in failing to present evidence about the Ephrata murder.

Under *Martinez*, the petitioner must make two showings to demonstrate cause and prejudice sufficient to excuse the procedural default. First, to establish "cause," the petitioner must show that his counsel in state habeas proceedings was ineffective under the two-prong test announced in *Strickland v. Washington*, 466 U.S. 668 (1984). Second, to demonstrate "prejudice," the petitioner must make "only a showing that the trial-level ineffective assistance of counsel claim was 'substantial.'" *Clabourne v. Ryan*, 745 F.3d 362, 377 (9th Cir. 2014).

*Strickland* requires the petitioner to satisfy two prongs. "First, the defendant must show that counsel's performance was deficient. . . . Second, the defendant must show that the deficient performance prejudiced the defense."

---

[17]    In its opinion remanding this case, the court of appeals expressly directed me to "consider the 'heightened need for fairness in the administration of death[,] . . . born of the appreciation that death truly is different from all other punishments a society inflicts upon its citizens.'" *Teleguz v. Pearson*, 689 F.3d at 331 (quoting *Callins v. Collins*, 510 U.S. 1141, 1149 (1994) (Blackmun, J., dissenting from denial of certiorari)). One recognized exception to the mandate rule is to correct a serious injustice. *See Chao*, 511 F.3d at 467. No explanation has been given as why *Martinez* was not argued to the Fourth Circuit by Teleguz's counsel as an alternative gateway claim.

-54-

*Strickland*, 466 U.S. at 687. Teleguz contends that his state habeas counsel was deficient, insofar as they failed to investigate and raise the penalty-phase ineffective assistance of trial counsel claim as it related to the Ephrata murder allegations. Because I find that the underlying claim was not substantial, I also find that the error of state habeas counsel was not prejudicial.

To establish deficiency, the petitioner must show that "counsel's representation fell below an objective standard of reasonableness." *Strickland*, 466 U.S. at 688. In evaluating the performance of the petitioner's counsel, I must "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance," *id.* at 689, and "the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" *Id.* "*Strickland* does not guarantee perfect representation, only a reasonably competent attorney." *Harrington v. Richter*, 131 S. Ct. 770, 791 (2011) (internal quotation marks and citations omitted).

As noted, state habeas counsel Jennifer Givens testified at the evidentiary hearing that no one from the petitioner's team had investigated the allegations surrounding the Ephrata Recreation Center. She lamented, "We clearly missed this issue, and I can't figure out how or why." (Hr'g Tr. 20:20-21, Nov. 14, 2013.) She admitted that state habeas counsel's failure to investigate the allegations and raise a claim had no strategic or tactical basis. However, she declined to call the

state habeas representation deficient and testified that she had "pursued the claims that [she] spotted in the record." (Hr'g Tr. at 25:14-15, Nov. 14, 2013.) Even assuming that state habeas counsel did not provide reasonable professional assistance, I find that the error was not so prejudicial as to create a reasonable likelihood that the outcome of the case would have otherwise been different.

To establish prejudice, "*Strickland* asks whether it is 'reasonably likely' the result would have been different." *Harrington*, 131 S. Ct. at 792 (quoting *Strickland*, 466 U.S. at 696). In other words, "the difference between *Strickland*'s prejudice standard and a more-probable-than-not standard is slight and matters only in the rarest case." *Id.* (internal quotation marks and citation omitted). In *Clabourne*, the Ninth Circuit noted that there is "overlap between the two [*Martinez*] requirements," 745 F.3d at 377, and as in that case,

> [d]etermining whether the result of the post-conviction proceedings would have been different will require consideration of the underlying claim of ineffective assistance by . . . counsel and the questions of (a) whether . . . counsel performed deficiently, and (b) whether there was a reasonable probability that, absent deficient performance . . . , the result of the . . . proceedings would have been different.

*Id.* at 382. Thus, the facts that bear on the *Strickland* prejudice analysis and the *Martinez* substantiality analysis will be largely the same.

Much of the Ephrata murder argument is founded on a misconception of the evidence. Of course, while an investigative report stated that Gilkes claimed to have witnessed a person being shot by a companion of Teleguz at the recreation

center in Ephrata over a drug deal after which Teleguz told the group present, "'Tell your boys we'll be back for the other two'" (Resp't's Ex. 2 ¶ 17), at trial Gilkes denied making such a statement and claimed only that Teleguz had been present at the recreation center when a companion made a threat and that a murder later occurred elsewhere. Teleguz thus incorrectly claimed, in his Amended Petition, that "Gilkes also told jurors that Teleguz was responsible for a murder in Pennsylvania," (Am. Pet. 58) and now argues that "[e]vidence that a capital defendant was responsible for a prior murder is 'the most powerful imaginable aggravating evidence.'" (Pet'r's Post-Hr'g Br. 85 (quoting *Wong v. Belmontes*, 558 U.S. 15, 28 (2009).)

At the evidentiary hearing, attorney Givens appeared remorseful about what she perceived as a devastating oversight. Givens opined that she would be "hard pressed to come up with a worse [mistake] than this because evidence that my client would have been involved in another alleged murder that was presented at the guilt and the penalty phase of a capital murder trial was unbelievably prejudicial." (Hr'g Tr. 20:24-21:3, Nov. 14, 2013.) However, she could not actually recall Gilkes' trial testimony concerning the Ephrata murder allegations.

During oral argument from the court of appeals, a question from the court indicated a similar misconception of this evidence. (Oral argument at 30:32, *Teleguz v. Pearson*, No. 11-9 (May 16, 2012), *available at*

http://www.ca4.uscourts.gov/oral-argument ("Do you think it's not negligent for a lawyer to put before a jury in a capital case evidence that his client committed an uncharged murder in another jurisdiction?").) This misunderstanding was repeated in the court's subsequent opinion. *Teleguz v. Pearson*, 689 F.3d at 326 ("According to Gilkes, Teleguz had shot a Russian criminal in the street outside the Ephrata Recreation Center.").

The omission of a guilt-phase claim based upon the Ephrata murder allegations — by both state and federal habeas counsel — is understandable given the fact that, at most, the evidence before the jury demonstrated that Teleguz was present when another individual threatened to murder someone at the Ephrata Recreation Center, and a murder did occur in the following week. At no point was it alleged that Teleguz was responsible for another murder. It was otherwise clear to the jury that Teleguz kept disreputable company, and that he accompanied an individual who would make such a threat would likely come as no surprise. Given Gilkes' and Hetrick's testimony tying Teleguz to the Russian Mafia, the introduction of Teleguz's federal gun trafficking convictions, and his obvious associations with convicted criminals, the actual content of Gilkes' testimony concerning the Ephrata Recreation Center was minimally prejudicial.

While the introduction of the alleged murder certainly did not aid the petitioner, it is not so prejudicial that the outcome of the trial or the sentence would

have been different. The allegations do not bear on the murder-for-hire scheme itself and their single mention in the penalty phase was in conjunction with other evidence in support of a finding of future dangerousness. In addition, the jury found that the Commonwealth had demonstrated beyond a reasonable doubt an alternative aggravating factor, vileness, in their recommendation of a sentence of death. (J.A. at 3532.)

Furthermore, trial counsel's failure to investigate the allegations was not unreasonable, given that Gilkes never accused Teleguz of actually committing an uncharged murder, and even more, any investigation would likely have been unhelpful to the petitioner's defense. Although it has been established that a murder as described by Gilkes did not occur, there are multiple statements that reveal contemporaneous rumors that Teleguz had supplied a gun used in the Belyy murder. Indeed, in his second affidavit, Gilkes did not admit that he had fabricated the allegations but that "Gene Popov told [him] that Teleguz was involved in the rec center shooting." (Pet'r's Ex. 34 ¶ 8.)

The petitioner argues that if his trial counsel or state habeas counsel had investigated the allegations of a murder in Ephrata, "there is no question that they would have found a similar and utter lack of evidence." (Pet'r's Post-Hr'g Br. 87.) As discussed above, however, an investigation would only have led to the weaker conclusion that Gilkes' account at trial was likely based upon a rumor that Teleguz

-59-

was complicit in the Belyy murder. For these reasons, the performance of Teleguz's counsel at trial was not so deficient as to fall below the wide range of reasonable professional assistance.

For the same reasons, the second *Martinez* requirement, demanding a showing that the ineffective assistance of trial counsel claim is "substantial," has not been satisfied. As such, Teleguz's request for relief under *Martinez* is denied.

I will also deny the petitioner's request for additional discovery related to this claim. It is certainly true that the equitable relief created by *Martinez* would be hollow if a petitioner's only opportunity to develop a record of ineffectiveness was in the very proceedings in which the ineffective counsel represented him. However, the evidentiary hearing before me generated a substantial record on the veracity of the Ephrata murder allegations and on the failure of both trial counsel and state habeas counsel to investigate and rebut these allegations. Further discovery will not aid in the evaluation.

## VI. *NAPUE* CLAIM.

This court previously found that Teleguz's claims arising under *Napue v. Illinois*, 360 U.S. 264 (1959), were procedurally defaulted and that the petitioner had not established cause to excuse the default. However, the petitioner now contends that "new evidence," in the form of Detective Donald Brown's testimony,

excuses procedural default as it applies to the Ephrata murder portion of his *Napue* claim. He argues that the new evidence establishes cause for his failure to raise the evidence previously, insofar as its delayed discovery is the result of "the State's suppression of the relevant evidence." *Banks v. Dretke*, 540 U.S. 668, 691 (2004). However, there is no evidence that the Commonwealth was aware of Brown's investigation.

At the evidentiary hearing, Brown testified that he "called down to Ephrata to ask has there been a murder at the Ephrata Recreation Center. . . . Their response was no." (Hr'g Tr. 165:4-7, Nov. 13, 2013.) He could not recall with whom he talked or what office he called. Brown mentioned his findings to Richard Winfield, the case agent for the illegal firearms trafficking investigation in Massachusetts, but did not recall reporting the information to anyone else other than his partner. He was under the impression that his report was forwarded to prosecutors involved in the Teleguz case because Winfield "had a working relationship with the prosecutors in Virginia." (Hr'g Tr. 163:8-9, Nov. 13, 2013.) The petitioner asks the court to make the inferential leap that, because of this "working relationship," Winfield must have provided Brown's findings to Garst or her office. This testimony is simply insufficient to establish that the Commonwealth knew of, much less suppressed, information refuting the Ephrata murder allegations. Garst testified at the evidentiary hearing that she was always

under the impression at trial that Gilkes was testifying truthfully and had no information to the contrary. I find her statement credible.

For the same reasons, the petitioner's *Napue* claim would fail even if he were to overcome procedural default. In *Napue v. Illinois*, the Supreme Court reaffirmed the principle that "a State may not knowingly use false evidence, including false testimony, to obtain a tainted conviction." 360 U.S. at 269. A *Napue* claim requires a showing of both (1) the falsity and materiality of the testimony and (2) the prosecutor's knowledge of the falsity. *Basden v. Lee*, 290 F.3d 602, 614 (4th Cir. 2002). As discussed, there is an insufficient showing of the prosecutor's knowledge of the falsity of Gilkes' testimony to justify further consideration of this claim.

## VII. CONCLUSION.

For the foregoing reasons, I must reject the arguments made on behalf of Teleguz. The Amended Petition for a Writ of Habeas Corpus will again be denied. A separate order will be entered forthwith.

DATED: July 17, 2014

/s/ James P. Jones
United States District Judge